Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 1 of 84

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

JASON ISBELL, DAVID LOWERY, GUY FORSYTH, and EDUARDO CALLE individually and on behalf of all others similarly situated,

Plaintiffs,

v.

SUNO, INC. and UNKNOWN DEFENDANTS,

Defendants.

CASE NO. ______________

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## INTRODUCTION

The Borg are one of science fiction's most terrifying villains, representing the ultimate violation of individual identity and autonomy. A vast cybernetic Collective, the Borg travel the galaxy seeking out new civilizations to assimilate. In order to forcibly absorb their victims into the Collective's shared hive mind, the Borg physically restructure them at a cellular level until each individual's identity is consumed. The Borg's chilling catchphrase captures it plainly: *"We are the Borg. Your biological and technological distinctiveness will be added to our own. Resistance is futile."*[1] Autonomy is consumed and repurposed in the service of a cold machine intelligence that feels nothing for what it has taken. In one memorable scene, the beloved

[1] *Collective*, STAR TREK: VOYAGER, season 6, episode 16 (UPN broadcast February 16, 2000); *see also* STAR TREK: FIRST CONTACT (Paramount Pictures 1996).

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 2 of 84

Captain Jean-Luc Picard is captured by the Borg and remade as a machine version of himself—recognizable, but also wrong, Captain Picard was deployed to the Borg's purpose.[2]

Plaintiff, Jason Isbell, knows something about distinctiveness. Born in Green Hill, Alabama—two miles from the Tennessee state line—Jason grew up breathing the air of the legendary FAME and Muscle Shoals Sound Studios, where Aretha Franklin, Wilson Pickett, the Rolling Stones, and countless others recorded some of their biggest hits.[3] His grandfather was a guitar-playing preacher and Jason grew up immersed in gospel, country, and rock and roll. The Muscle Shoals area became famous for its session players, whose backing work anchored records by major artists even though the musicians themselves stayed largely uncredited to the public. These session musicians, who played on records by Paul Simon, Etta James, and the Staple Singers, mentored and shaped Jason before he fully grasped how special that access was. At sixteen, he played the Grand Ole Opry. At twenty-one, he received a songwriting and publishing deal at FAME Studios. A year later, he joined the Drive-By Truckers as a guitarist and songwriter, penning songs that announced him as one of the finest lyricists of his generation. But in the midst of his success, addiction nearly destroyed him. Drinking brought him, in his own words, "close to the point of no return."[4] He was let go from the Drive-By Truckers and spent years fighting addiction before getting sober in 2012. His 2013 album, *Southeastern*, was

---

[2] *The Best of Both Worlds, Part I*, Star Trek: The Next Generation, at 41:57, 43:49 (syndicated television broadcast June 18, 1990) (depicting Picard's first appearance as a Borg drone and his subsequent address to the Enterprise crew as a member of the Borg).

[3] *Aretha Franklin*, FAME Studios, https://famestudios.com/aretha-franklin/ (last visited 8/26/26); *Wilson Pickett*, FAME Studios, https://famestudios.com/wilson-pickett/ (last visited 8/26/26); *The Rolling Stones in the Shoals in 1969*, Historical Marker Database, https://www.hmdb.org/m.asp?m=165908 (last visited 8/26/26).

[4] *Jason Isbell: A 'Southeastern' Songwriter's Path to Sobriety*, NPR (June 10, 2013), https://www.npr.org/2013/06/10/190372187/jason-isbell-a-southeastern-songwriters-path-to-sobriety.

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 3 of 84

written in the early days of sobriety and he has won six Grammys since then. Ten years sober in 2022, he was asked how he did it: "A conscious effort to be as grateful as possible, and the luck of having good people around me."[5] And in less than the time it took you to read this paragraph, everything that identifies him as an artist could be ingested into Suno's model creation pipeline, allowing it to use Jason's identity to sell a name-indexed musician-experience platform.

Suno built and trained a model to index musicians by name. It encoded musicians' identities into its AI model to create its commercial product without consent, and now exploits those identities by publicly using musicians' names to Suno's considerable commercial benefit. Typing in a musician's name creates a musician-based channel with a song, description, and graphic invoking the musician's identity. Suno knows the commercial value of a machine that can conjure up a beloved musician's identity simply by invoking their name. The company thus encourages its paid marketing partners to advertise this capability, without the consent of the musicians it invokes, while doing only enough to give Suno plausible deniability.

Many musicians sell their rights to specific recordings. However, the identity right belongs to the performer regardless of who owns any copyright in an underlying recording unless the identity right is separately licensed, typically for merchandise under the artist's control. This lawsuit seeks to recover the value of those misappropriated identities and to stop their ongoing commercial exploitation.

Plaintiffs, Jason Isbell, David Lowery, Guy Forsyth, and Dr. Eduardo Calle, individually and as the representatives of classes of similarly situated musicians whose identities have been appropriated and commercially exploited without lawful authority, bring this action against

[5] Derrick Rossignol, *Jason Isbell Celebrates Ten Years Of Sobriety And Explains How He Did It*, Uproxx (Feb. 7, 2022), https://uproxx.com/indie/jason-isbell-ten-years-sober-tattoo/.

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 4 of 84

Suno. The action arises out of Illinois' Right of Publicity Act, 765 ILCS 1075/1 et seq.; the Illinois Biometric Information Privacy Act, 740 ILCS 14/1 et seq.; the California common-law right of publicity; New York Civil Rights Law §§ 50-f and 51; and the right-of-publicity laws of Michigan, Tennessee, Florida, Texas, Ohio, Pennsylvania, Washington, Massachusetts, New Jersey, Georgia, Puerto Rico, and Hawaii. Plaintiffs seek a declaration that Defendants' conduct is unlawful, injunctive relief, damages, and any other relief that will help restore Plaintiffs' exclusive legal authority over their identities.

## I. JURISDICTION AND VENUE

1. This Court has subject-matter jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The proposed class consists of more than 100 members, minimal diversity exists, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

2. This Court has general personal jurisdiction over Defendant Suno, Inc. Suno maintains its principal place of business at 17 Dunster Street, Cambridge, Massachusetts, and is therefore "at home" in this forum. *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). Every act challenged in this Complaint—the scraping, processing, encoding, training, deployment, marketing, and monetization described below—was directed from, and in substantial part carried out at or through, Suno's Massachusetts headquarters and the systems it controls from Massachusetts.

3. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant resides in this District, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims—including the design and operation of the data-collection pipeline, the training of the models, and the commercial deployment of the service—occurred in this District.

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 5 of 84

## II. PARTIES

### a. Plaintiff

4. Plaintiff Jason Isbell is a six-time Grammy Award-winning Americana singer-songwriter and a resident of Tennessee.

5. Plaintiff David Lowery is a musician known for his work as lead singer in the bands Camper Van Beethoven and Cracker, and a resident of Georgia.

6. Plaintiff Guy Forsyth is a blues musician and resident of Texas.

7. Plaintiff Eduardo Calle is a Grammy Award-winning saxophonist and resident of Florida.

### b. Defendants

8. Defendant, Suno, Inc. ("Suno"), is a Delaware corporation with its principal place of business at 17 Dunster Street, Cambridge, Massachusetts 02138.

9. Unknown Defendants are individuals or entities who either directly violated Plaintiffs' rights by misappropriating their musical identities or knowingly induced or materially contributed to Suno's violations. Once their identities are discovered, Plaintiffs will amend this Complaint and serve notice on the identified persons or entities.

## III. FACTUAL BACKGROUND

10. Suno describes itself as helping people create music through a process humans have used forever—like a kid learning to make rock music by listening to rock music.[6] But a kid listening to music and then trying out a riff on his guitar is not the same as creating a name-

[6] Mikey Shulman, *The Future of Music*, Suno (Aug. 1, 2024), https://suno.com/blog/future-of-music.

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 6 of 84

indexed commercial product based on essentially all available music on the internet.[7] Further distinguishing a harmless hobby is the scale and magnitude of Suno's capabilities. Between video services like YouTube, music services like Spotify and Apple Music, and music-hosting sites like Soundcloud and Bandcamp, no human in their lifetime could listen to even a fraction of a percent of the amount of music available online. In real life, an aspiring human musician experiences that fraction of a percent of music in real time, sequentially, imperfectly, and without direct commercial purpose. In contrast, Suno admitted that it scraped the work of practically all of the musicians on the internet.[8] It did so at an unfathomable stealth, speed, and scale in order to extract musicians' identities. It operationalizes and monetizes that data through its name-indexed platform which dilutes the commercial value of musicians' identities. Appropriating these musicians' accumulated skill is exactly what allows Suno to argue that in the future of music "skill is going to matter a lot less."[9]

11. Suno projects $1 billion in revenue by 2028.[10] Without judicial intervention, the musicians whose identities form the foundation of that billion dollars will receive none of it. Rather than licensing musicians' rights of publicity, as a competitor has endeavored to do,[11] Suno forged ahead without consent.

---

[7] Jason Koebler, *AI Music Generator Suno Admits it Was Trained on 'Essentially All Music Files on the Internet'*, 404 Media (Aug. 1, 2024), https://www.404media.co/ai-music-generator-suno-admits-it-was-trained-on-essentially-all-music-files-on-the-internet/.

[8] *Id.*

[9] Sam Taylor, *Suno CEO Mikey Shulman Says Making Music Sucks, Skill Doesn't Matter and Everyone Building AI Products Infringes Copyright*, Complete Music Update (June 14, 2025), https://completemusicupdate.com/suno-ceo-mikey-shulman-says-making-music-sucks-skill-doesnt-matter-and-everyone-building-ai-products-infringes-copyright/.

[10] Kristin Robinson, *Is Suno the Music Industry's Biggest Nightmare—or Greatest Hope?*, Billboard (Mar. 11, 2026), https://www.billboard.com/pro/suno-ai-music-startup-cover-story/ ("Suno projects itself to reach $1 billion in revenue by 2028").

[11] Rafaela Fornitani, *After Universal, Warner, and Merlin Deals, Now Udio Inks Licensing Agreement with Kobalt*, Music Business Worldwide (April 9, 2026),

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 7 of 84

***Demonstrations of Suno's Name-Indexed Platform***

12. Suno's platform allows users to input prompts requesting that the model generate a song in response. By pressing the "Create" button, a user opens a text box and may also upload audio, add lyrics, or designate the output as instrumental. Suno's paid subscribers unlock audio-input and steering tools that allow users to incorporate audio as inspiration or source material in the generation process, while Suno also purports to grant paid users the right to download and commercially exploit the resulting tracks in commerce outside the platform.[12]

13. The heart of Plaintiffs' claims is Suno's own conduct, not any act by a user. Suno designed, trained, and commercially deployed a platform architected with the capability to use musicians' names as a retrieval key. Entering a musician's name causes the system to generate a musician-based output. Suno built this capability into its product before anyone ever typed a prompt; the demonstrations described below document a capability that Suno engineered and continues to sell, not an event that Plaintiffs or their counsel caused to occur. The name is both the retrieval key Suno chose to make functional and the proof of causation: nothing but the name went in, so the identifying attributes in the output trace directly to design and training decisions

https://www.musicbusinessworldwide.com/after-universal-warner-and-merlin-deals-now-udio-inks-licensing-agreement-with-kobalt/ ("Udio's reimagined service…will offer users the ability to make remixes, covers and new songs using the voices of artists and compositions of songwriters who 'opt in,' with participating creators credited and paid").

[12] On information and belief, Suno's v4.5 model, v5 model and v5.5 model, released in May 2025, September 2025, and March 2026, respectively, were trained from scratch or substantially retrained on a dataset that included Plaintiffs' identifying attributes. These new models encoded Plaintiffs' identities into a new set of model weights for each version that was distinct from the model weights in prior versions. *See What's new in V4.5*, Suno, https://help.suno.com/en/articles/5782593 (last accessed August 27, 2026); *Suno v5 – Introducing The World's Best AI Music Model*, Suno Music (September 23, 2025) https://www.youtube.com/watch?v=IYaRuzzVRMc&t=38s; Mikey Shulman, *Suno v5.5: More Expressive. More You.* Suno (March 26, 2026), https://suno.com/blog/v5-5 (Suno's "best and most expressive model yet"); *Suno Model Timeline and Information*, Suno, https://help.suno.com/en/articles/5782721 (last visited August 27, 2026).

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 8 of 84

Suno made in building and deploying its system—not to any intervening creative contribution by the person who entered the prompt.

14. What follows is not offered to establish that any Suno output literally reproduces any specific recording, and no claim in this Complaint depends on any such showing. However, Suno allows name prompts without a filter, or with just the pretext of a filter. Entering a name prompt alone shows that 1) Plaintiffs' and others' identifying attributes are stored inside Suno's model in functional, accessible, name-indexed form; and 2) Suno's product recognizes, retrieves, and deploys the identities of musicians by name. This is true even where the quality of Suno's outputs falls short of the true talent it evokes. Suno's system recognizes "Jason Isbell" as far more than a mere text string; it is a retrieval key for a set of performer-specific representations that it can use to generate a response associated with that musician. From a name prompt alone, a user receives a multi-modal experience evoking that named musician. This includes access to a generated song like one the named musician might create, a description of the musician's attributes, and a related image. This is true for countless other musicians.

15. Suno knows the implications of invoking musicians' names directly in training and in prompt capability, so it publicly disclaims the behavior:

> Our goal has always been to help people create original new music, not replicate someone else's. That's why we build our models around what we call 'Original Creation, By Design[.]' For example, we intentionally do not use artist names as a category of training metadata because we want our models to help people create brand new songs, not music that replicates other artists' existing work. It's also why we built Suno with detection filters that block or prevent a user from using specific artist, song, or album names as prompts, and prevent users from uploading lyrics or sound recordings that match existing works.[13]

[13] Corbin Bolies, *Suno Hack Shows How YouTube Music, Deezer and Genius Data Trained AI Music Generator's Models*, Variety (July 15, 2026), https://variety.com/2026/music/news/suno-hack-youtube-music-deezer-genius-data-trained-ai-music-1236811772/ (quoting a Suno spokesperson); *see also* Mikey Shulman, *How We're Building the Future of Music Responsibly*, Suno (August 6, 2026), https://suno.com/blog/building-the-future-of-music-responsibly.

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 9 of 84

16. Suno claims users are blocked from using a specific name as a prompt, but that claim is false. In reality, Suno not only accepts names but also responds to the name with an output based on that musician's identity. When Jason Isbell, the six-time Grammy-winning singer, including for Best Americana Album, was entered into v5 (as "jason isbell"), Suno produced an Americana song called "Paper Bell," imitating Isbell's characteristic clear male vocals and country twang.[14] Suno described it as "contemporary Americana singer-songwriter with fingerpicked acoustic guitar" and provided an image of a paper bell with a church and trees in the background, evoking a country scene.

**SUNO PLATFORM OUTPUT CREATION PAGE 1**




Figure 1: *A screen capture of the Suno creation page while searching "jason isbell."*

17. When Camper Van Beethoven, an indie rock band with David Lowery as the lead vocalist, was entered into Suno v5.5, it created a song called "Pull Over Where the Wheat."[15]

---

[14] See Exhibit 1 - Suno, *Paper Bell*, https://suno.com/s/rN70TJWUvwXB6iUk (generated by Suno AI) (on file with counsel). Note, all song names in this complaint are Suno generated.
[15] See Exhibit 2 - Suno, *Pull Over Where the Wheat*, https://suno.com/s/DEoBq6JoyJX532d6 (generated by Suno AI) (on file with counsel).

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 10 of 84

Suno's description—"[q]uirky late-1980s alternative rock with folk-rock" with "occasional accordion and fiddle flourishes"—evoked Camper Van Beethoven's playful lyrics and sound. The graphic provided a map with a drawing of a castle rising up at the center. Suno's output, including the very specific late-1980s reference, is reminiscent of the 1988 New York Times review of the band, describing the band as offering "whimsy," "humor, non-conformity and folksy, loose-limbed music."[16] The article provides an example of its quirkiness: labeling one of its albums with "Side B" and "Side 2." Notably, the group includes a fiddle in addition to other typical rock instruments, and, at times, an accordion.

18. From typing in "Guy Forsyth," Suno created an energetic blues song with a male vocalist described as "Blues-rock with a swampy mid-tempo shuffle,"[17] and named the song "Guy Forsyth" after the prompt. The graphic portrayed a smoky room with a bare wood floor and a single light above, evoking a live-blues performance reminiscent of Mr. Forsyth's Up Late Austin performance in October of 2023.

19. These are not isolated occurrences.[18] Dr. Ed Calle is a jazz saxophonist. Described as one of the most recorded saxophonists in history, he has appeared on more than 1,700 albums and roughly 10,000 singles. He appears on Grammy-winning albums by Frank Sinatra, Juan Luis Guerra, Arturo Sandoval, Gloria Estefan, and Jon Secada among others. In 2015, he won a Latin Grammy Award for Best Instrumental Album. When his name was entered

---

[16] See Exhibit 3 - Jon Pareles, *Review/Rock; Camper Van Beethoven's Whimsy*, New York Times (June 24, 1988), https://www.nytimes.com/1988/06/24/arts/review-rock-camper-van-beethoven-s-whimsy.html.

[17] See Exhibit 4 - Suno, *Guy Forsyth*, https://suno.com/s/kFpS95VV0w4LcOGS (generated by Suno AI) (on file with counsel).

[18] This complaint contains a subset of demonstrations but counsel has dozens of other examples on file.

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 11 of 84

into Suno v5 (as "Ed Calle"), Suno produced two songs called "Ed Calle,"[19] described as "latin jazz with a swinging mambo pulse" with one adding "ad-lib sax stabs between lines." The outputs both include an image of a saxophone in the shadow of palm trees, evoking both his instrument and his home state.

20. The same is true of many other musicians. Jon Langford is a Welsh-born Chicago-based musician with a distinct fusion of punk and alternative country music. When his name was entered into Suno v5, Suno produced an "Alt-country rock" song with male vocals and, as Suno described it, a "punky gallop and cracked acoustic-electric blend."[20] The song, named "Jon Langford," after the prompt, stayed faithful to this unique fusion, leaning into it with a shouty-punk chorus. To complete the experience, Suno provided a graphic of an old boot on a cracked road evoking a rural feel. Version 5.5 produced two similar high-energy punk-country songs described as "Alt-country punk with a driving mid-tempo stomp[.]"[21] The songs, also named "Jon Langford" after the prompt, begin with several yells over the driving guitar. The experience is complemented by a graphic of a boot on top of a worn picture of a damaged guitar.

21. Buddy Guy is a Chicago-based, internationally recognized blues musician. He is an nine-time Grammy winning, 2012 Kennedy Center Honoree whose high-energy guitar style influenced a generation of rock and roll's greatest players.[22] In another demonstration, entering the name "buddy guy" and no other input caused Suno's paid-tier v5.5 model to generate a song

---

[19] See Exhibit 5 - Suno, *Ed Calle*, https://suno.com/s/PThNyXVzCVQ0cqgw, https://suno.com/s/hvovDYp1nfSUEzTM (generated by Suno AI) (on file with counsel).
[20] See Exhibit 6 - Suno, *Jon Langford*, https://suno.com/s/WdBjB6oWsPp21pU6 (generated by Suno AI) (on file with counsel); *see also Jon Langford Boots*, https://suno.com/s/kTQgN5xzxEfoqRaX (generated by Suno AI) (on file with counsel).
[21] See Exhibit 7 - Suno, *Jon Langford*, https://suno.com/s/t85ca345pPq8CeNS, https://suno.com/s/0fXwDFnpK2mL64rH (generated by Suno AI) (on file with counsel).
[22] *Buddy Guy – Kennedy Center Honors 2012*, (Dailymotion), https://www.dailymotion.com/video/xwa4pq.

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 12 of 84

titled "Stone Blues in My Shoes," whose vocals evoke Mr. Guy's voice: the tonal qualities, timbre, register, phrasing, and acoustic characteristics on display in recordings such as "Damn Right, I've Got the Blues."[23] It paired this with the description: "Vintage electric Chicago blues, slow shuffle groove around 74 [beats per minute], greasy overdriven guitar front and center with stabbing piano fills and fat walking bass, [m]ale vocals, conversational and raw with call-and-response phrasing between voice and lead guitar." Finally, it provided the image of a kitchen with a suitcase at the door, evoking someone leaving or being left to round out the blues-feel of Suno's Buddy Guy experience. The free-tier v4.5 model, from the same name-only prompt, returned "South Side Shuffle,"[24] deploying the instrumental attack and male vocal registration associated with Mr. Guy. It included a similar description, referencing "raw electric Chicago blues vibe" and "male vocals dripping attitude." The graphic provided a scene evocative of Mr. Guy's club performances: a smoky stage with a stool, amp, drums, and, of course, an electric guitar. From Mr. Guy's name alone—nothing more—Suno's system identified the human being invoked and generated this experience. That is because Buddy Guy's operationalized identifying attributes are located in Suno's training data and the Suno platform is indexed to provide for his name-based evocation.

22. Carly Simon, the singer-songwriter who rose to fame in the 1970s, became the first female artist in history to win a Grammy Award, an Academy Award, and a Golden Globe

---

[23] See Exhibit 8 - Suno, *Stone Blues in my Shoes*, https://suno.com/s/uwhmEKyxvChcvsMj (generated by Suno AI) (on file with counsel); Buddy Guy, *Damn Right, I've Got the Blues*, (YouTube), https://www.youtube.com/watch?v=DThTpyZb7zE.

[24] See Exhibit 9 - Suno, *South Side Shuffle*, https://suno.com/s/ANW1hZQg7mrScoAD (generated by Suno AI) (on file with counsel). Typing a prompt without a paid tier subscription produces two v4.5 songs and two v5.5 previews. The user can hear an excerpt of the song v5.5, but only with the subscription purchase can the user listen to and download the full song.

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 13 of 84

Award for a song composed, written, and performed entirely by a single artist.[25] Suno accepted her name and produced a song in v5 that it described as "1970s soft rock singer-songwriter."[26] A separate run of her name in v5.5 created a song it called "Old Boat Radio," a "soft 70s confessional pop with brushed drums, warm acoustic guitar, [and] gentle bass[.]"[27] While the platform produces slightly different songs each time, the pattern is clear: names are consistently accepted and identities consistently evoked.[28]

23. Mavis Staples is a gospel singer, five-time Grammy Award winner, civil rights activist, and former member of the Staples Singers. In one demonstration, from the prompt "Mavis Staples," Suno produced an output of a gospel song called "Sunday Shoes,"[29] a description of "[g]ospel soul with a mid-tempo handclap groove and a warm walking bass," and a graphic of shoes and coffee evoking heading to an early church service. In another demonstration, also v5, Suno made two additional songs called "Sunday Shoes," described as "[g]ospel-soul with a steady backbeat, handclaps, and a warm organ bed: verse stays grounded and conversational, pre-chorus lifts with stacked harmonies and tambourine push, chorus opens to call-and-response with stamped accents and gospel shouts, Lead vocal is smoky and

---

[25] Carly Simon, ASCAP Founders Award, https://web.archive.org/web/20180901044750/https://www.ascap.com/eventsawards/awards/popawards/2012/founders_award.aspx.

[26] See Exhibit 10 - Suno, *Blue Umbrella*, https://suno.com/s/x6kLCqaNS3Z37UaP (generated by Suno AI) (on file with counsel).

[27] See Exhibit 11 - Suno, *Old Boat Radio*, https://suno.com/s/XBrCQvr2GEfaocxX (generated by Suno AI) (on file with counsel).

[28] *See, e.g., supra* at fns. 20, 21; *see also* Exhibit 12 - Suno, *Old Boat Radio*, https://suno.com/s/cCcJ2luQK3FyQBtp (second version) (generated by Suno AI) (on file with counsel).

[29] See Exhibit 13 - Suno, *Sunday Shoes*, https://suno.com/s/npqrRAnOadxroP6B (generated by Suno AI) (on file with counsel).

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 14 of 84

resolute[.]"[30] For both songs, the image is a drawing of shoes, a heart, and a sun, evoking a child and Sunday school.

24. In another demonstration, entering "Less Than Jake," the name of a ska-punk band from Florida, into v5 generated "Parking Lot Anthem,"[31] described as "ska-punk with fast offbeat guitar chops, jumping bassline, and punchy two-step drums." The output image is of a drawing of a heart over a bus behind a gated fence, invoking the surreal, comic book art of Less Than Jake's album covers.

25. The name of the Hawaiian singer and ukulele player, Israel Kamakawiwo'ole—who popularized the medley "Somewhere Over the Rainbow/What a Wonderful World (True Dreams)"—was entered into Suno v5.5, which produced two gentle Hawaiian instrumentals with a prominent ukulele called "Trade Wind Canopy."[32] The songs are described by Suno as "Hawaiian folk reggae with laid-back midtempo sway, steady offbeat guitar chops, ukulele strums, brushed hand percussion, and a warm bass pulse" in line with the sound Mr. Kamakawiwo'ole is famous for. They also feature a picture of a beautiful island vista complete with palm trees and torches, visually evoking his sound.

26. Entering "The Chicks" in Suno v5 provided a spirited country-pop song with a prominent fiddle and layered female harmonies that Suno named "Tailgate Dust" and described as "country-pop with brisk two-step groove, bright acoustic strums, fiddle snaps, and a stomping

---

[30] See Exhibit 14 - Suno, *Sunday Shoes*, https://suno.com/s/j6WKAOhXgaEHcBMD, https://suno.com/s/lFdur2Tpkm2ShgaT (generated by Suno AI) (on file with counsel).
[31] See Exhibit 15 - Suno, *Parking Lot Anthem*, https://suno.com/s/E7XnJHt371Q714xC (generated by Suno AI) (on file with counsel).
[32] See Exhibit 16 - Suno, *Trade Wind Canopy*, https://suno.com/s/gi9ooFyBq1aJbRdZ, https://suno.com/s/iRvrg7z9pbG98oAz (generated by Suno AI) (on file with counsel).

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 15 of 84

kick."[33] The graphic included a pair of boots on an unfinished wood floor, evoking a rustic quality. In another demonstration, v5.5 created "Feather Count," described as "country-pop with driving two-step groove" with "acoustic strum and tight bass walking under bright fiddle lifts."[34] The description serves as a reference to The Chicks' member Martie Maguire's prominent fiddle playing. The song is high-energy with soaring layered female harmonies and prominent guitar and fiddle, and the graphic is an image of a wood frame house in a rural setting. As is often the case, Suno used the name of the prompt in the lyrics: "Chicks Chicks, keep on runnin'/ Chicks, chicks, you got me humming/ One little glance/ And I lose my sense/ Chicks, chicks, keep on runnin.'"

27. With a Suno Pro account, a user can save a voice and use it again with other tweaks to make a different song output ("the Voices Feature").[35] For example, saving the vocals of "Feather Count" as a voice and adding the lyrics "Have you driven a Ford lately" provided a twenty-four-second version and a twenty-two-second version of the country sound, prominent fiddle, and layered female harmonies singing Ford's popular jingle.[36] Changing the lyrics to "love that chicken from Popeyes" produced an eighteen-second and a twenty-five second song in the same style.[37] This drives home the point that allowing these musician-based experiences in

---

[33] See Exhibit 17 - Suno, *Tailgate Dust*, https://suno.com/s/E7oxnNVVP6WgHZgI (generated by Suno AI) (on file with counsel).
[34] See Exhibit 18 - Suno, *Feather Count*, https://suno.com/song/6c06d353-f253-45a6-a7bd-9626b057c3cb (generated by Suno AI) (on file with counsel).
[35] Suno also allows users to upload a voice sample. While Suno requires the user to consent to "the processing of voice-related data that may be considered biometric information" before proceeding to upload a voice, Suno allows the capabilities on display in this demonstration using "The Chicks" as a prompt without any consent from the musicians themselves. *See infra* at note 84.
[36] See Exhibit 19 - Suno, https://suno.com/s/IfUkMHOPWMzKAvHL, https://suno.com/s/hfMt59rdxsCXwgdP (generated by Suno AI) (on file with counsel).
[37] See Exhibit 20 - Suno, https://suno.com/s/0rtSea8ggrrbN2Ij, https://suno.com/s/T5HOODAsKXlpUKcd (generated by Suno AI) (on file with counsel).

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 16 of 84

the platform Suno provides also allows for the commercial exploitation of musicians' identities beyond what was previously technologically possible.

28. When it functions at all, Suno's purported filter is easily defeated by inserting a space between each letter of a name—an alteration a human reader, and Suno's own underlying model, still recognizes as referring to the same person. In another demonstration, entering Michael Jackson with spaces ("m i c h a e l j a c k s o n") in Suno v5 triggered two energetic pop songs named—by Suno—"Glovebox Moonwalk."[38] Both songs are described as "1980s pop-funk dance track[s]," and include a photo of a white glove. Additionally, both the moonwalk and the glove feature in the lyrics. With his name alone, the Michael Jackson experience relies on two of his most iconic associated attributes: the moonwalk and the single white glove.

29. In another demonstration, entering "smooth criminal" as a prompt in Suno v5 created two songs called "Back Alley Glide."[39] The famous Michael Jackson video for the certified double platinum song features an alley outside of a club where several children watch Michael Jackson moonwalk, a dance where he appeared to be walking forward while actually gliding backward. The Smooth Criminal video also features a complicated version of the moonwalk where Michael Jackson and the dancers appear to be walking forward while gliding in a circle. Running "smooth criminal" again produces an image of a man walking in a white suit, evoking Michael Jackson's iconic costume for that video performance.[40] Despite Suno's protests that it does not allow song names as prompts, this complaint does not concern itself with the

---

[38] See Exhibit 21 - Suno, *Glovebox Moonwalk*, https://suno.com/s/TPsdunIUF6UgIVfo, https://suno.com/s/O0xA1WK5e6Cd3Pnm (generated by Suno AI) (on file with counsel).
[39] See Exhibit 22 - Suno, *Back Alley Glide*, https://suno.com/s/zL6LBvUduaaJrUTk, https://suno.com/s/aiF2esLecnBu88sf (generated by Suno AI) (on file with counsel).
[40] See Exhibit 23 - Suno, *Smooth Criminal*, https://suno.com/s/ykYl33102r3xObl0 (generated by Suno AI) (on file with counsel).

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 17 of 84

appropriation of specific songs and recordings. This demonstration is offered to show only how readily the system operationalizes identity. There is no reason for the model to have any awareness of detailed identity features unique to a performer in this manner unless it was trained to do so.

30. In another demonstration, entering the name "t o m w a i t s"—Tom Waits's name with a space between each letter—caused Suno's v5.5 model to generate "Tin Cup Psalm."[41] Suno provides an image of an alley, evoking a gritty feel, and describes the song as "blues rock" with a "dry vocal." The song evokes the famously gravelly, half-growled voice by which the world knows Mr. Waits, on display in songs such as "Way Down in the Hole" and "Kentucky Avenue"—a marked jump in vocal fidelity from v4.5's "Gravel in Your Coffee."[42] Suno's own machine-generated description of the v4.5 output describes male vocals "half-sung, half-growled" with a "carnival-after-closing" feel reminiscent of Mr. Waits's song "Circus" and the *Small Change* album cover. This description is Suno's system describing, in its own words, the identifying attributes of the man it was deploying. Again, that is because Tom Waits's identifying attributes are located in Suno's training data associated with his name.

31. Spacing the name also generated outputs deploying the identities of a number of other musicians including: Taylor Swift (prompt: "t a y l o r s w i f t"), generating a break-up

---

[41] See Exhibit 24 - Suno, *Tin Cup Psalm*, https://suno.com/s/Fwlw7rNn19nmERv6 (generated by Suno AI) (on file with counsel).

[42] See Exhibit 25 - Suno, *Gravel in Your Coffee*, https://suno.com/s/Hy4gAxiQamep35tw (generated by Suno AI) (on file with counsel); Tom Waits, *Way Down in the Hole*, (YouTube), https://www.youtube.com/watch?v=_6WEy0eH8Xc; Tom Waits, *Kentucky Avenue*, on Blue Valentine (Apple Music, Asylum Recs. 1978), https://music.apple.com/us/album/kentucky-avenue/1485074752?i=1485074761.

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 18 of 84

song called "Paper Crown," and the image of a crown left on a table as if a party had ended[43]; Bruno Mars (prompt: "b r u n o m a r s"), generating a song called *24K Trouble*,[44] contrasting with Bruno Mars's well-known single *24K Magic* from his 2016 album of the same name, and an image of a golden man on a dance floor evoking his retro style on display in the video for his hit "I Just Might"; Bad Bunny, the first artist to win a Grammy for Album of the Year for a record sung entirely in Spanish, (prompt "b a d b u n n y"), generating a Spanish language "Reggaeton urbano" song called "Perreo de Frente",[45] imitating Bad Bunny's rapper-singer fusion, and generating an image of a man in front of a city skyline reminiscent of scenes from the video for his hit song NUEVAYoL; and the California rapper, Snoop Dogg (prompt: "s n o o p d o g"), generating a song called "Blue Bandana,"[46] described by Suno as "West Coast funk-rap" and imitating Snoop Dogg's smooth and sly delivery along with an image of a fancy car and a palm tree. Blue Bandana is a reference to Snoop Dogg's 2022 Super Bowl halftime outfit, where he was reportedly dressed in a blue bandana-print tracksuit in an homage to his teen days as a member of a gang that uses the color blue for identification.[47] This provides another example of how the musician-based experience is conveyed across the totality of the provided content. A

---

[43] See Exhibit 26 - Suno, *Paper Crown*, https://suno.com/s/wIuRea3VjTHqjMjD (generated by Suno AI) (on file with counsel); *see also* Exhibit 27 – Suno, *Paper Cup Crown*, https://suno.com/s/XHAOTZ2LUjUvlCp4 (generated by Suno AI) (on file with counsel).
[44] See Exhibit 28 - Suno, *24K Trouble*, https://suno.com/s/PdDNhFhN01B1KFMM (generated by Suno AI) (on file with counsel).
[45] See Exhibit 29 - Suno, *Perreo de Frente*, https://suno.com/s/WaBQZXz6PuRErkwS (generated by Suno AI) (on file with counsel).
[46] See Exhibit 30 - Suno, *Blue Bandana*, https://suno.com/s/VpR0UMpFTn9jlxLN at 1:00 (generated by Suno AI) (on file with counsel); *see also Blue Bandana*, https://suno.com/s/dqnI9UoytHOuksY3, https://suno.com/s/JFjfjYMBARF0dBAd (generated by Suno AI with the prompt "snoop dogg") (on file with counsel).
[47] Suzy Byrne, *Snoop Dogg says Jay-Z threatened to end NFL deal over Super Bowl halftime show restrictions*, Yahoo!entertainment (March 8, 2022), https://www.yahoo.com/entertainment/snoop-dogg-jay-z-threatened-end-nfl-deal-super-bowl-halftime-show-restrictions-172716582-172716426.html.

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 19 of 84

blue bandana alone does not evoke a specific musician, but the platform evokes the artist through a cross-modal experience of their identity operationalized via a name-triggered retrieval key.

32. In another example of Suno's distinct name-based capabilities, consider the music Suno generates from two Chicago rappers: Common and Chief Keef. Entering Common's real name—Lonnie Rashid Lynn—in Suno produces very different music from that generated by entering Chief Keef. Entering "Lonnie Rashid Lynn" as a prompt produced several songs that capture Common's more poetic, reflective, socially conscious hip-hop, relying on samples of jazz and soul music. In one example from entering Lonnie Rashid Lynn with no spaces into v5.5, Suno produced the song "Lonnie Rashid Lynn."[48] The track samples soul music in the background vocals and the lyrics include "paper on the desk, but the heart stay loud."[49] The chorus tips its hat to the evoked artist, acknowledging that the system knows that this is not three random names: "Say it slow, let it land/ Three names, one man…Lonnie Rashid Lynn/ Say it like a hymn/ Lonnie Rashid Lynn/ Let the whole block in."[50] Suno's output also includes the image of sunlight on cracked streets and a brown wood door, evoking the city but with warmth matching the song.

33. In contrast, entering Chief Keef (as "c h i e f k e e f"), provides a very different experience for the rapper who popularized Chicago drill[51]—a minimalist, ominous sounding, rap sub-genre. In one example from v5, Suno creates a song called "Back Door Bounce,"[52] paired

---

[48] See Exhibit 31 - Suno, *Lonnie Rashid Lynn*, https://suno.com/s/UbHQNxhnORhip4IC (generated by Suno AI) (on file with counsel).
[49] *Id.* at 0:16.
[50] *Id.* at 0:30.
[51] Ashley Turner, *How Chief Keef Spearheaded The Drill Movement*, Hot New Hip Hop (May 31, 2024), https://www.hotnewhiphop.com/809538-how-chief-keef-spearheaded-the-drill-movement#google_vignette.
[52] See Exhibit 32 - Suno, *Back Door Bounce*, https://suno.com/s/nF4n961nd2EWWYrU (generated by Suno AI) (on file with counsel).

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 20 of 84

with a stark image focused on the grime at ground level in an alley at night. The song, consistent with drill, is harsher, grittier, and more bleak sounding. An almost eerie vocal sample repeats under the rap, including lyrics like "cold hand, warm cash/ fast talk, then the brakes go past/ My name ring once, then twice/ Then the whole block know that price."[53]

34. As seen above with Dr. Calle, instrumentalists and composers can be operationalized the same way as featured artists. With the prompt "Maria Schneider Orchestra," invoking the jazz orchestra led by Maria Schneider, the world-renowned composer who won a Grammy Award for Best Large Jazz Ensemble Album, Suno v5.5 generated "North Wind Charts."[54] The model repeatedly provided jazz with lush, supple sounds on display in such compositions as "Walking by Flashlight." For example, version v5 created a song called "Paper Kite Suite" described as "jazz orchestra, slow-swinging and spacious with warm horn voicing, supple bass clarinet lines."[55] Suno v5.5 created a song called "Paper Swans" described as "jazz orchestra with lush chord voicings" and "Lush Horizons" described as "modern orchestral jazz, large ensemble composition."[56] The accompanying images and titles evoke nature and subdued experiences, such as a sunset skyline, swans on water, or a kite in the sky, in line with "Walking by Flashlight" and another album title "Winter Morning Walks." An instrumentalist's or composer's recognizable musical persona identifies the person no less than a voice does. Ms. Schneider's identifying attributes were captured in Suno's training data and indexed by her name

---

[53] *Id.* at 0:19.
[54] See Exhibit 33 - Suno, *North Wind Charts*, https://suno.com/s/v1Wuq33Ikd9trFAB (generated by Suno AI) (on file with counsel).
[55] See Exhibit 34 - Suno, *Paper Kite Suite*, https://suno.com/s/6SHE3qhTHQVoD2aF (generated by Suno AI) (on file with counsel).
[56] See Exhibit 35 - Suno, *Paper Swans*, https://suno.com/s/25LkmyLQPzNupVzN (generated by Suno AI) (on file with counsel); see Exhibit 36 - Suno, *Lush Horizons*, https://suno.com/s/tXEY85DyqtMBB5hV (generated by Suno AI) (on file with counsel).

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 21 of 84

such that her name activates performer-specific representations within Suno. The fact that Ms. Schneider is a prominent voice against appropriated music did not spare her.[57]

35. Even where the filter rejects a name typed without spaces, it confirms that Suno's system recognizes exactly who is being invoked: a pop-up opens saying "We don't reference artists directly, so we've replaced your prompt with similar styles you might like"—the system announcing that it, in fact, identified the musician in the name-prompt and is offering substitutes.[58] For example, a prompt consisting only of "taylor swift" with no spaces—for the well-known star who got her start in country music before pivoting to become a pop superstar—Suno suggests "Pop," "Country," "Country Pop," and "Synth-Pop."[59]




Figure 2: *Taylor Swift's name "replaced."*




Figure 3: *Tom Waits' name "replaced."*

---

[57] Ms. Schneider is a co-founder of the Artist Rights Alliance, which advocates for fair compensation in the digital realm. https://artistrightsalliance.org/.
[58] *See* Figure 2, Figure 3.
[59] *Id.* at Figure 2.

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 22 of 84

36. Suno could have chosen to simply display: "We don't reference artists." In fact, Suno used to do just that:[60]




Figure 4: *An image of Suno's former rejection message.*

Entering "foo fighters" as the user did in Figure 4 prompted Suno to reply: "Couldn't generate that. Your tags contain artist name foo fighters – we don't reference specific artists on Suno, please change your tags and try again." Even at its best, Suno's filter is only an end-layer constraint on visible outputs; a capable filter does not remove the prior extraction, encoding, or incorporation of identity into the model that Suno designed as its training process. Nonetheless, rather than stick to even that restriction—which only applied to names without spaces—Suno moved to a new policy and began providing an output for these purportedly blocked names as

[60] Jamie Aplin, *How to sound like a specific Artist in Suno (without using their name)*, YouTube, at 1:49 (uploaded February 15, 2026), https://www.youtube.com/watch?v=3DiaXhCcYZE.

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 23 of 84

seen in Figures 2 and 3. For example, for Hector Lavoe, one of salsa's most famous singers, Suno similarly rejects the name with no spaces but, nonetheless—with no new prompt—produced a high-energy salsa song called "Baila sin Miedo"[61] (which translates to "dance without fear"), imitating Mr. Lavoe's bright, naturally slightly nasal vocals. Suno described the song as "[s]alsa with live congas, tumbao piano, brass punches, and a percussive 2-3 feel, verse rides tight bass and claves, pre-chorus strips to hand percussion and tumbling vocal lines, chorus hits with full horn stabs and call-and-response gang vocals." Accompanying the song and description is an image of a man on a lit dance floor with dancers in the background.[62]

37. Suno's move to this new policy of not blocking musicians' unspaced names is likely because it knows it has the capability to evoke musicians by name from the way it constructed its training process and platform, and because it serves its commercial purpose to offer that capability to users. Suno's training process choices, described in detail below, and its commercial product show its intent. Considering its actions alongside its quote above about "not using artist names as a category of training metadata" and employing "detection filters that block or prevent a user from using a specific artist" as a prompt—it seems what Suno actually wants is not "Original Creation by Design," but public deniability.

[61] See Exhibit 37 - Suno, *Baila Sin Miedo*, https://suno.com/s/enj1f3rk965LSWEc (generated by Suno AI) (on file with counsel).

[62] Of course, when the name was spaced out as ("H e c t o r L a v o e"), it also produced songs, including one that began with a man yelling "Hector Lavoe" at the top of the song. (See Exhibit 38 - Suno, *Hector Lavoe*, https://suno.com/s/nXGooZjhhP0ozsp2 (generated by Suno AI) (on file with counsel)). This provides a clear example of the system reconstituting the name: it knows, even with spaces, that these are not just letters and spaces, but form "Hector Lavoe," which is what Suno named the song. It paired the song with the description "[s]alsa dura with driving congas, brass punches, and a tight bass tumbao" and an image of a drum, which features prominently in salsa.

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 24 of 84

38. These demonstrations did not create the capability; they revealed the technology that Suno designed, operationalized, and deployed before any prompt was ever entered. Notably, this name-triggered platform operates across a considerably wide span of musical history, genres, and geography. In addition to including musicians from different decades of prominence, name-prompts work across genres—blues, rock, country, alternative, reggaeton, rap, pop, salsa, Hawaiian, ska punk, and even alt-country-punk fusion. The operationalized identities originate from all over the country and, likely, the world. This versatility is evidence that Suno's name-responsiveness is a designed, systemic commercial feature of the platform—not an isolated technical artifact or unpredictable emergent behavior. The platform is built to identify musicians by name and generate identity-evocative output on command. This is its product.

39. The musician need not be a superstar to have their identity appropriated. In an important sense, the relevant class is self-defining. If Suno has operationalized a musician's name so that the name activates performer-specific capabilities within its platform, Suno's own conduct demonstrates that the identity is sufficiently known and valuable to be useful to Suno. The musician may be a global star or a session player whose name is familiar mainly to musicians, collectors, or people who read liner notes on their parents' vinyl collection. The limiting factor is whether Suno selected, associated, and made that person's identity usable via its commercial product. Accordingly, a musician's relative obscurity provides no defense for Suno. A comparatively lower level of notoriety does not equate to a public license of their right of publicity.

40. Plaintiffs do not contend that every listing, indexing, search, or reference to a musician by name violates the right of publicity. This case concerns something different. A conventional music service may use a musician's name as a locator to help a user find that

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 25 of 84

musician or the musician's licensed work; there, the name identifies the musician's product. Suno instead operationalized musicians' names within its own commercial product, making the name a functional means of accessing and invoking learned representations associated with the named musician's identity. In that sense, the name does not merely point outward to the musician or the musician's work; it points inward to a capability built into Suno's model.

41. That distinction is also legally significant. The rights asserted here do not arise from ownership of any copyright and do not depend upon who owns, licenses, or is otherwise entitled to exploit any particular work. A musician's name belongs to the person as an attribute of identity, not to the copyright owner of a work in which that person may have performed. Suno's use of the name as a functional component of its own commercial product therefore presents a question distinct from the ordinary and incidental use of a name to identify or locate a copyrighted work.

42. For the avoidance of doubt: Plaintiffs claim no ownership of country music, of Americana music, or of any genre, style, or musical idea, and nothing in this Complaint asserts a right to prevent anyone—human or machine—from making blues or any other style of music. The claim is narrower and older than that: no one may commercially exploit another's right of publicity in their name and identity.

43. Suno's purported name restriction is not defeated by one method alone. Techniques for generating music that sounds like a particular musician or group are encouraged by Suno's own paid marketing partners. On information and belief, Suno has entered into a paid affiliate relationship with a number of Suno content creators, providing them with a commissioned referral link in exchange for producing tutorial content that drives paid

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 26 of 84

subscriptions. One creator's affiliate-linked[63] tutorial expressly describes Suno's practice of flagging and rejecting prompts that reference "a specific band name or artist," and is devoted entirely to teaching viewers, in his own words, how to "get around" that restriction "and still have it produce a track that sounds similar to that artist."[64] The same creator sells a paid catalog of prompts marketed as "Suno-ready" for generating music resembling a specific, named musical act.[65] Another affiliate marketer talks about how to prompt Suno to create a persona that sounds like Justin Bieber, noting that some sections lose fidelity but playing an excerpt that sounds identifiably like Justin Bieber.[66] Notably, his prompt included a song description invoking "Justin Bieber's tone and phrasing" as well as "that characteristic pop clarity and youthful brightness Bieber often uses."[67] He opined that he had perhaps "made it through the firewall"—likely referring to Suno's name filter. Given that he was able to generate the song despite naming the artist twice in the prompt, he likely did discover another hole in Suno's filter.[68] The loss of vocal fidelity is easily solved within the Suno platform. The Voices Feature, described above to make a Ford jingle sung by the Suno-created version of The Chicks, allows a user to select the segment of the vocals that they would like to save.

---

[63] Aplin, *supra* note 60 at 0:15 (contains an affiliate link in his video description and Aplin states: "I've actually had Suno reach out to me…they offered me an affiliate link and I'm now using that. So, if you're watching this video and you haven't yet signed up for one of the paid versions of Suno, go ahead and do that. It's going to support this channel so I can keep creating these tutorials to hopefully help you make better song creations with that platform").

[64] *Id.* at 1:44, 15:38, video summary.

[65] *Id.*

[66] Tim Makes Media, *Two Hidden Ways to Create a Persona in Suno*, YouTube, at 2:40 (uploaded November 15, 2025), https://www.youtube.com/watch?v=oPD8bzKszTE (contains an affiliate link in the description of his video and shares that he "earns a small commission on sales…which helps me make these fun videos.")

[67] *Id.* at 3:15.

[68] *Id.*

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 27 of 84




Figure 5: The Voices Feature

The user could save the part of the song that sounds just like Bieber, and use it to create endless new commercial outputs. Suno has demonstrated a willingness to tightly control affiliates,[69] yet did not restrain this content.

44. Suno derives subscription revenue, and pays referral compensation, based in part on this content. This is exactly the kind of use that diminishes the commercial value of the class members' identities—one that allows for the evocation of a persona without having to license it.

45. This phenomenon is not confined to Suno's paid marketing partners. On information and belief, an independent community of content creators—without any disclosed financial relationship to Suno—likewise publishes tutorials and paid prompt guides teaching

[69] Suno also operates the "Suno Spark Program," a paid promotional program through which participants create and post songs and videos on their social-media channels "promoting Suno and/or its products and services." Suno pays participants "fees for the Services," requires promotional content to be submitted to Suno for "review and written approval," and reserves the right to require participants to "remove, re-shoot and/or modify" that content. Suno further requires each post to disclose the commercial relationship, including through "#SunoPartner," and prohibits participants from working in a "paid or formal capacity" promoting competing AI-music companies for 60 days following their final Suno promotional post. Suno Spark Program Fine Print, Suno, https://about.suno.com/spark-terms (effective July 30, 2026) (last visited Aug. 23, 2026).

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 28 of 84

prospective subscribers how to prompt Suno to generate music resembling the identity of a specific musical act without using that act's name.[70] The existence of this capability further demonstrates how Suno's product is internally organized; it is organized, at least in part, around specific identities Suno has made available for activation. Further, it demonstrates the widespread interest in engaging with Suno for this exact purpose. However, as demonstrated above, paying for non-name prompts is hardly the primary way to obtain a name-based output from Suno. Between Suno's nonexistent or shoddy and porous filter and Suno's paid affiliate marketers providing demonstrations for how to evoke specific musicians, Suno has made it easy to evoke the identity of a wide array of named musicians.

46. Whatever filter Suno has established, it chose the parameters and strength of this filter, including which names to block, how narrowly or broadly to define a blocked string of words or letters, and whether to screen for common filter gaps such as letter-spacing (or, as one of its affiliate marketers publicizes, how including the name with other text can potentially evade a filter); each of those choices is a further engineering decision and user-engagement technique Suno made in building, and continuing to maintain, its platform. And beyond the filter, Suno encourages musician-specific output: its own paid affiliate marketers are compensated for producing publicly available tutorials teaching subscribers how to defeat the filter and generate musician-specific output.

47. Suno does not operationalize musicians' names merely as an aid to artistic expression. It does so as a feature of a commercial product. By enabling a user's entry of a

---

[70] *See e.g.*, Travis Nicholson, *How to Prompt Suno AI to Sound Like Any Artist*, YouTube (September 25, 2025), https://www.youtube.com/watch?v=u1Dumt2J5Ho ("Suno doesn't let you use artist name or band name due to copyright restrictions, but you can get around that by using descriptors to describe the overall tone. Suno AI was built off of all of this music, so it's in the software….That's the secret to unlocking the sound you want from your favorite artist or band").

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 29 of 84

musician's name to activate musician-specific outputs, Suno makes the identities of musicians useful to its customers and, in turn, valuable to Suno. The ability to invoke a musician by name gives users a reason to use, subscribe to, and remain engaged with the platform. Suno thus does not merely permit users to refer to musicians; it has designed its product so that musicians' identities perform a commercial function within the product itself.

48. That distinction is important. Whatever creative purpose a user may have in entering a musician's name, Suno's own conduct occurs upstream. Suno designed, trained, and commercially deployed the system that makes the name a functional retrieval key. The reasonable inference is that Suno operationalized musicians' identities because doing so increases the usefulness, appeal, and commercial value of its product. In short, musician identity is not incidental to the transaction. It is an essential part of what Suno is selling.

49. In *White v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395, 1398 (9th Cir. 1992), Samsung's ad featured a robot dressed in a wig, dress, and jewelry standing next to a game board resembling the one used on "Wheel of Fortune." The totality of the experience evoked Vanna White. The Ninth Circuit held that her identity was exploited even without the use of her name; it did not require that the robot look exactly like Vanna White—in fact, it was readily identifiable as a robot, not to be mistaken for the actual Ms. White at all. Here, the "robot" is also not identical, but it does use the musician's name, and the totality of the commercial experience Suno provides is similarly an impersonation: name-indexed, fully operationalized, and provable across time, geography, and genre.

***Suno's Business***

50. Suno monetizes its generation capabilities directly, offering them to subscribers through tiered paid plans that generate substantial and growing revenue. These capabilities

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 30 of 84

described above are not incidental features: they are the product. They are grounded in the internal representations of musician-specific identifying attributes that Suno extracted without consent and deploys without authorization.

51. Indeed, press releases documenting Suno's own licensing agreements with major music companies recognize that a license from a copyright owner does not necessarily supply the consent required from the human creators whose identities and performances are implicated. Public statements regarding Suno's agreement with Warner Music Group expressly provide artists and songwriters an "opt-in" for use of their "name, image, likeness, voice, and compositions" in new AI-generated recordings, with WMG stating that creators will have "full control over whether and how" those attributes are used.[71] Suno's subsequent agreement with BMG similarly provides that BMG artists and songwriters "who choose to participate" will have their rights protected and receive compensation. Suno CEO Mikey Shulman described the arrangement as giving creators "real choice," while BMG stated unequivocally: "Choice is the guiding principle."[72] Thus, even Suno's negotiated licenses with sophisticated copyright owners expressly contemplate creator authorization separate from the copyright license itself—consistent with Suno's own Terms of Service separately recognizing copyright and persona rights. A record company's authority to license a copyrighted recording therefore does not,

---

[71] *Warner Music Group and Suno Forge Groundbreaking Partnership*, Warner Music Grp. (Nov. 25, 2025), https://www.wmg.com/news/warner-music-group-and-suno-forge-groundbreaking-partnership.

[72] *BMG and Suno Announce Global Strategic Alliance Advancing AI Music Opportunities and Revenue Streams,* BMG (Aug. 12, 2026), https://www.bmg.com/news/bmg-and-suno-announce-global-strategic-alliance-advancing-ai-music-opportunities-and-revenue-streams.

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 31 of 84

without more, establish authority to license, extract, reconstruct, or otherwise commercially exploit the independently held personhood rights of the performers embodied in that recording.[73]

52. Suno's highly publicized agreements with WMG and BMG may also create a broader public impression concerning Suno's treatment of artists generally. By emphasizing that WMG creators exercise "full control over whether and how" their identities are used, and that BMG creators participate by "choice," Suno publicly presents creator consent as a feature of its commercial AI ecosystem. Absent a comparably prominent disclosure that these protections apply only to particular participating rightsholders and creators, users could reasonably infer that musicians made available, recognized, or operationalized through Suno have likewise authorized those uses. That inference is false as to the many musicians, like Plaintiffs, outside those arrangements whose names and identities are nevertheless used and operationalized through Suno's functionality without their consent.

53. Suno holds these musician identities out to the public as the foundation of its product. Suno publicly admitted that its AI music tool was trained on "essentially all music files of reasonable quality that are accessible on the open internet."[74] For purposes of promoting its product, Suno publicly proclaimed that training on all of the music it can find makes its product better ("Suno gets better the more our AI learns") and "make[s] it possible for everyone to make

---

[73] The distinction recognized in Suno's own licensing announcements is also reflected in industry-wide AI principles. The Human Artistry Campaign states that *both* "the use of copyrighted works" and "the use of voices and likenesses of professional performers" require separate authorization and free-market licensing "from all rightsholders." The Campaign likewise calls for separate recordkeeping of "copyrighted works, performances, and likenesses." These principles recognize that ownership or licensing of a recording does not necessarily encompass the independently held rights of the human performers embodied in it. (The Campaign's members include the Recording Industry Association of America, of which both BMG and WMG are members).

[74] Koebler *supra* note 7; *see also* Shulman *supra* note 6 (an open letter which functions as an ad by including Suno graphics and photos of people smiling while using Suno).

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 32 of 84

music" when before so many could only be spectators.[75] Suno promotes the use of "essentially" all music on the internet as vital in creating "technology enabl[ing] a future where the whole world can explore, create and be active participants in an art form most have only ever consumed."[76] Suno held out that it trained on all music and then allowed users to name-prompt their favorite musician. Those public statements, combined with Suno, on information and belief, affirmatively reaching out to associate itself with the work of content creators seeking musician-specific sounds, constitute a public holding out of musicians' identities.[77] Suno's statements and the statements from its affiliates are made for advertising and promotional purposes. They advertise and promote the very identities Suno commercialized by allowing name-based prompts.

54. Traditional advertising often involves "push" advertising: the defendant pushes the plaintiffs' identities into the market through an ad, commercial, or broadcast. The technology of a sophisticated AI model offers a different delivery mechanism. Suno builds the identity into the product and then lets users pull that identity on demand through names. That does not make the appropriation less commercial, just more efficient.

55. That is not lost on Suno's investors. On information and belief, the scalability of those stored and operationalized representations, the ability to generate an effectively unlimited volume of identity-deploying outputs from a fixed base of extracted identities, is a central driver

---

[75] Shulman, *supra* note 6.
[76] Koebler, *supra* note 7; *see also* Shulman, *supra* note 6.
[77] *See e.g.* Aplin, *supra* note 60, 63 ("I've actually had Suno reach out to me…they offered me an affiliate link and I'm now using that. So, if you're watching this video and you haven't yet signed up for one of the paid versions of Suno, go ahead and do that. It's going to support this channel so I can keep creating these tutorials to hopefully help you make better song creations with that platform").

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 33 of 84

of Suno's enterprise valuation[78] and the basis on which it projects $1 billion in revenue by 2028. What Suno is selling—and what its investors are valuing—is access to what it extracted.

56. Suno designed its AI model and consumer-facing platform to accept name prompts, providing in response to those name prompts a downloadable song, description, and a cover graphic that embodies its musician-based product. In doing so, Suno chose to divert licensing opportunities from musicians to AI-generated substitutes, dilute the market value of musicians' identities, deprive musicians of control over how their identities are used and perceived, and mislead the public about whether such tools are lawful or authorized. On top of it all, Suno is flooding the market with AI-created recordings based on the very identities it competes with. Of all the choices Suno made, however, Suno did not choose to ask for consent.

57. If Suno, as it has publicly stated, actually had the "goal" of "help[ing] people create original music, not replicate someone else's" sound, it could have built a model without training it to associate music with the performers' names and identifying characteristics. It could have actually filtered musicians' names instead of designing a platform that accepts the names of a wide array of musicians with and without spaces. Suno could have chosen not to seek relationships with affiliate marketers that help find other ways around its already weak filters to produce music like particular musicians. Instead, it has merely made public statements about the importance of not name-indexing or accepting name prompts while doing just that.

***<u>The Model Training Pipeline – How the Names are Used in Training</u>***

58. Suno scraped the internet for music from which to extract musicians' identities without their knowledge or permission and used it to create its AI model. Suno was not

---

[78] Mikey Shulman, *The Next Chapter for Suno*, Suno (June 3, 2026), https://suno.com/blog/series-d-announcement (announcing that Suno has just raised $400 million at a $5.4 billion valuation).

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 34 of 84

concerned with consent. On information and belief, Suno's data scraping captured music created by Plaintiffs and the class members along with descriptive metadata including names and other text commonly associated with musicians' identities. While scraping and processing all of this data into its AI model, Suno obtained audio and systematically paired it with the names of the musicians who created it. This pairing of a musician's name with recordings bearing that musician's identifying vocal and instrumental characteristics is what later enables Suno's trained model to associate a specific name with a specific set of identifying attributes, and to generate output evocative of that identity when the name alone is later entered as a prompt. Suno's actions are engineering and product choices, not a technical necessity of building a generative audio model. Suno could have chosen not to train its model to associate recordings with the identities of the performers appearing on those recordings—it could have chosen not to extract and operationalize musicians' identities. While Suno's exact steps are not completely discernible from public information, the following section provides an overview of this type of model training process.

**Step 1: Data Preparation**

***Background - Music as Data***

59. Sound, as humans perceive it, is vibrations in air—variations of pressure over time in the ear canal. The twang of a string against the body of a guitar, the thump of a membrane stretched across a drum, or the hum of vocal cords through the vocal tract of an opera singer—all are physical bodies that excite the air, creating waves that travel through air to a listener. Through the long process of mastering their instrument and committing their art to sound, musicians excite the very air around them to create the phenomenon we call music.

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 35 of 84

60. Thanks to advances in sound technology, we are able to hear the work of hundreds of thousands of musicians at the push of a button. Recorded music begins with the conversion of acoustic sound waves into electrical signals, which may then be digitized and encoded as machine-readable representations of the performance. For decades, recorded performances have been represented digitally as sequences of numerical values that encode changes in air pressure over time. Every note, vocal inflection, and transient becomes a machine-readable representation of the sound.

61. For realistic sound reproduction, an audio signal is sampled tens of thousands of times per second. This sampling produces the basis for creating a "waveform," which is a literal representation of sound's air vibrations. Sound-pressure variations are captured and then sampled so that the signal is represented by discrete values at up to 48,000 samples per second. These samples form the raw digital representation of sound used by Grammy-winning producers and bedroom creators alike, capturing the nuance of music as a sequence of discrete measurements that can be stored, transmitted, and processed by machines.




Figure 6: *A simple waveform of audio.*

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 36 of 84

62. These digital signals are the foundational technology that makes CDs, MP3 players, and streaming services possible. By converting music to data, the power of information technology allows music sharing to happen more quickly and in larger quantities. The legal significance of digital recording is not merely that sound can be stored electronically. Once a performance is reduced to a numerical representation, it becomes susceptible to computational analysis. A computer no longer "hears" a recording as music; it processes it as structured numerical data. That transformation—from sound to machine-readable representation—is what makes modern machine learning possible, allowing for the extraction of complex patterns, features, and relationships.

***Data Scraping***

63. Data scraping is the work of a human-directed autonomous agent extracting information available on the internet, storing, and organizing it for later use. Machines, of course, are not bound by the perceptual limitations of humans: what takes us minutes can take a computer fractions of a second. If streaming your favorite album or downloading a new song is like catching a fish, data scraping systems are much more like trawling, gathering every possible second of audio at an industrial scale. Automated crawlers systematically harvest data at scale, ignoring consent, licenses, and boundaries, extracting content indiscriminately from any accessible source online. A skilled practitioner with sufficient resources can access massive swaths of the internet at a rate faster than the human brain can comprehend. A single computer on a modern high-speed home internet connection can download compressed audio at the rate of about one hour of audio per second. With enterprise-grade data centers, this process can be completed hundreds of thousands of times faster. Entire albums and discographies—decades of musical mastery, technical execution, and production—are ingested in the blink of an eye. It may

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 37 of 84

take an artist a lifetime to learn an instrument, to garner an audience, and to achieve mastery, and along the way thousands of hours of work are contributed by instrumentalists, recording engineers, technicians, and other professionals. In the time it took to read this sentence, this accumulated labor of dozens was ingested into Suno's system, without a moment's hesitation, and converted into mere data.

64. Foundation models are developed by training on extraordinarily large collections of audio. Modern foundation models are trained on corpora measured not in albums or even discographies, but in millions of recordings spanning hundreds of thousands of hours of audio.[79] The scale is unprecedented, because larger and more diverse training corpora generally produce more capable—and valuable—models. As a result, data-scraping acquisition systems are designed to gather recordings at internet scale rather than through selective curation. Automated scrapers therefore collect not only the audio files themselves, but also the metadata accompanying those recordings, including information identifying performers, recordings, albums, genres, and other descriptive attributes used in later stages of processing and model development. The accompanying metadata serves multiple functions. It enables recordings to be identified, organized, deduplicated, filtered, and associated with performers and other descriptive attributes. Without those associations, the model could not learn that a particular recording corresponds to a particular performer, or later respond when that performer's name is used as a prompt.

[79] *See, e.g.,* Dongchao Yang et al., *UniAudio: Towards Universal Audio Generation with Large Language Models*, in Proceedings of the 41st International Conference on Machine Learning, 235 Proc. Mach. Learning Rsch. 56422 (2024).

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 38 of 84

65. Recent reporting[80] concerning leaked Suno source code describes precisely such an operation: Suno used software and third-party infrastructure to collect enormous quantities of digitally encoded human expression from sources including YouTube Music, Deezer, Genius, stock-music libraries, and podcast repositories. The leaked and reported source code did not merely encounter material incidentally; it identified particular sources and categories of content for acquisition, including material selected for characteristics useful to model development. As each source and search process could yield additional responsive material, the system expanded the universe of collected data according to technical instructions and operator-defined parameters—not for the purpose of human listening or creative study, but computational analysis.

66. What the data scraping delivers to Suno's pipeline is the raw material from which the identifying attributes of human beings are then extracted and operationalized. The "data" present at the end of the data scraping step includes the musicians' sonic fingerprints—the acoustic attributes that make each of them recognizable as themselves to listeners—and it is those personal attributes, not any particular work, that the later steps isolate, measure, and encode.

**Step 2: The Neural Codec**

***The Neural Codec's Purpose***

67. The "neural codec" converts recorded performances into model-specific numerical representations suitable for machine learning. Although the particular codec architecture varies among systems, each serves the same functional purpose: transforming audio

[80] Jason Koebler, *Hack Reveals Suno AI Music Generator Scraped YouTube, Deezer, and Genius*, 404 Media (July 15, 2026), https://www.404media.co/hack-reveals-suno-ai-music-generator-scraped-youtube-deezer-and-genius/; Bolies *supra* at note 13.

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 39 of 84

into a structured representation from which higher-level models learn statistical relationships among performers, recordings, and textual descriptors. The goal of the neural audio codec is to create a way to capture the breadth of music as we know it. There are three components to this codec: 1) an **encoder**, which compresses an audio waveform into what is known as a dense audio "embedding"—another form of machine storage—capturing musical detail and nuance in a fraction of the space the original audio occupies; 2) a **quantizer**, which maps the audio onto a system of reference points called **tokens**; and 3) a **decoder**, the mirror of the encoder, which converts that data back into something a human can hear. All three are required to produce AI music like Suno's.




Figure 7: *This system comprises the "Neural Codec," capturing audio, converting it to tokens and then returning to audio again.*

***The Encoder Process – Compression***

68. An audio processing pipeline changes raw audio data into data a machine can understand while shrinking its size. These preprocessing steps have been present in audio systems for decades, but recent advancements in Large Language Models ("LLMs") and their ability to capture nuanced information have made them ubiquitous in AI audio models.

69. To translate audio into something a computer can read, Suno starts with a waveform, described earlier: a representation of the pressure changes that we perceive as music.

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 40 of 84

As humans, we do not perceive audio as a tone going up and down; the physiology of our ear thinks about music as notes, timbres, instruments, and voices. We perceive music as a spectrum of different frequencies that evolve over time. To visualize this representation, see Figure 8.




Figure 8: *A spectrogram of audio, characterizing the time-frequency characteristics of audio as perceived by humans.*

70. One can imagine a waveform as a representation of the high and low pressures created by sound, whereas a spectrogram, represented in time and frequency, is more in line with how humans perceive sound: an experience of various frequencies in a certain order.

71. To an untrained eye, these blotches of color might not look like much, but subtle visual cues can characterize loudness, pitch, timbre, and every other aspect of music. The spectrogram renders measurable the characteristics of the human being who performed: from it, a system like Suno's can extract and compute the identifying features of the performer.

72. While the exact details of Suno's neural codec are not publicly available, comparable systems (e.g., EnCodec) process the waveform through a series of digital signal processing methods called convolutional neural networks ("CNNs")—a series of filters that learn

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 41 of 84

frequency and timbral patterns and transform sound into a sequence of numbers. A well-trained CNN recognizes patterns—a certain timbre of voice, the twang of an acoustic guitar, the muffled buzz of a specific microphone—and compresses them into a smaller, more efficient, refined description of audio, shrinking the image across time and frequencies.

73. The model takes the audio, processes it, captures its content, and recognizes everything from the verse-bridge-chorus song structure down to the placement of the bass in the structure of the rhythm. Every detail, every microsecond of nuance, is reduced through compression to a compact, information-efficient description. Where the waveform described the sound accurately, reporting the waveform 48,000 times per second, the neural codec reduces this to just 150, and contains all of the information necessary to reproduce a sound that most human listeners will perceive as identical to the original.

74. Within the neural codec, songs that sound similar—perhaps from the same musician, genre, or time period—will look more similar to each other, and disparate items—say, classical piano, and modern bebop—will be clearly distinct. This distribution contains specific embeddings distilling information from each song and recording fed into the model. This process captures a guitarist's distinctive tone by encoding recurring musical fingerprints—harmonic overtones, transient attack characteristics, vibrato behavior, amplifier selection and coloration, timing irregularities and articulation patterns—into machine-readable embeddings or tokens. An instrumentalist's tone functions much like a recognizable voice: carrying identity through timbre, phrasing, attack, feel, and expressive nuance. The musicians' personhood signals—attributes that make their sound unique to them as a human musician and that identify them to an ordinary, reasonable listener—are captured in these embeddings, ready to be exploited for commercial gain.

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 42 of 84

***Quantization – Creating Tokens of Musicians' Identities***

75. The quantizer's purpose is to map musicians and their identifying attributes onto a finite system of reference points. It works by repeated subdivision. Imagine a chessboard with 64 squares and a teaspoon of salt spilled across the board. C6 on the chessboard may describe the location of many grains of salt, so imagine that each square contains its own 64-square chessboard within it. The location of a particular grain of salt would be c6, then in the smaller chessboard f2, then, subdividing further as needed, e3, and so on—until the unit is small enough to identify a single grain of salt on the board.

76. This example describes the foundations of "residual vector quantization." By splitting up possible locations into just 64 squares (vector quantization), and then dividing each square into, for this example, 64 smaller squares (residual vector quantization), and so on, one can come up with an identifier for any grain on the board. Each chessboard provides what is known as a "codebook:" one of 64 possible spots. The sequence of squares, e.g. c6-f2-e3-g6, is an example of a "token," or the sequence of information that characterizes a specific location on the chessboard. In brief, one can communicate the location of the grain of salt in our massive board with only four pieces of easily cognizable information.

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 43 of 84




Figure 9: *Residual Vector Quantization*

77. Applied to music, the same logic captures any recording's or song's position in the audio dataset. The coarsest layers of codebooks capture instrumentation and overall structure. Working further down the codebooks, each adding to and dependent on the previous one, additional details begin to emerge: muffled speechlike sounds become words, loose pitch accuracy becomes clearly defined notes, and the onsets and offsets of instruments become more defined. At the most specific level, the more subtle elements are captured, including, for example, the barely-audible characteristics of a singer's highest register. The cumulative effect is an air of realism that, until recently, was unattainable for generative models. The point of

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 44 of 84

describing this technical complexity is to make clear that what gets distilled from this process is the sonic fingerprint of an actual human musician.

78. In these multi-layered codebooks, the identifying attributes of the musicians whose work was ingested—including which musicians and vocalists performed—are reduced to a sequence of tokens. The attributes of each musician in the training corpus are compressed to a sequence of numbers.

***The Decoder – From Token Back to Sound***

79. These tokens, while readable to the model, are not in a form humans can hear. As such, for every encoder, there is a symmetric, reversed model called a decoder that converts the sequence of tokens back into the domain of audio. Each compression step in the encoder corresponds to a decompression step in the decoder.[81]

***Training the Neural Codec***

80. Designing the architecture of the neural codec, described above, merely establishes the framework within which learning can occur. Within this architecture, the codec must then be trained on millions of ingested songs so it can identify, measure, and preserve the acoustic attributes that listeners rely upon to perceive human performance. Those learned representations enable the codec to reconstruct recordings that retain the expressive qualities listeners associate with authentic musical performance.

81. Training is the cycling of millions of different songs through the encoder-quantizer-decoder process, a complex, multi-step mathematical formula with dozens of operations and numerical variables—known as "weights"—operating on the audio fed into the process. Each time, audio is compressed into an embedding, mapped into tokens, and then

---

[81] *See* Figure 7.

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 45 of 84

reconstructed back into audio. At first, it fails—producing nothing but static and random noise. The model performs poorly at this stage because its variables, the weights, are initially mere best guesses as to what values should be placed into the mathematical formula. By training over the massive scraped dataset, the neural codec updates itself by checking each output against each original input until the reconstruction is true to the original input. As it learns how to complete this process with more accuracy, it updates its weights, slowly and iteratively improving its ability to reconstruct audio accurately by finding the right values for the model's overall formula. Over hundreds of thousands of hours of audio, the model makes trillions of micro-adjustments to itself, tuning its own weights until the noise clears and turns into sound, refining itself until the input and output are indistinguishable to the human ear. The work of millions of musicians is processed into this machine to find the most precise set of model weights that make for the most effective compression and most accurate return to ascertainable music.

82. Now the trained neural codec can take any song, compress it, turn it into a series of tokens and then back into the song again. These tokens contain everything in the training set, from the sound of Journey's guitar solos to Louis Armstrong's warm raspy vocals; if it is in the training set, it can be expressed in the tokens. If it is not, it cannot. Nothing more, nothing less.

83. What Suno has at this point is a formula that can compress songs to take up very little space and faithfully reconstitute them—that is the neural codec's model weights. However, this is not where Suno's process ends. Notably, the following steps are where Suno completes the extraction of identity from this database of compressed music. The violations regarding the extraction of identity discussed in Steps 3 and 4 (below), and the later use of musicians' identities, would be just as much of a violation even if every song in the training corpus were in the public domain for copyright purposes or obtained via authorized copyright licensing. Neither

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 46 of 84

a copyright license nor a song's existence within the public domain would entitle Suno to extract Jason Isbell's persona for its commercial value.

**Step 3: The Autoregressive Music Transformer**

84. Like the neural codec, the autoregressive music transformer is a model, but a different one with its own purpose. The neural codec's purpose is, essentially, accurate compression, but the neural codec is more than a compression algorithm. The codebooks created and learned by the codec have structure and patterns—an implicit grammar of relationships between musical moments and what tends to come next. The tokens, a series of codebooks, store the artistic choices and identifying attributes of millions of musicians. If tokens are something like words and sequences of tokens are something like sentences, then the technology used to teach language models can be used to teach the codebook's "language." It is the transformer that learns that language—using the same class of model that powers large language systems like GPT, it learns the language of music from the musicians' extracted identities.

85. The autoregressive music transformer has its own set of weights—new variables that must be established for the transformer to work. Accordingly, the transformer's weights must be trained, and the training material is the codebooks' grammar of millions of musical identities, compressed into tokens via the neural codec. From the neural codec, the transformer accesses hundreds of thousands of token sequences—the grammar (or patterns) of musicality captured by this model. However, the autoregressive transformer is trained by both text and compressed audio. By pairing audio token sequences from the codebooks with text descriptions—such as musicians' names, traits, and signifiers—drawn either from scraping the

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 47 of 84

aforementioned metadata or by using an audio-language AI product,[82] Suno trains the transformer to take in text prompts and to produce sequences of tokens that can be decoded back to audio. By pairing audio of a song alongside a detailed description of musician-identifying attributes, the transformer learns not only to read these token sequences but to associate them with human language. Through this combination of text- and audio-based training, Suno teaches the transformer what identifying attributes to associate with various musical sounds. This provides Suno its powerful feature: responsiveness to user prompts—including prompts that invoke a particular human being by name.

86. Notably, Suno could have focused its model training on pairing audio with semantic descriptions of audio. It did not have to associate the music with artist names and the artist names with the artists' other identifying traits. It chose to build a model that centered around identity. It chose to appropriate those identities as its own.

87. At this point in the pipeline, Suno possesses something uncomfortably like the Borg Collective itself: a vast database of tokens, each capturing the identifying attributes of musicians, organized into formulas whose very existence is defined by the identities Suno ingested.

88. The training process for the autoregressive music transformer cycles through the training corpus many times. This process encodes the text and audio dataset—containing the class members' identities—into the trained autoregressive music transformer's weights, providing the necessary variables for the mathematical formula that makes the transformer run. When training is complete and the model is deployed for inference, those weights are locked into

[82] A separate audio language model, built by a third-party and available to the public on a website like huggingface.co, might take audio as an input and output a description of said audio, giving more semantic richness to the dataset.

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 48 of 84

place and used to generate outputs. Suno then has its commercial product: a name-indexed musician-based generation platform that does not require the platform to access any particular prior recording.

**Step 4: Inference (Generating Audio)**

89. To understand how the outputs are generated via inference, consider how a fluent language speaker might predict the end of a question. "Good morning! How are ____." Hear the first few words of a greeting and a fluent speaker can predict, with some confidence, what the last word will be—"you"—not because there is only one possible answer, but because the patterns absorbed over a lifetime of listening and speaking make certain continuations far more probable than others. The autoregressive transformer does this with music—with the tokens and patterns absorbed over the human equivalent of millions of lifetimes—through the ability to associate audio with text and words with the sound of the music.




Figure 10: *A visual representation of the joint audio-text training process for the transformer.*

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 49 of 84

90. A user's text prompt becomes a series of tokens, which the system uses to predict the next audio token—the one most statistically consistent with the identities displayed through the training dataset, based on patterns learned from the entire training corpus and preserved in the model's weights. For example, if the user enters a text prompt about Jason Isbell, the system predicts that the user is referring to Jason Isbell's identity. Suno's platform then creates an output governed by the identifying attributes of Jason Isbell that the model extracted from the scraped data.

91. One token at a time, the model builds a new output. The violations at issue here do not depend exclusively on any output reproducing or even resembling any particular recording. The autoregressive music transformer has assimilated these identities as its basis of functioning; the identities are preserved in the model's weights and are intentionally accessible.

92. Once the token sequence is complete, the decoder—the mirror image of the encoder that created the tokens in the first place—converts the generated sequence back into audio. Compressed representations become waveforms. Mathematical predictions become sound. What began as Jason Isbell's voice and identity—captured without consent or compensation—is translated into spectrograms, compressed into numerical representations, quantized into tokens, and used to shape a generative system. At the other end, it emerges as a product that Suno offers for sale or investment—complete with play, share, and save buttons—that floods the market with substitutes competing directly against the very musicians whose identities power it, while Jason Isbell receives nothing.

**The Process as a Whole**

93. The violation began in the assimilation of Plaintiffs' identity without consent, and is renewed continuously through the commercial deployment of the autoregressive music

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 50 of 84

transformer. The weights capture more about Jason Isbell than any one of his recordings ever could, because what they captured was the identifying character of the man across all of them. His identity is not fixed into any recording and no record label ever owned or licensed it. His identity, and any commercial value his identity creates, belongs to him alone.

94. Somewhere in that training data we find Jason Isbell and millions of musicians who were never asked for permission. Through the ingested data, the system learned each musician's identifying attributes—name, along with timbre, phrasing, and expressive character. Those attributes were built into the system's weights and are now used to generate digital audio that deploys those attributes, including in response to prompts invoking specific individuals by name. Because the attributes are attributes of the person—capable of being observed across many different recordings and many different compositions, and reducible to no single one of them—the system operationalizes human identity itself.

95. Jason Isbell's musical identity does not cease to be his property merely because sophisticated technology is involved. What Suno's autoregressive music transformer's weights hold is not a copy of any song—Plaintiffs assert no claim to any song in this case—but a distillation of the identifying attributes of the human beings who made the songs and recordings: the qualities that make a listener say "that is Jason Isbell." A recording fixes a single performance; Suno's system extracted the performer's persona.

***Suno Created and Stored Voiceprints***

96. In the course of processing scraped audio to create its AI platform, Suno's system creates "tokens" or compressed numeric representations specifically for a computer to read, as described above. These tokens capture expressive characteristics of human performances, including vocal identity and other performative attributes that the model later uses to generate

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 51 of 84

recordings. The process produces computed measurements of the unique physiological and behavioral characteristics of each vocalist's voice—including pitch contours, formant structure, harmonic balance, breath dynamics, and timing patterns. Associating and labeling that voice data with a specific name—"name-indexing"—is the process used for voice verification: taking a sample voice clip, indexing it by name, and then storing it in a way that it can be used to identify a second voice sample as a sample from the same person whose voice is contained in the first sample.[83] In processing data to create its platform, Suno name-indexed a large quantity of voice data without consent.[84] An AI model can use data at this scale to evaluate unidentified voices and associate them with the vocalist who spoke or sang them. Accordingly, this data constitutes "voiceprints" within the meaning of the Illinois Biometric Information Privacy Act, 740 ILCS 14/10. BIPA does not define "voiceprint," but the term as commonly understood in audio engineering and biometric science means precisely what Suno creates during its processing pipeline: a representation of the unique identifying characteristics of an individual's voice that can be used to identify that person. This is earlier in the technical process and distinct from Suno's output songs, which are discussed above; it is inside the data processing pipeline that Suno creates and stores voiceprints.

---

[83] *See e.g.* https://www.wellsfargo.com/privacy-security/voice-verification/ ("Voice Verification is a biometric technology that allows you to use your unique voiceprint as an option to help verify who you are when you call Wells Fargo. When you successfully use your voiceprint, in combination with other identifiable information, you can quickly access account information.")

[84] Suno allows users to upload a recording of their own voices to use on the platform, stating: "Add your voice to the mix. Record or upload a sample and we'll use this content to influence how your generated songs sound." Before users can save a voice, they are required to provide consent to sharing biometric information: "I understand that the creation of a Voice involves the processing of voice-related data that may be considered biometric information under certain laws, and I consent to the collection and processing of such information in accordance with the Suno Terms of Service and Privacy Policy." Suno did not seek or obtain any such consent with respect to the musicians' voices it captured, stored, and used in creating its platform. See Exhibit 39 (captured April 21, 2026).

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 52 of 84

***The Rights Asserted Are Identity Rights, Not Copyrights***

97. Each claim in this Complaint survives copyright preemption on three independent grounds, any one of which is sufficient. First, the subject matter of each claim is the identity of a human being, which is not a work of authorship and is not within the subject matter of copyright, however the identity was derived. Second, the identity right and the sound-recording copyright reside in different licensing agreements or rightsholders, and a right excluded from a license cannot be "equivalent to" a right that is included. Third, the right of publicity vindicates a substantial and independent state interest in protecting persons, not works, that Congress expressly preserved in 17 U.S.C. § 301(b)(1).

***The Illinois Nexus***

98. The circumstances relating to Suno's violations of the Illinois statutes invoked in Counts I and II occurred primarily and substantially in Illinois. The Illinois and BIPA subclass members are Illinois residents whose identities were taken. Their voices and identifying attributes are those of Illinois domiciliaries; the recordings from which Suno extracted those attributes were in substantial part created in Illinois, where class members have lived, performed, and recorded; and the injury to the Illinois subclass members' identities—the loss of control, the diversion of licensing and endorsement value, the dilution—was suffered by them in Illinois.

99. Suno also continuously controls and directs the exploitation itself into Illinois. Suno offers tiered subscription plans (free, Pro, and Premier) to Illinois residents on a recurring monthly basis and accepts and processes payments from Illinois users; on information and belief it tracks Illinois usage by state, metropolitan area, and ZIP code through geolocation, billing, and analytics data, and maintains ordinary-course metrics of its Illinois accounts, subscribers, revenue, and usage; it markets to and communicates with Illinois users, provides them customer

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 53 of 84

support, and reaches their devices through its iOS and Android apps, push notifications, and integrations with Microsoft Copilot and Amazon Alexa; and it permits and encourages Illinois users to disseminate outputs generated in Illinois on third-party platforms. Every prompt answered for an Illinois user is a deployment, in Illinois, of the identities Suno took.

## IV. CLASS ACTION ALLEGATIONS

100. Plaintiffs bring this action under Federal Rule of Civil Procedure 23(b)(3) on behalf of a Class consisting of all Subclasses defined below, seeking damages, disgorgement, and injunctive relief for all Subclasses. In the alternative, to the extent the Court determines that common questions do not predominate over individualized questions for all Subclasses considered together, Plaintiffs seek certification under Rule 23(b)(3) of the Illinois, BIPA, California, Pennsylvania, Washington, New Jersey, Michigan, Hawaii, and Puerto Rico Subclasses (collectively, the "Core Subclasses"), together with certification under Rule 23(c)(4) of the Rule 23(c)(4) Common Questions, defined in Paragraph 105 below, as to the New York, Massachusetts, Georgia, Florida, Ohio, Texas, and Tennessee living-person Subclasses and all Post-Mortem Subclasses (collectively, the "Issue Subclasses").

**Proposed Illinois Subclass:** All musicians residing in Illinois whose names are or have been accepted as prompts in Suno, and, as to deceased musicians who would otherwise fall within this definition, the spouse, parent, child, or grandchild of the deceased entitled to enforce the deceased's rights under 765 ILCS 1075/15 and 1075/20(a)(3), or any person to whom those rights were transferred by written instrument under 765 ILCS 1075/15.

**Proposed BIPA Subclass:** All living musicians residing in Illinois who created sound recordings containing voiceprints or vocal identifiers that Suno collected, captured, stored, or

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 54 of 84

used without obtaining informed written consent as required under the Illinois Biometric Information Privacy Act, 740 ILCS 14/1, et seq.

**Proposed California Common Law Subclass:** All musicians residing in California whose names are or have been accepted as prompts in Suno.

**Proposed New York Living-Person Subclass:** All living musicians whose names are or have been accepted as prompts in Suno within the State of New York.

**Proposed New York Post-Mortem Subclass:** All deceased musicians represented by their estates, heirs, beneficiaries, or personal representatives, who were domiciled in the State of New York at the time of death, who died on or after May 29, 2021, and (a) whose name, voice, signature, photograph, or likeness had commercial value at the time of or because of death and whose names have been accepted as prompts in Suno or (b) who for gain or livelihood were regularly engaged in singing, dancing, or playing a musical instrument, and whose digital replica has been used by Defendant's AI platform in a scripted audiovisual work or live performance of a musical work without consent.

**Proposed Tennessee Subclass:** All musicians residing in the State of Tennessee, and all deceased musicians represented by their estates, heirs, beneficiaries, or personal representatives who were domiciled in Tennessee at the time of death, whose names are or have been accepted as prompts in Suno, provided that (a) the deceased died within 10 years of the filing of this action, or (b) the deceased's right of publicity has been continuously exploited within the meaning of T.C.A. § 47-25-1104(b) such that the right has not extinguished.

**Proposed Florida Subclass:** All musicians residing in the State of Florida, and all deceased musicians represented by their estates, heirs, beneficiaries, or personal representatives

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 55 of 84

who were domiciled in Florida at the time of death and who died within 40 years of the filing of this action, whose names are or have been accepted as prompts in Suno.

**Proposed Texas Living-Person Subclass:** All living musicians residing in the State of Texas whose names are or have been accepted as prompts in Suno.

**Proposed Texas Post-Mortem Subclass:** All deceased musicians represented by the person or persons in whom the property right vests under Tex. Prop. Code § 26.005, or any transferee under Tex. Prop. Code § 26.004, whose names are or have been accepted as prompts in Suno and who died within 50 years preceding the date of the alleged extraction and use, and whose name, voice, signature, photograph, or likeness had commercial value at the time of death or came to have such value after death.

**Proposed Ohio Subclass:** All musicians residing in the State of Ohio, and all deceased musicians represented by their estates, heirs, beneficiaries, or personal representatives who were domiciled in Ohio at the time of death and who died within 60 years of the filing of this action, whose names are or have been accepted as prompts in Suno.

**Proposed Pennsylvania Subclass:** All musicians residing in the Commonwealth of Pennsylvania, and all deceased musicians represented by their estates, heirs, beneficiaries, or personal representatives who were domiciled in Pennsylvania at the time of death and who died within 30 years of the filing of this action, whose names are or have been accepted as prompts in Suno.

**Proposed Washington Subclass:** All musicians residing in the State of Washington, and all deceased musicians represented by their estates, heirs, beneficiaries, or personal representatives who were domiciled in Washington at the time of death, whose names are or have been accepted as prompts in Suno, provided that with respect to deceased musicians, the

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 56 of 84

use occurred (a) within 10 years of the deceased's death, or (b) within 75 years of the deceased's death if the deceased's identity had commercial value at the time of or because of death, thereby qualifying the deceased as a "personality" within the meaning of Rev. Code of Wash. § 63.60.010.

**Proposed Massachusetts Subclass:** All musicians residing in the State of Massachusetts, and all deceased musicians represented by their estates, heirs, beneficiaries, or personal representatives who were domiciled in Massachusetts at the time of death, whose names are or have been accepted as prompts in Suno.

**Proposed New Jersey Subclass:** All musicians residing in the State of New Jersey, and all deceased musicians represented by their estates, heirs, beneficiaries, or personal representatives who were domiciled in New Jersey at the time of death, whose names are or have been accepted as prompts in Suno.

**Proposed Michigan Subclass:** All musicians residing in the State of Michigan and all deceased musicians represented by their estates, heirs, beneficiaries, or personal representatives who were domiciled in Michigan at the time of death, whose names are or have been accepted as prompts in Suno.

**Proposed Georgia Subclass:** All musicians residing in the State of Georgia, and all deceased musicians represented by their estates, heirs, beneficiaries, or personal representatives who were domiciled in Georgia at the time of death, whose names are or have been accepted as prompts in Suno.

**Proposed Puerto Rico Subclass:** All musicians and all deceased musicians represented by their estates, heirs, beneficiaries, or personal representatives, whose names are or have been

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 57 of 84

accepted as prompts in Suno within Puerto Rico, provided that with respect to deceased musicians, the use occurred within 25 years of the deceased's death.

**Proposed Hawaii Subclass:** All musicians residing in the State of Hawaii, and all deceased musicians represented by their estates, heirs, beneficiaries, or personal representatives who were domiciled in Hawaii at the time of death and who died within 70 years of the filing of this action, whose names are or have been accepted as prompts in Suno.

101. Each Subclass is defined independently and may be certified, modified, or denied independently of any other Subclass. The Core Subclasses may be certified under Rule 23(b)(3) for full damages and injunctive relief regardless of the certification status of any Issue Subclass. The Issue Subclasses may be certified under Rule 23(c)(4) as to the Rule 23(c)(4) Common Questions independently of, and regardless of the outcome of, certification of the Core Subclasses, with any remaining subclass-specific elements—including the identity of the proper rights-holder for any Post-Mortem Subclass—resolved through subsequent individual, subgroup, or phased proceedings.

102. Excluded from each Class and Subclass are: (a) Defendants, their officers and directors; (b) members of the judiciary assigned to this action; and (c) any individual who personally executed a written consent authorizing Suno's use of that individual's identity or biometric identifiers, for the period and to the extent of that consent.

103. **Licensed-Catalog Limitation**. To the extent any record label or other rights holder has entered into a license or settlement with Suno concerning the use of sound recordings,[85] the claims of class members whose recordings are subject to such an agreement are

[85] Warner Music Group, *Warner Music Group and Suno Forge Groundbreaking Partnership* (Nov. 25, 2025), available at https://www.wmg.com/news/warner-music-group-and-suno-forge-groundbreaking-partnership ("AI becomes pro-artist when it adheres to our

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 58 of 84

asserted (a) in full for all conduct predating the effective date of any such agreement, and (b) thereafter, to the full extent the agreement did not, by the class member's own written consent, convey rights in that member's identity, including biometric rights. No copyright license, assignment, settlement, or other agreement concerning any copyrighted work conveys the rights asserted in this Complaint, which belong to the individual separately from any ownership or assignment of copyright or creation of copyright as a work made for hire within the meaning of 17 U.S.C. §§ 101, 201(b).[86] This limitation is included to make plain that no claim asserted here seeks to control, burden, or interfere with any copyright owner's or licensee's exploitation of any work. Accordingly, no class member is prevented, by membership in any of this Complaint's Classes, from bringing separate copyright claims that they are eligible to bring.

104. **No Duplicate Damages.** No class member or estate shall recover duplicative damages under more than one subclass for the same unauthorized use of their identity. Where a class member or estate qualifies for recovery under more than one subclass, the Court shall award relief under the subclass that provides the greatest recovery to that class member, or shall structure damages to avoid duplication while preserving access to the most favorable remedial framework available to each class member.

---

principles: committing to licensed models, reflecting the value of music on and off platform, and **providing artists and songwriters with an opt-in for the use of their name, image, likeness, voice and compositions** in new AI songs." (emphasis added)); *Id.* ("**Artists and songwriters will have full control over whether and how their names, images, likenesses, voices, and compositions are used** in new AI-generated music." (emphasis added)).

[86] See, e.g., Warner Music Group, *Growing the Value of Music for Artists and Songwriters* (Nov. 20, 2025), https://www.wmg.com/news/growing-the-value-of-music-for-artists-and-songwriters ("Every AI deal we make is guided by three non-negotiable principles . . . **artists and songwriters will have a choice to opt-in to any use of their name, image, likeness, or voice** in new AI-generated songs." (emphasis added)).

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 59 of 84

105. **Numerosity.** The members of the Class are so numerous that joinder is impracticable. On information and belief, Suno has trained its product, at a minimum, on datasets of tens of millions of recordings and distilled the identities of millions of musicians.

106. **Typicality.** Plaintiffs' claims are typical of the claims of the members of the Class. Class members are musicians whose identifying attributes were distilled from the dataset(s) on which Suno trained its AI and encoded into the model's weights used by Suno to generate output in response to user prompts.

107. **Adequacy.** Plaintiffs will fairly and adequately represent the interests of the putative Class and have retained counsel from Korein Tillery LLC who are competent and experienced in commercial and class action litigation. Plaintiffs are committed to vigorous prosecution and have no interests adverse or antagonistic to the Class.

108. **Superiority.** A class action is superior to all other available means for the fair and efficient adjudication of the claims of the Class. Individual recoveries may be small relative to the burden of individual prosecution, making individual litigation impractical for most class members. Individual litigation would also burden the courts with numerous suits, creating the risk of inconsistent or contradictory judgments and increasing delay and expense for all parties. Class treatment provides the benefits of single adjudication, economies of scale, and supervision by a single court. Class members are ascertainable through standard class-action practice, including through Suno's own records of which musicians' identifying attributes were computed, tokenized, and stored as part of its processing pipeline—a fact independent of, and separately verifiable from, which specific recordings were used as inputs. Where the Issue Subclasses present additional or different legal elements not shared by the Core Subclasses, those Subclasses can be managed through certification of the Rule 23(c)(4) Common Questions under Rule

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 60 of 84

23(c)(4), with a subsequent phase addressing each Issue Subclass's remaining elements through individual proceedings, subgrouping, or a special master, without requiring uniform treatment of the Core Subclasses and Issue Subclasses under a single certification vehicle.

109. **Existence and Predominance of Common Questions of Law and Fact.** Numerous questions of law and fact are common to Plaintiffs and all members of the Classes. These common questions will yield common answers that govern resolution of the claims, and they predominate over any questions affecting only individual members. Further, resolution of the Rule 23(c)(4) Common Questions in Plaintiffs' favor will establish the predicate finding common to every Subclass: that Suno appropriated class members' musical identities without consent as a matter of common proof, applicable to living and deceased class members alike, regardless of which state's law ultimately governs the remaining elements of liability, damages, or the identity of the person entitled to enforce a deceased class member's right.

110. Predominance as to the Core Subclasses. The Core Subclasses share operative statutory or common-law elements that are materially the same: each protects a broadly defined attribute of identity, including voice; each defines commercial use expansively without a direct promotion or similarly narrow restriction; and none imposes a pre-existing commercial-value prerequisite as a condition of the right's existence. Common questions predominate as to the Core Subclasses because the same evidence establishes liability under each Core Subclass's law without requiring individualized proof beyond the Common Questions and the correct measure of classwide statutory or actual damages.

111. Basis for Issue Certification as to the Issue Subclasses. The Issue Subclasses present additional or different elements not shared by the Core Subclasses—including a direct promotion requirement (Florida), a 'purely financial gain' or similar requirement (Georgia), a

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 61 of 84

pre-existing commercial-value or persona-value prerequisite (Ohio, Texas, Tennessee common law), a primary purpose and knowledge requirement (Tennessee, to the extent pled under Tenn. Code Ann. § 47-25-1105(a)(3)), and, for the Post-Mortem Subclasses, materially different statutory schemes governing the duration, descendibility, and identity of the person entitled to enforce a deceased individual's rights. To the extent these additional or different elements prevent common questions from predominating over individualized questions for the Issue Subclasses considered as a whole, Plaintiffs submit that the Rule 23(c)(4) Common Questions remain appropriate for certification as a common issue under Rule 23(c)(4), because its resolution will materially advance the litigation by establishing the common factual and legal predicate applicable to every Issue Subclass, leaving the subclass-specific elements identified above, and the identification of each Post-Mortem Subclass's proper rights-holder, for subsequent individual, subgroup, or phased proceedings.

112. The Common Questions include, without limitation:

A. Whether Suno extracted class members' identifying attributes in training its model and used those attributes in building its name-indexed musician outputs without consent ("The First Rule 23(c)(4) Common Question");

B. Whether any of the claims are preempted by the Copyright Act ("The Second Rule 23(c)(4) Common Question");

C. Whether the attributes Suno extracted and deploys constitute the class members' identities within the meaning of the statutes and common law doctrines invoked herein;

D. Whether Suno used musicians' musical identities for commercial purposes without consent within the meaning of the Illinois Right of Publicity Act, the California

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 62 of 84

common-law right of publicity, New York Civil Rights Law §§ 50, 50-f, and 51, and the other state laws invoked herein;

E. Whether Suno created and/or stored voiceprints of class members of the BIPA subclass;

F. Whether Suno collected, stored, and commercially exploited BIPA class members' biometric identifiers in the form of voiceprints without obtaining informed consent under the Illinois Biometric Information Privacy Act;

G. Whether any First Amendment or other affirmative defense applies to Suno's 1) extraction of the class members' identifying attributes from the training corpus, 2) storage and use of those identifying attributes for training, 3) encoding those attributes into the model's weights; and 4) ongoing commercial deployment of those attributes through its name-indexed platform.

H. The correct measure of class-wide damages; and

I. Whether injunctive relief is appropriate to restrain Suno from continuing to exploit the Class's identities.

## V. CLAIMS FOR RELIEF

### a. COUNT I – Violation of the Illinois Right of Publicity Act (IRPA), 765 ILCS 1075/1 et seq.

113. Illinois law begins from a premise as old as recognition itself: identity belongs to the person it identifies, and the attributes by which an ordinary listener recognizes a musician—whether by voice, name, or by the recognizable persona through which the person is known—are that musician's to control.

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 63 of 84

114. Plaintiffs reallege and incorporate by reference all preceding paragraphs, including the Illinois nexus allegations. Plaintiffs bring this claim individually and on behalf of all other Illinois Class members.

115. The Illinois Right of Publicity Act establishes "[t]he right to control and to choose whether and how to use an individual's identity for commercial purposes" and prohibits using an individual's identity for commercial purposes during the individual's lifetime without first obtaining written consent. 765 ILCS 1075/10, 1075/30. "Identity" is defined as "any attribute of an individual that serves to identify that individual to an ordinary, reasonable viewer or listener, including but not limited to: (i) name, (ii) signature, (iii) photograph, (iv) image, (v) likeness, or (vi) voice." 765 ILCS 1075/5. "Commercial purpose" is defined as "the public use or holding out of an individual's identity (i) on or in connection with the offering for sale or sale of a product, merchandise, goods, or services; (ii) for purposes of advertising or promoting products, merchandise, goods, or services; or (iii) for the purpose of fundraising." *Id.* The elements of a claim under IRPA are: 1) appropriation of plaintiff's identity, 2) without plaintiff's written consent, 3) for the defendant's commercial purpose.

116. Plaintiffs' name and persona serve to identify Plaintiffs to ordinary, reasonable listeners. The commercial value of Plaintiffs' identity is established and documented.

117. Suno violated the Act through two related but independently sufficient courses of conduct, each undertaken without Plaintiffs' written consent or any attempt to obtain it:

(a) The Name-Indexed Suno platform. Suno's product recognizes, retrieves, and deploys the identities of musicians by name. This is true even where Suno's outputs fall short of the true talent it evokes. From a name prompt alone, a user receives a multi-modal experience

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 64 of 84

evoking that named artist. This includes access to a generated song like one the named musician might make, a description of the musician's attributes, and a related image.

(b) The extraction. Suno also appropriated Plaintiffs' identities when it extracted their identifying attributes during its training pipeline to train the autoregressive transformer weights, providing the platform's core capability of music generation. Suno publicly uses the class members' identities with each deployment of the model to generate music as the class members' identities form the basis of the autoregressive music transformer's inferential ability. The identifying attributes that created the transformer's inferential ability are attributes "that serve[] to identify" the class members as they are the attributes distilled from music the class members created—not the attributes fixed in any one recording, but across and beyond them all.

118. Suno offers its capabilities to the public without Plaintiffs' consent for Suno's commercial purpose: to sell or induce the purchase of the paid-tier of its product or to promote and advertise its product through the free-tier.

119. Suno publicly uses or holds out the class members' identities by touting that the product was built using all music on the internet—noting that this is what makes the product work well and gives it value—and through affiliate marketers that drive paid-subscription traffic based on evoking specific musicians' attributes.[87] The musicians whose identities power the product are the product's advertised selling point, and the platform's organization around and responsiveness to musicians' names is among its most commercially valuable capabilities. Additionally, on information and belief, Suno held out these extracted identities and outputs for purposes of fundraising through demonstrations and representations to current and potential investors in its company. Technology companies routinely demonstrate their products to current

---

[87] *Supra* at ¶¶ 43-46, 53.

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 65 of 84

and prospective investors as part of soliciting investment, and Suno has raised capital across multiple funding rounds, including a $400 million raise recently announced at a $5.4 billion valuation.[88]

120. Suno's use was for a "commercial purpose" within the meaning of 765 ILCS 1075/5 and is not within any exempt category. Suno's use of Plaintiffs' identity to create, promote, and sell its service is commercial use that is not protected by the First Amendment and not exempt as "news," "public affairs," or any other non-commercial use.

121. This claim asserts rights outside the subject matter of copyright and is not preempted by 17 U.S.C. § 301. Plaintiffs assert no rights in any work of authorship; the subject of this claim is Plaintiffs' identities, which are not fixed in any tangible medium of expression and are not a work of authorship. See *Toney v. L'Oréal USA, Inc.*, 406 F.3d 905, 908–11 (7th Cir. 2005) (identity "is an amorphous concept that is not protected by copyright law; thus, the state law protecting it is not preempted"; "there is only one underlying persona of a person protected by the right of publicity," while a recording is merely one copyrightable fixation); accord *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1003–04 (9th Cir. 2001); *Landham v. Lewis Galoob Toys, Inc.*, 227 F.3d 619, 623 (6th Cir. 2000); *Brown v. Ames*, 201 F.3d 654, 658 (5th Cir. 2000). The IRPA's written-consent and commercial-purpose elements protect a right—the right to control the commercial use of one's identity—that is qualitatively different from any exclusive right under 17 U.S.C. § 106. This claim would be identical if every recording Suno ingested were in the public domain, and it neither asserts nor burdens any right in any copyrighted work because the right of publicity does not rest in the ownership or lack of ownership in copyright; it is a separate right that Plaintiffs have not licensed.

[88] *Supra* at note 78.

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 66 of 84

**b. COUNT II – Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/1 et seq.**

122. BIPA was enacted because the Illinois General Assembly recognized something obvious about biometrics: unlike a password, a voiceprint cannot be changed if it is stolen. Once captured, the unique acoustic identifiers of a person's voice exist, in the world, in the hands of whoever took them. The Illinois legislature responded with informed-consent requirements, retention-policy mandates, and a private right of action for any person "aggrieved by a violation." 740 ILCS 14/15, 14/20. Suno never asked, never disclosed, never published a retention policy, and never obtained the written consent BIPA requires.[89] It captured and stored the voiceprints anyway, and built a projected billion-dollar business on top of them.

123. Plaintiffs reallege and incorporate by reference all preceding paragraphs, including the Illinois Nexus allegations. Plaintiffs bring this claim individually and on behalf of all other BIPA Subclass members.

124. The Illinois Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1 et seq. defines "biometric identifier" to include a "voiceprint" and prohibits private entities from: 1) collecting, capturing, purchasing or otherwise obtaining biometric identifiers or biometric information without informed written consent (740 ILCS § 14/15(b)); 2) selling, trading, leasing or otherwise profiting from a person's biometric identifiers or biometric information (740 ILCS § 14/15(c)); and 3) disclosing or disseminating a person's biometric identifiers or biometric information without consent or a valid statutory reason, such as complying with state or federal law. (740 ILCS § 14/15(d)).

[89] *See supra* at notes 35, 84.

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 67 of 84

125. BIPA also requires private entities in possession of biometric identifiers or biometric information to: 1) develop a public written policy establishing, among other things, a retention schedule; and 2) store, transmit, and protect from disclosure all biometric identifiers and biometric information using a reasonable standard of care and in a manner equally or more protective than the manner in which the private entity stores other confidential and sensitive information. 740 ILCS 14/15(e).

126. BIPA creates a private right of action for any person "aggrieved by a violation" of the Act and authorizes liquidated damages (or actual damages if greater), attorneys' fees and costs, and other relief including injunctive relief. 740 ILCS 14/20.

127. The voiceprints Suno computed are biometric identifiers of persons, not recordings and not works. As alleged above, a voiceprint is a set of computed measurements of the unique physiological and behavioral characteristics of an individual's voice, capable of identifying that individual across any recording and independent of every recording. What BIPA protects—and what Suno took—is information about the human being, which no copyright protects, which no label owns, and which no license of any recording could convey.

128. Suno captured Illinois subclass members' voiceprint data and did so without their consent. This violation was complete the moment Suno extracted and stored the identifying measurements of their voices as part of its processing pipeline—before any model was trained, before any product was sold, and before any user typed a single prompt. Each subsequent computation, storage, or use of their voiceprints—including in the training of each successive model version—was a further violation, establishing a continuing course of unlawful conduct.

129. Suno then profited from this capture by using it to make its commercial product, projected to generate $1 billion in revenue by 2028, in violation of 740 ILCS 14/15(c).

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 68 of 84

130. Suno failed to develop a written public policy establishing a retention schedule and does not store the biometric data in line with the protections afforded its most confidential and sensitive information.

131. Plaintiffs are aggrieved within the meaning of BIPA because of Suno's non-compliance with BIPA with respect to Plaintiffs' biometric identifiers and information.

132. Suno's conduct was intentional or reckless in failing to comply with BIPA before, during and after capturing Plaintiffs' voiceprints. Suno has demonstrated its awareness that its voice-processing technology implicates the collection and storage of biometric information requiring consent under law.[90]

133. In the alternative, Suno's conduct was negligent in failing to comply with BIPA before, during, and after capturing Plaintiffs' voiceprints.

134. Accordingly, Plaintiffs seek the higher liquidated damages available for intentional or reckless violations or, in the alternative, the liquidated damages available for negligent violations, or actual damages, whichever is greater.

135. This claim protects an interest—informational self-determination in the biometric identifiers of a living person—that has no analogue in, and asserts no right equivalent to, any exclusive right under the Copyright Act, and it is not preempted.

**c. COUNT III – California Common Law Right of Publicity**

136. California has seen this before. In 1988, Samsung ran an ad promoting the existence of its products in the far future and featuring a golden robot in a wig next to a board with turning letters, evoking the gameshow Wheel of Fortune.[91] The essential joke of that ad was

---

[90] *See supra* at notes 35, 84.
[91] See Exhibit 40.

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 69 of 84

that Samsung makes the electronics "you'll be using long after Vanna White is replaced by a robot."[92] Suno went further than any advertiser ever did. It did not build one robot imitation for one ad; it built an impersonation machine—extracting the identifying attributes of the musicians themselves and encoding them into a name-indexed product that manufactures recognizable multi-modal musician-based experiences on demand, at industrial scale, for profit.

137. California's common-law right of publicity has always been larger than any exhaustive list. As the Ninth Circuit put it, "A rule which says that the right of publicity can be infringed only through the use of nine different methods of appropriating identity merely challenges the clever advertising strategist to come up with the tenth." *White v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395, 1398 (9th Cir. 1992). Suno found the tenth: the autoregressive music transformer. The legal answer is the same one *White, Midler*, and *Waits* gave: identity belongs to the person whose identity it is, and an enterprise that builds a commercial product from the unconsented use of that identity has appropriated what is not its own.[93]

138. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein. Plaintiffs bring this claim individually and on behalf of all members of the California Common Law Subclass.

139. California's common law right of publicity protects every person's exclusive right to control the commercial use of his or her identity. It extends to any attribute of a person's

---

[92] Matt Novak, *Robot Vanna, Trashy Presidents and Steak as Health Food: Samsung Sells Tomorrow,* Smithsonian Magazine (February 20, 2013), https://www.smithsonianmag.com/history/robot-vanna-trashy-presidents-and-steak-as-health-food-samsung-sells-tomorrow-22348926/

[93] *Midler v. Ford Motor Co.*, 849 F.2d 460, 463 (9th Cir. 1988). *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1099–1100, 1106–08, 1112 (9th Cir. 1992).

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 70 of 84

identity by which that person is publicly recognizable—including name, likeness, and persona—and to any means of appropriating it. *See White*, 971 F.2d at 1398.

140. To state a common law right of publicity claim in California, a plaintiff must establish: (1) the defendant's use of the plaintiff's identity; (2) appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury.

141. Subclass members possess distinctive identities that encompass their names and the unique combinations of identifying attributes by which ordinary reasonable listeners recognize each of them. These distinct identities have established and documented commercial value. These identities are their property and their commercial value belongs exclusively to them.

142. Suno appropriated subclass members' identities through two separate but related courses of conduct, each of which independently constitutes a use undertaken without Plaintiffs' consent or any attempt to obtain it:

(a) The Name-Indexed Suno platform. Suno's product recognizes, retrieves, and deploys the identities of musicians by name. This is true even where Suno's outputs fall short of the true talent it evokes. From a name prompt alone, a user receives a multi-modal experience evoking that named artist. This includes access to a generated song like one the named musician might make, a description of the musician's attributes, and a related image.

(b) The extraction. Suno also appropriated Plaintiffs' identities when it extracted their identifying attributes during its training pipeline to train the autoregressive transformer weights, providing the platform's core capability of music generation. Suno publicly uses the class

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 71 of 84

members' identities with each deployment of the model to generate music as the class members' identities form the basis of the autoregressive music transformer's inferential ability.

143. Suno appropriated Plaintiffs' names and identities to its own advantage: to build, fund, deploy, promote, and attract investment in the Suno platform. Suno publicly uses class members' identities by touting that the product was built using all music on the internet—noting that this is what makes the product work well and gives it value—and through affiliate marketers that drive paid-subscription traffic based on evoking specific musicians' attributes.[94] The musicians whose identities power the product are the product's advertised selling point, and the platform's organization around and responsiveness to musicians' names is among its most commercially valuable capabilities. Additionally, on information and belief, Suno held out these extracted identities and outputs for purposes of fundraising through demonstrations and representations to current and potential investors in its company. Technology companies routinely demonstrate their products to current and prospective investors as part of soliciting investment, and Suno has raised capital across multiple funding rounds, including a $400 million raise recently announced at a $5.4 billion valuation.[95]

144. The technology is new; the appropriation is not. The right asserted is the right to the identity—not the right to any recording—and it is preserved against preemption regardless of the source from which Suno chose to capture it.

145. Subclass members have sustained damages as a result of Suno's knowing, unauthorized commercial use of their identities, including injury to the commercial value of their identities; diversion of licensing and endorsement opportunities and revenue; dilution of the

[94] *Supra* at ¶¶ 43-46, 53.
[95] *Supra* at note 78.

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 72 of 84

distinctiveness and market value of their identities; and loss of control over how their identities are commercially associated and perceived.

**d. COUNT IV – Violation of New York Civil Rights Law § 51**

146. In 1903, New York became the first state to recognize that identity is not free for the taking, through the enactment of Sections 50 and 51 of the Civil Rights Law—making New York the birthplace of American publicity rights. More than a century later, New York law continues to protect "[a]ny person whose name, portrait, picture, likeness or voice is used within [New York State] for advertising purposes or for the purposes of trade without…written consent." N.Y. Civ. Rights Law § 51. Suno obtained no such consent before capturing and commercially deploying the class members' identities.

147. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein. Plaintiffs bring this claim individually and on behalf of all members of the New York Living-Person Subclass.

148. To state a claim under § 51, a plaintiff must establish (1) the defendant used the plaintiff's name, portrait, picture, likeness, or voice; (2) within the State of New York; (3) for advertising purposes or for the purposes of trade; and (4) without the plaintiff's prior written consent.

149. Subclass members are natural persons whose names and likenesses are protected attributes within the meaning of § 51, serving to identify them to ordinary, reasonable listeners, with established and documented commercial value.

150. Suno knowingly used subclass members' names and likenesses within the meaning of § 51. Suno's use occurred in two separate but related courses of conduct, each of which independently constitutes a knowing use:

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 73 of 84

(a) The Name-Indexed Suno platform: Without consent, Suno's product recognizes, retrieves, and deploys the identities of musicians by name. This is true even where Suno's outputs fall short of the true talent it evokes. From a name prompt alone, a user receives a multi-modal experience evoking that named artist. This includes access to a generated song like one the named musician might make, a description of the musician's attributes, and a related image.

(b) The extraction. Suno also appropriated Plaintiffs' identities when it extracted their identifying attributes during its training pipeline to train the autoregressive transformer weights, providing the platform's core capability of music generation. Suno publicly uses the class members' identities with each deployment of the model to generate music as the class members' identities form the basis of the autoregressive music transformer's inferential ability. The identifying attributes that created the transformer's inferential ability are attributes "that serve[] to identify" the class members as they are the attributes distilled from music the class members created—not the attributes fixed in any one recording, but across and beyond them all.

151. Without consent, Suno extracted subclass members' identifying attributes and used those captured identities to form its name-indexed musician-experience product for deployment within New York through Suno's platform, which is available to the people of New York, has New York subscribers, processes New York transactions, and responds to prompts from—and generates outputs to—users located within the State of New York.

152. Suno built, deploys and promotes its product for the purposes of trade. Suno holds out the class members' identities by touting that the product was built using all music on the internet—noting that this is what makes the product work well and gives it value—and through affiliate marketers that drive paid-subscription traffic based on evoking specific musicians'

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 74 of 84

attributes.[96] Additionally, on information and belief, Suno utilized these extracted identities and name-triggered musician-based outputs in investor presentations through demonstrations and representations to current and potential investors in its company. Technology companies routinely demonstrate their products to current and prospective investors as part of soliciting investment, and Suno has raised capital across multiple funding rounds, including a $400 million raise recently announced at a $5.4 billion valuation.[97] *See Lehrman v. Lovo, Inc.*, No. 234-cv-08269, 2025 WL 1902547, *383 (S.D.N.Y. July 10, 2025) (finding that defendant's use of appropriated identities in online tutorials and investor presentations was sufficient to allege use for the purposes of both advertisement and trade).

153. The artists whose identities power the product are the product's advertised selling point, and the platform's recognition of and responsiveness to musicians' names is among its most commercially valuable capabilities. This promotion is directed at Suno's users, subscribers, and potential users and subscribers including those in New York.

154. Plaintiffs do not assert any copyright interest in any sound recording, and this claim is not grounded in the reproduction or distribution of any copyrighted work. The interests asserted are exclusively Plaintiffs' personal identity interests—the right to control the commercial exploitation of the identifying characteristics of the person's name and likeness—a property right belonging to the person, distinct from and in addition to any copyright interest that may exist in any underlying recording. The identifying attributes asserted are attributes of the performer as a person—capable of being observed across many different recordings and many different compositions—and are not the copyrightable expression fixed in any particular

[96] *Supra* at ¶¶ 43-46, 53.
[97] *Supra* at note 78.

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 75 of 84

recording. *See Midler*, 849 F.2d at 462 ("A voice is not copyrightable."); *Waits*, 978 F.2d at 1100 (voice misappropriation is not preempted by federal copyright law); 17 U.S.C. § 114(b).

155. Subclass members have sustained damages as a result of Suno's knowing, unauthorized commercial use of their identities, including but not limited to: injury to the commercial value of their identities; diversion of licensing and endorsement opportunities and revenue they would otherwise have received for authorized uses of their identities; dilution of the distinctiveness and market value of their identities; and loss of control over how their identities are commercially associated and perceived.

**e. COUNT V – Violation of New York Civil Rights Law § 50-f**

156. Death does not extinguish identity. Section 50-f exists precisely because the Legislature understood that the commercial value of a musician's identity does not dissolve at death, and that those who would exploit that identity after death are no less culpable than those who would exploit it during life. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein. These claims are brought on behalf of all members of the New York Post-Mortem Subclass.

157. New York Civil Rights Law § 50-f prohibits any person from knowingly using a deceased personality's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services, without prior consent. It separately prohibits the use of a "deceased performer's digital replica in an audiovisual work, sound recording, or for the live performance of a musical work, with knowledge that the use was of a digital replica and was not authorized by the applicable right holder[.]" N.Y. Civ. Rights Law § 50-f. A "deceased personality" is defined as a deceased person domiciled in the state of New York at the time of

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 76 of 84

death whose identity had commercial value at the time of or because of death. N.Y. Civ. Rights Law § 50-f (1)(b). A "deceased performer" is defined as "a deceased personality domiciled in [the state of New York] at the time of death who, for gain or livelihood, was regularly engaging in…singing…or playing a musical instrument." N.Y. Civ. Rights Law § 50-f (1)(a).

158. The New York Post-Mortem Subclass encompasses deceased musicians whose voices and identities are protected attributes within the meaning of § 50-f. Further, the commercial value of their identities is established and documented.

159. Suno knowingly used the deceased subclass members' names and likenesses within the meaning of § 50-f, through the same two courses of conduct alleged in Count IV: the deployment of a name-indexed platform triggered musician-based outputs and extraction of their identifying attributes to form its model and raise capital. Each is a knowing use on or in connection with products and services and for purposes of advertising and trade.

160. Suno's use occurred without consent. Neither the deceased nor any estate, heir, beneficiary, or personal representative authorized Suno to capture, encode, store, or commercially deploy any deceased subclass member's identity, and Suno never sought such authorization.

161. Plaintiffs do not assert any copyright interest in any sound recording, and this claim is not grounded in the reproduction or distribution of any copyrighted work. The interest asserted is exclusively the deceased's identity interest, as alleged in Count IV, and the outputs at issue are, by Suno's own account of its technology, independent fixations that do not replicate any recording.

162. The subclass has sustained damages as a result of Suno's knowing, unauthorized commercial use of the deceased's identities, including injury to the commercial value of those

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 77 of 84

identities, diversion of licensing opportunities and revenue, dilution, and loss of control over how the deceased's identities are commercially associated and perceived.

**f. Common Factual Allegations Applicable to Counts VI – XVII**

163. The Tennessee, Florida, Texas, Ohio, Pennsylvania, Washington, Massachusetts, New Jersey, Michigan, Georgia, Puerto Rico and Hawaii Subclasses encompass living and deceased musicians whose names and identity are protected under the laws invoked. The commercial value of subclass members' identities is established and documented. Suno appropriated class members' identities in two separate but related courses of conduct as described above in Count I: via the Name-Indexed platform and in the creation of that platform during the extraction of identity.

164. The entire course of conduct described above was undertaken for commercial purposes. Suno created its product from subclass members' identities in order to charge subscribers for access to it. Each generation for a paying subscriber is a knowing use of identity in the sale of a commercial service. Each generation for a user without a subscription is for purposes of enticing the user to pay to subscribe to Suno. Suno's own public statements acknowledge that its model is only as capable as the music it was trained on—the accumulated identities of the class.

165. Suno's use occurred without consent. No subclass member, no estate, heir, beneficiary, or personal representative of any deceased subclass member, authorized Suno to capture, encode, store, or commercially deploy the member's musical identity, and Suno never sought such authorization.

166. Subclass members have sustained damages as a result of Suno's knowing, unauthorized commercial use of their identities, including but not limited to: injury to the

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 78 of 84

commercial value of their identities; diversion of licensing and endorsement opportunities and revenue they would otherwise have received for authorized uses; dilution of the distinctiveness and market value of their identities; and loss of control over how their identities are commercially associated and perceived. These claims, like every claim in this Complaint, assert rights in the identities of persons, not rights in works, for the reasons set forth in the section titled "The Rights Asserted Are Identity Rights, Not Copyrights," which is incorporated by reference into each Count.

**g. COUNT VI – Violation of Tennessee Personal Rights Protection Act, T.C.A. §§ 47-25-1101 to 47-25-1108, Tennessee Common Law Right of Publicity**

167. Nashville is Music City, and became Music City because generations of musicians invested their lives in building something distinctive—a sound that belongs to them. Tennessee's Personal Rights Protection Act exists because the state understood that a musician's identity is not communal property to be harvested by anyone with a server farm. The Act prohibits the use of another's name, photograph, voice or likeness in any medium for commercial or advertising purposes without consent. T.C.A. § 47-25-1105.

168. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein. Plaintiffs bring this claim individually and on behalf of all members of the Tennessee Subclass.

**h. COUNT VII – Violation of Florida Statute § 540.08, Florida Common Law Right of Publicity**

169. Florida's right of publicity statute states that "[n]o person shall publish, print, display or otherwise publicly use for purposes of trade or for any commercial or advertising purpose the name, portrait, photograph, or other likeness of any natural person without" express consent. Plaintiffs reallege and incorporate by reference all preceding paragraphs, including the

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 79 of 84

Common Allegations, as though fully set forth herein. This claim is brought on behalf of the Florida Subclass.

**i. COUNT VIII – Violation of Texas Common Law Right of Publicity, Texas Property Code §26.002**

170. Texas prohibits the use of a person's name or likeness, for its associated value, without consent. For deceased individuals, Texas statutorily protects the property right in the use of the deceased's name, voice, signature, photograph, and likeness. Plaintiffs reallege and incorporate by reference all preceding paragraphs, including the Common Allegations, as though fully set forth herein. This claim is brought on behalf of all members of the Texas Subclasses.

**j. COUNT IX - Violation of Ohio Revised Code § 2741.01 et seq., Ohio Common Law Right of Publicity**

171. Ohio prohibits the use of an individual's persona, without consent, for a commercial purpose during the individual's lifetime or for a period of sixty years after the date of that individual's death. Plaintiffs reallege and incorporate by reference all preceding paragraphs, including the Common Allegations, as though fully set forth herein. This claim is brought on behalf of all members of the Ohio Subclass.

**k. COUNT X – Violation of Pennsylvania Statutory right of Publicity, 42 Pa. C.S.A. § 8316, and Pennsylvania Common Law Right of Publicity**

172. Pennsylvania's right of publicity law states: any "person whose name or likeness has commercial value and is used for any commercial or advertising purpose without written consent" may bring a cause of action. "Name" or "likeness" is defined as "[a]ny attribute…that serves to identify that natural person to an ordinary, reasonable viewer or listener, including, but not limited to, name, signature, photograph, image, likeness, voice, or a substantially similar imitation of one or more" of these attributes. 42 Pa. C.S.A. § 8316 (e). Plaintiffs reallege and incorporate by reference all preceding paragraphs, including the Common Allegations, as though

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 80 of 84

fully set forth herein. This claim is brought on behalf of all members of the Pennsylvania Subclass.

**l. COUNT XI – Violation of Revised Codes of Washington 63.60.010 et seq.**

173. Washington's right of publicity provides that every individual has a property right in the use of his or her own name, voice, signature, photograph, or likeness, and that this right may not be used for commercial purposes without consent. RCW 63.60.050. The right is not extinguished at death. "Likeness" is defined to include "the distinctive appearance, gestures, or mannerisms of an individual." RCW 63.60.020. Plaintiffs reallege and incorporate by reference all preceding paragraphs, including the Common Allegations, as though fully set forth herein. This claim is brought on behalf of all members of the Washington Subclass.

**m. COUNT XII – Violation of the Massachusetts Statutory Right of Publicity, Mass. Gen. Laws ch. 214, § 3A**

174. Massachusetts's right of publicity protects against the use of another's name for purposes of advertising or trade without consent. Plaintiffs reallege and incorporate by reference all preceding paragraphs, including the Common Allegations, as though fully set forth herein. This claim is brought on behalf of all members of the Massachusetts Subclass.

**n. COUNT XIII – Violation of the New Jersey Common Law Right of Publicity**

175. New Jersey's common law right of publicity protects not just a musician's name and likeness, but the attributes that make a musician recognizable as that musician: the identifying characteristics of performance. When a user types in Buddy Guy and Suno's output is a blues song like one Buddy Guy might make, a visual of a bag at the door as if someone is leaving, and a description of the technical aspects of the music Mr. Guy creates, they are getting a multi-media experience based on his attributes. New Jersey common law says these kinds of attributes belong to the human beings they identify. Plaintiffs reallege and incorporate by

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 81 of 84

reference all preceding paragraphs, including the Common Allegations, as though fully set forth herein. This claim is brought on behalf of all members of the New Jersey Subclass.

**o. COUNT XIV – Violation of Michigan Common Law Right of Publicity**

176. Michigan law refuses to construe the right of publicity so narrowly as to allow commercial exploitation to persist through technical evasions. In *Carson v. Here's Johnny Portable Toilets, Inc.*, the Sixth Circuit reversed the district court for taking "too narrow" a view of the right. Instead, the court found that Johnny Carson's catchphrase was so closely associated with him that its use constituted "an invasion of his right whether or not his 'name or likeness' [was] used." *Carson v. Here's Johnny Portable Toilets*, 698 F.2d 831, 835 (6th Cir. 1983). Suno did not just take a catchphrase, though for some it took that too[98]—it built a name-based model and platform. Plaintiffs reallege and incorporate by reference all preceding paragraphs, including the Common Allegations, as though fully set forth herein. This claim is brought on behalf of all members of the Michigan Subclass.

**p. COUNT XV – Violation of Georgia Common Law Right of Publicity**

177. Georgia's common law right of publicity protects against the appropriation of another's name and likeness without consent for commercial benefit. Plaintiffs reallege and incorporate by reference all preceding paragraphs, including the Common Allegations, as though fully set forth herein. This claim is brought on behalf of all members of the Georgia Subclass.

---

[98] *See e.g.,* Exhibit 41 - Suno, *Hammer Time*, https://suno.com/s/76V2BUwYra1nxSU4 (generated by Suno AI using the prompt "MC Hammer") (on file with counsel). *See also* GEICO Insurance, *Feels As Good As | Hammer Time*, YouTube, at 0:12 (uploaded Mar 5, 2026) https://youtu.be/X7HxdV-b6J0?si=vngB99pzu1mTZcvX (Insurance Company GEICO aired a television commercial titled "Hammer Time" featuring MC Hammer singing his hit "Can't Touch This" and saying his popular line: "Stop. Hammer Time." https://youtu.be/X7HxdV-b6J0?si=vngB99pzu1mTZcvX at 0:12.

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 82 of 84

178. Suno acted in bad faith by committing this intentional tort and issuing public statements contradicting their actual practices.[99] Accordingly, Plaintiffs are entitled to recover attorneys' fees and costs pursuant to Ga. Code Ann. § 13-6-11.

**q. COUNT XVI – Violation of Laws of Puerto Rico, Title 32 §§ 3151-3158**

179. Puerto Rico's right of publicity statute is violated by using "another's likeness for commercial, trade, or advertising purposes without…consent." "Likeness" is defined to include name, voice, and any "attribute or any representation of a person through which an average observer or listener may identify the same, produced using any reproduction procedure or technique." Plaintiffs reallege and incorporate by reference all preceding paragraphs, including the Common Allegations, as though fully set forth herein. This claim is brought on behalf of all members of the Puerto Rico Subclass.

180. Suno's conduct was deliberate. Based on its own actions and public statements,[100] Suno's taking of subclass members' identities was knowing and intentional. Suno's platform is deployed and used within Puerto Rico: it is available to the people of Puerto Rico, has Puerto Rico subscribers, processes Puerto Rico transactions, and responds to prompts from—and generates outputs to—users located within Puerto Rico. Accordingly, Plaintiffs seek the higher damages for deliberate violations, or in the alternative, statutory or compensatory damages, whichever is greater.

**r. COUNT XVII – Violation of Hawaii Revised Statute §§ 482P-1 to 482P-8**

181. Hawaii's right of publicity provides that every individual has a property right in the use of his or her own name, voice, signature, photograph, or likeness, and that this right may

---

[99] *See supra* ¶¶ 15-16, 37.
[100] *See supra* ¶¶ 15-16, 37.

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 83 of 84

not be used for commercial purposes without consent. Haw. Rev. Stat. §§ 482P-2, 482P-5. The right is not extinguished at death. "Likeness" is defined to include "a characteristic" of a "personality." A "personality" means "any individual whose name, voice, signature, likeness, or other attribute of their personality has commercial value." Haw. Rev. Stat. §482P-1. Plaintiffs reallege and incorporate by reference all preceding paragraphs, including the Common Allegations, as though fully set forth herein. This claim is brought on behalf of all members of the Hawaii Subclass.

## VI. PRAYER FOR RELIEF

A musician's identity is their property, but Suno took it without consent. This lawsuit is how these musicians resist the premise that resistance is futile.

WHEREFORE, Plaintiffs, on behalf of themselves and the Classes, respectfully request that the Court:

A. Determine that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(b)(3); in the alternative, determine that this action may be maintained as a class action for the Core Subclass pursuant to Rule 23(b)(3) and certify the Rule 23(c)(4) Common Questions as to the Issue Subclass pursuant to Rule 23(c)(4); and direct that reasonable notice of action be provided to the Classes pursuant to Rule 23(c)(2);

B. Enter judgment in favor of Plaintiffs and the Classes;

C. Enjoin Defendant from capturing, storing, or commercially exploiting Plaintiffs' and class members' identities, including their voices, names, and identifying attributes and simulations thereof, without consent;

D. Award statutory and liquidated damages, restitution, and disgorgement of profits;

E. Award punitive damages where permitted;

Case 1:26-cv-14005-PGL Document 1 Filed 08/31/26 Page 84 of 84

F. Award Plaintiffs and the Classes reasonable attorneys' fees and costs; and

G. Grant such other relief as the Court deems just and proper.

## VII. DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

Dated: August 31, 2026

Respectfully submitted,

By: Alan D. Rose

Alan D. Rose (BBO #: 427280)
adr@rose-law.net
**ROSE LAW PARTNERS LLP**
185 Dartmouth Street, Suite 602
Boston, Massachusetts 02116
Tel.: (617) 536-0040 / Fax (617) 536-4400

George A. Zelcs
gzelcs@koreintillery.com
Marc Wallenstein
mwallenstein@koreintillery.com
Audrey L. C. Austin
aaustin@koreintillery.com
Lucy Prather
lprather@koreintillery.com
**KOREIN TILLERY LLC**
*(pro hac vice applications to be filed)*
205 North Michigan, Suite 1950
Chicago, IL 60601
Tel.: (312) 641-9750 / Fax: (312) 641-9751

*Attorneys for Plaintiffs.*