**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

JASON ISBELL, DAVID LOWERY, GUY FORSYTH, and EDUARDO CALLE, *individually and on behalf of all others similarly situated*,

Plaintiffs,

v.

SUNO, INC., and UNKNOWN DEFENDANTS,

Defendants.

Civil Action No. 1:26-cv-14005-AK

# DEFENDANT SUNO, INC.'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**


PRELIMINARY STATEMENT ....... 1

BACKGROUND ....... 3

LEGAL STANDARD ....... 6

ARGUMENT ....... 6

I. Plaintiffs' Right of Publicity Claims Fail as a Matter of Law ....... 6

A. Plaintiffs Allege Use of Their Names as Shorthand for Categories of Musical Styles—Not Commercial Appropriation of Their Identities ....... 6

1. The "Violation by Recognition" Theory Is Not Actionable ....... 7

2. The "Violation by Training" Theory Fails Because Using an Artist's Music to Train a Transformative AI Model Is Not Appropriation of a Protected "Identity" ....... 17

B. Plaintiffs' Right of Publicity Claims Are Preempted by the Copyright Act ....... 18

1. Plaintiffs' Claims Are Expressly Preempted ....... 19

a. Plaintiffs' Claims Fall Within the Subject Matter of Copyright ....... 19

b. Plaintiffs' Claims Assert Rights Equivalent to Copyright's Exclusive Rights ....... 22

2. Plaintiffs' Claims Are Conflict Preempted ....... 25

C. Plaintiffs' Individual Claims Fail for Multiple Independent Reasons ....... 28

II. Plaintiffs Lack Standing to Assert Claims That Belong Solely to Absent Class Members ....... 30

A. Plaintiffs Cannot Assert an Illinois BIPA Claim ....... 30

B. Plaintiffs Cannot Assert Absent Class Members' Right of Publicity Claims from Other States or Post-Mortem Claims ....... 32

CONCLUSION ....... 34

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Allee v. Medrano*,
416 U.S. 802 (1974)....................33

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................6

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
489 U.S. 141 (1989)....................25

*Bullard v. MRA Holdings, LLC*,
740 S.E.2d 622 (Ga. 2013)....................32

*Campbell-Ewald Co. v. Gomez*,
577 U.S. 153 (2016)....................28

*Canidae, LLC v. Cooper*,
2022 WL 3588936 (N.D. Tex. Aug. 4, 2022)....................29, 32

*Cardtoons, L.C. v. Major League Baseball Players Ass'n*,
95 F.3d 959 (10th Cir. 1996) ....................15

*Comedy III Prods., Inc. v. Gary Saderup, Inc.*,
21 P.3d 797 (Cal. 2001) ....................15, 16

*Compco Corp. v. Day-Brite Lighting, Inc.*,
376 U.S. 234 (1964)....................26

*Cornette v. Graver*,
2020 WL 1643370 (W.D. Pa. Apr. 2, 2020)....................9

*Cortes v. Universal Music Latino*,
477 F. Supp. 3d 1290 (S.D. Fla. 2020) ....................20

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000)....................25

*Cross v. Facebook, Inc.*,
222 Cal. Rptr. 3d 250 (Ct. App. 2017)....................9

*Data Gen. Corp. v. Grumman Sys. Support Corp.*,
36 F.3d 1147 (1st Cir. 1994)....................19, 22

*Data Gen. Corp. v. Grumman Sys. Support Corp.*,
795 F. Supp. 501 (D. Mass. 1992), *aff'd*, 36 F.3d 1147 (1st Cir. 1994) ..................................19

*Davis v. Yelp, Inc.*,
2026 WL 1138502 (M.D. Fla. Mar. 27, 2026), *adopted*, 2026 WL 1137848
(M.D. Fla. Apr. 27, 2026) ..................................29, 32

*Dielsi v. Falk*,
916 F. Supp. 985 (C.D. Cal. 1996) ..................................23

*Eldred v. Ashcroft*,
537 U.S. 186 (2003)..................................18

*ETW Corp. v. Jireh Publishing, Inc.*,
332 F.3d 915 (6th Cir. 2003) ..................................15

*Fantini v. Salem State Coll.*,
557 F.3d 22 (1st Cir. 2009)..................................6

*In re Asacol Antitrust Litig.*,
907 F.3d 42 (1st Cir. 2018)..................................31, 32

*In re Jackson*,
972 F.3d 25 (2d Cir. 2020).................................. *passim*

*In re Pharm. Indus. Average Wholesale Price Litig.*,
263 F. Supp. 2d 172 (D. Mass. 2003) ..................................33

*Isaac Hayes Enters., LLC v. Trump*,
2025 WL 1211113 (N.D. Ga. Apr. 25, 2025) ..................................29

*J.R. v. Walgreens Boots All., Inc.*,
470 F. Supp. 3d 534 (D.S.C. 2020)..................................10

*Jennings v. Rodriguez*,
583 U.S. 281 (2018)..................................17

*Jimenez v. Kohl's Dep't Stores, Inc.*,
480 F. Supp. 3d 305 (D. Mass. 2020) ..................................31

*Justice v. Suno, Inc.*,
No. 25-cv-11739 (D. Mass. Sep. 22, 2025) ..................................24

*Lane v. MRA Holdings, LLC*,
242 F. Supp. 2d 1205 (M.D. Fla. 2002)..................................29

*Laws v. Sony Music Ent., Inc.*,
448 F.3d 1134 (9th Cir. 2006) ..................................22, 23, 24, 28

*Lewis v. Casey*,
518 U.S. 343 (1996)....................32

*Maloney v. T3Media, Inc.*,
853 F.3d 1004 (9th Cir. 2017) ....................24

*McDonald v. West*,
138 F. Supp. 3d 448 (S.D.N.Y. 2015)....................20

*New Kids on the Block v. News Am. Publ'g, Inc.*,
971 F.2d 302 (9th Cir. 1992) ....................16

*Obado v. Magedson*,
2014 WL 3778261 (D.N.J. July 31, 2014)....................12

*Perfect 10, Inc. v. Google, Inc.*,
2010 WL 9479060 (C.D. Cal. July 30, 2010)....................8, 9

*Phillips v. Equity Residential Mgmt. LLC*,
2016 WL 10706403 (D. Mass. Feb. 9, 2016) ....................28

*Power v. Connectweb Techs., Inc.*,
2023 WL 4019042 (D. Mass. Feb. 13, 2023) ....................24

*ProCD, Inc. v. Zeidenburg*,
86 F.3d 1447 (7th Cir. 1996) ....................18, 19

*Rae v. Woburn Pub. Schs.*,
113 F.4th 86 (1st Cir. 2024)....................6

*Ray v. ESPN, Inc.*,
783 F.3d 1140 (8th Cir. 2015) ....................24, 25

*Skidmore v. Led Zeppelin*,
952 F.3d 1051 (9th Cir. 2020) (en banc) ....................11, 20

*Snyder v. Phelps*,
562 U.S. 443 (2011)....................14

*Spear Mktg., Inc. v. BancorpSouth Bank*,
791 F.3d 586 (5th Cir. 2015) ....................20

*Stayart v. Google Inc.*,
783 F. Supp. 2d 1055 (E.D. Wis. 2011)....................12

*Structured Asset Sales, LLC v. Sheeran*,
120 F.4th 1066 (2d Cir. 2024) ....................11, 20

*Swirsky v. Carey*,
376 F.3d 841 (9th Cir. 2004) ....................20

*Tremblay v. OpenAI, Inc.*,
742 F. Supp. 3d 1054 (N.D. Cal. 2024) ....................23

*Tyne v. Time Warner Ent. Co.*,
901 So.2d 802 (Fla. 2005)....................8

*UMG Recordings, Inc. v. Suno, Inc.*,
No. 1:26-cv-14275 (D. Mass. Sep. 18, 2026) ....................27

*UMG Recordings, Inc. v. Suno, Inc.*,
No. 24-cv-11611 (D. Mass. Aug. 25, 2026) ....................24

*United States ex rel. Berge v. Bd. of Trs. of the Univ. of Ala.*,
104 F.3d 1453 (4th Cir. 1997) ....................19

*Valentine v. C.B.S., Inc.*,
698 F.2d 430 (11th Cir. 1983) ....................15

*Vidal v. Ester*,
602 U.S. 286 (2024)....................15

*Vrdolyak v. Avvo, Inc.*,
206 F. Supp. 3d 1384 (N.D. Ill. 2016) ....................12

*Wallen v. Consumer Reports, Inc.*,
2022 WL 17555723 (S.D.N.Y. 2022)....................10, 17

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989)....................16

*Watkins v. Cornell Cos.*,
2013 WL 1914713 (N.D. Tex. Mar. 15, 2013) ....................29

*White v. Samsung Elecs. Am., Inc.*,
971 F.2d 1395 (9th Cir. 1992) ....................8, 10

*Woulard v. Suno, Inc.*,
No. 25-cv-12684 (N.D. Ill. Oct. 16, 2025) ....................31

*Yan v. ReWalk Robotics Ltd.*,
973 F.3d 22 (1st Cir. 2020)....................30

## STATUTES

740 ILCS
14/5(a) ....................................................................................................................31
14/20 .......................................................................................................................31

765 ILCS
1075/15 ....................................................................................................................32

17 U.S.C.
§ 102(b) ........................................................................................................18, 19, 20
§ 106(1)-(2) .............................................................................................................22
§ 114(b) ...................................................................................................................22
§ 301(a) ........................................................................................................18, 19, 20

N.Y. Civ. Rights Law § 50-f(7) ....................................................................................32

Tenn. Code
§ 47-25-1102(6) .......................................................................................................28
§ 47-25-1105(a) ...............................................................................................8, 28, 32

## TREATISES

Restatement (Second) of Torts § 652C cmt. d (1977) .........................................................10, 12

Restatement (Third) of Unfair Competition § 46 (1995) .............................................6, 8, 10, 12

## OTHER AUTHORITIES

*About*, Suno, https://suno.com/about (last visited Nov. 3, 2026) ..................................................3

Andy Tennille, *Jason Isbell Answers the Siren's Call* (July 24, 2007),
https://jambands.com/features/2007/07/24/jason-isbell-answers-the-sirens-call/ ..........................................................................................................................13

ATX Music Talent, *Guy Forsyth*, YouTube (June 21, 2025),
https://www.youtube.com/watch?v=R60q6NIR-- ....................................................................22

*Community Guidelines: Intellectual Property*, Suno, https://suno.com/community-guidelines#ip (last visited Nov. 3, 2026) ..........................................................................4

Craig Manning, *Interview: Jason Isbell* (Apr. 3, 2016),
https://chorus.fm/features/interviews/jason-isbell/ ...............................................................14

*Interview with David Lowery*, Marc Laidlaw,
https://www.marclaidlaw.com/interview-david-lowery/ (last visited Nov. 3, 2026) ..........................................................................................................................21

Jay McDowell, *5 Contemporary Americana Artists You Have to Check Out*, Am. Songwriter (Oct. 24, 2023), https://americansongwriter.com/5-contemporary-americana-artists-you-have-to-check-out/ ....................11

Jim Beaugez, *Jason Isbell on the Redemptive Power of Vintage Gear, Sweet Tones and Finding What Works for the Song,* Guitar Player (July 31, 2020), https://www.guitarplayer.com/players/jason-isbell-on-the-redemptive-power-of-vintage-gear-sweet-tones-and-finding-what-works-for-the-song ....................13

Melvin Simensky et al., *Entertainment Law: Legal Concepts and Business Practices* § 16:10 (3d ed. 2024) ....................20

Mike Levine, *For Producer and Mix Engineer Dave Isaac, Being a Great Listener Has Been the Key to Success*, Audio Fanzine (Sep. 25, 2017), https://en.audiofanzine.com/sound-technique/editorial/articles/the-ears-have-it.html ....................14

Mikey Shulman, *How We're Building the Future of Music Responsibly*, Suno (Aug. 6, 2026), https://suno.com/blog/building-the-future-of-music-responsibly ....................4

Rich Kienzle, *Jason Isbell: New Vistas, Old Gear*, Vintage Guitar Mag. (Mar. 2025), https://www.vintageguitar.com/87562/jason-isbell/ ....................21

*Safety*, Suno, https://suno.com/safety (last visited Nov. 3, 2026) ....................4

The Sessions Panel, *Dr. ED CALLE*, YouTube (Apr. 1, 2020), https://www.youtube.com/watch?v=CoJ8hGngUPo&t=191s ....................22

Sound Field, *Where Is the Funk? How Prince Created the Minneapolis Sound (feat. Jellybean Johnson of The Time)* at 1:28-1:33, YouTube (Jan. 2, 2020), https://www.youtube.com/watch?v=TBr6H75DBsU ....................14

*Terms of Service*, Suno, https://suno.com/terms (last visited Nov. 3, 2026) ....................4

The Tonight Show Starring Jimmy Fallon, *Fred Armisen Impersonates Each Decade of Punk Music*, YouTube (Nov. 3, 2021), https://www.youtube.com/watch?v=bB5KyoKtivI ....................14

1 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 2:3 (6th ed., June 2026 rev.) ....................30

## PRELIMINARY STATEMENT

When people describe styles of music, they often use artists' names as shorthand for the genre they perform in. Rather than say, "this sounds like an instance of late 1980s/early 1990s arena rock, with glam metal influences that simultaneously presage the rise of grunge," they might just say, "this sounds like Guns N' Roses." The Complaint in this case turns on the premise that the law somehow condemns that universal practice. In reality it does not; the First Amendment would not allow it to; and our creative and cultural ecosystem would be materially impaired if the imagined theory of Plaintiffs' suit were real and the law prohibited the ubiquitous methods of communicating ideas that this litigation attacks.

Suno is a generative AI platform for making new music. It is built to allow people to express themselves, in ways they might otherwise not be able to, by submitting a prompt describing the kind of song they imagine. Suno takes the prompt, translates it into instructions that the underlying AI model can effectively comprehend, and produces a novel, never-before-heard creation. The new songs produced by Suno are, of course, recognizable as music generally, and as instances of particular musical genres, specifically. So if you ask Suno for a song on a given topic in the style of 1990s Seattle grunge rock, the resulting output will indeed contain the distorted guitars and angsty vocals characteristic of that place and time. But by design and in practice, Suno outputs do not "sample" snippets of pre-existing music; they do not reprise specific melodies from songs someone else wrote; and they do not replicate the auditory characteristics of any real artist's voice to the point that someone would confuse a Suno creation with one actually sung by a particular famous musician.

There is no contrary allegation in the Complaint. Plaintiffs nowhere contend, in any of the 84 pages they filed with the Court, that anyone has ever used Suno to create a song that could be

or is actually mistaken for Jason Isbell or any of the other named Plaintiffs. And they disavow the suggestion that Suno actually replicates any particular recording. Compl. (Doc No. 1) ¶ 161.

The theory, instead, is that Suno violates state right of publicity laws by effectively tying the name of an artist to the genre for which the artist is known. In Plaintiffs' own words, the problem for which they seek redress in this litigation is that "Suno's system recognizes 'Jason Isbell' . . . as a retrieval key for a set of performer-specific representations that it can use to generate a . . . song like one the named musician might create." *Id.* ¶ 14. In other words, if a user asks Suno for a song in the style of Jason Isbell, Suno will effectively translate that request into one for a song in the style of "contemporary Americana singer-songwriter with fingerpicked acoustic guitar," and generate an accompanying output containing the "clear male vocals and country twang" characteristic of that genre. *Id.* ¶ 16.

There is nothing unlawful about that. No state confers a right of publicity that prohibits a musician in a studio from saying to their producer, "let's go for something here with more of a Jason Isbell vibe," and actually achieving that result without infringing any copyright or creating a likelihood of confusion over the identity of the performer. And what Suno does, by Plaintiffs' own account, is no different.

In doctrinal terms the asserted claims fail principally for two reasons. First, using artist names in the manner the Complaint alleges is simply not the kind of use of a name that state right of publicity laws condemn—nor could it be, consistent with the First Amendment. Second, federal copyright law would preempt any such state law right if it did exist. Congress made the considered policy choice *not* to confer intellectual property protection on an artistic style, precisely to allow subsequent creators to build on the prior works of a genre. The theory of this Complaint would

create a shadow state law IP regime sitting on top of and fundamentally conflicting with the federal regime that has been in place for more than two centuries.

Taking the allegations in the Complaint as true, they do not state a claim upon which relief can be granted. Suno respectfully seeks dismissal under Rule 12(b)(6).

## BACKGROUND

Suno offers an artificial intelligence-powered tool that allows users to create new music. *See* Compl. (Doc No. 1) ¶ 12. The technology was built on two foundational principles. *First*, the building blocks of music—the structure of a pop song, the sound of a guitar in country music, and chord progressions used and reused for centuries—are part of humanity's shared cultural heritage. No one owns them. *Second*, Suno's purpose is to create *new* music, not to replicate specific creative expression that already exists, such as a particular melody, a sample of someone else's recording, or the identifiable sound of an actual person's voice. *See id.* ¶ 161 (acknowledging that the songs produced "do not replicate any recording").

Suno's tool is powered by an underlying computer program that was constructed by showing the software tens of millions of instances of different kinds of recordings. *See id.* ¶¶ 58, 64-65. The program, known as a "neural network," uses a variety of novel techniques to extract insights from that data set regarding what the elements of sounds recognizable as "music" consist of. *Cf. id.* ¶¶ 67-74. The result, after extensive refinement by Suno's engineers, is a model with a vast store of information about what various musical styles sound like, which can be used to generate completely new creations in any of those styles in response to plain English descriptions of the music a user wants to bring into existence. *See id.* ¶ 12; *see also About*, Suno, https://suno.com/about (last visited Nov. 3, 2026).

Because "[r]espect for artists and the integrity of their work is foundational to [its] platform," Suno prohibits attempts to reproduce existing songs, uploading material to which users

do not have the rights, or the use of any person's voice or likeness without permission. *Community Guidelines: Intellectual Property*, Suno, https://suno.com/community-guidelines#ip (last visited Nov. 3, 2026); *see also Terms of Service*, Suno, https://suno.com/terms (last visited Nov. 3, 2026). And Suno has implemented robust technological measures to ensure that any content created is original, providing tools for rightsholders to report content they believe is infringing and to enforce their rights. *See generally Safety*, Suno, https://suno.com/safety (last visited Nov. 3, 2026); Mikey Shulman, *How We're Building the Future of Music Responsibly*, Suno (Aug. 6, 2026), https://suno.com/blog/building-the-future-of-music-responsibly (listing tools for screening and detecting unauthorized uses of artists' work).

The principle that Suno is not designed to output music that could be passed off as the work of an existing artist is baked into the very architecture of the platform: Suno does not train its generative music AI model to recognize artist names at all; there is no "artist name" metadata field in the source material used to train the model. But even if the model were trained to recognize artist names (it wasn't), Suno "ha[s] never allowed prompts for specific artists or copyrighted songs." *Id.* Rather, when a prompt references a specific artist, Suno either blocks that prompt or "remove[s] the artist's name and redirect[s] the request toward descriptive musical characteristics." *Id.* As a result, the portion of the model that processes a user's prompt never even sees an artist's name. Instead, it sees the genre and style descriptions that a third-party tool has identified as being associated with that name. When a user types, for example, "Duran Duran" into a prompt, that name is replaced with a description of the genre the model can understand—say, "New wave, Synth-pop, Pop rock"—before the operative instructions are transmitted to the model. The band name itself is not part of the direction that reaches the engine of creation, i.e., the part of the technology stack that translates text instructions into music.

There is no dispute over these facts. Plaintiffs quote Suno's statement that it does "not use artist names as a category of training metadata." Compl. (Doc No. 1) ¶ 15. Plaintiffs also admit that when a user enters an artist's name, Suno tells the user: "We don't reference artists directly, so we've replaced your prompt with similar styles you might like," and then offers genres such as "Pop," "Country," "Country Pop," and "Synth-Pop." *Id.* ¶ 35.[1] And Plaintiffs acknowledge that Suno's outputs "do not replicate any recording," *id.* ¶ 161; *id.* ¶ 14 (disclaiming that "any Suno output literally reproduces any specific recording"). Nor do Plaintiffs allege that Suno has replicated any of the Plaintiffs' specific voices to the point that a Suno output would be actually identified as or mistaken for one of the Plaintiffs, or that Suno has generated recordings that are presented to the public in a manner that implies any of the Plaintiffs created this new music.

The gravamen of Plaintiffs' complaint is different. Plaintiffs allege that Suno appropriated their names or likenesses by creating a tool that recognized the Plaintiffs' names as associated with specific musical styles or genres and is capable of creating music in that musical style or genre. *See id.* ¶¶ 14, 16. The resulting causes of action arise under the right of publicity laws of Tennessee, Texas, Georgia, and Florida (where they reside). *Id.* ¶¶ 4-7, 167, 169-170, 177. These are state-specific implementations of the common law "right of publicity" tort, which generally prohibits the appropriation of a plaintiff's name or likeness for the defendant's commercial benefit

[1] Plaintiffs allege a handful of examples in which this function worked imperfectly in response to atypical requests involving artists who are not plaintiffs in this lawsuit. *See, e.g.*, Compl. (Doc No. 1) ¶¶ 28, 30-31 (alleging Suno accepted a prompt with individual letters that spelled a musician's name, e.g., "t a y l o r s w i f t"). But even in cases like these in which a malintentioned actor has attempted to circumvent receiving the message that Suno normally transmits to users explaining that the model will not process artist-name prompts, there is no allegation that Suno's music generation model itself somehow works differently. In other words, Plaintiffs allege in these circumstances, too, that Suno generated outputs in the style of broad genre-level descriptions like "1980s pop-funk dance tracks" or "blues rock with a dry vocal," and do not allege any output replicated any artist's work or was identifiable solely as that artist. *See id.* ¶¶ 28, 30.

without the plaintiff's consent. *See* Restatement (Third) of Unfair Competition § 46 (1995) ("Restatement (Third)"). In addition to right of publicity claims under the laws of their own states, Plaintiffs also seek to represent a putative class (or classes) of musicians "whose names are or have been accepted as prompts in Suno" under eleven other state right of publicity laws, *see* Compl. (Doc No. 1) at 3-4, ¶ 100. And they seek to represent a putative class of Illinois resident musicians with claims under the Illinois Biometric Information Privacy Act ("BIPA"). *Id.* ¶¶ 100, 122-135.

## LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and quotation marks omitted). A court "must accept as true all well-pleaded facts." *Fantini v. Salem State Coll.*, 557 F.3d 22, 26 (1st Cir. 2009) (citation and quotation marks omitted). But "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Rae v. Woburn Pub. Schs.*, 113 F.4th 86, 98 (1st Cir. 2024).

## ARGUMENT

### I. PLAINTIFFS' RIGHT OF PUBLICITY CLAIMS FAIL AS A MATTER OF LAW

Plaintiffs' primary theory is one for violation of the right of publicity under various state laws. Those claims fail as a matter of law on their own terms. And they fail for the additional and independent reason that they are preempted by the Copyright Act. They should be dismissed.

#### A. Plaintiffs Allege Use of Their Names as Shorthand for Categories of Musical Styles—Not Commercial Appropriation of Their Identities

The Complaint alleges right of publicity violations from two "related but independent[]" forms of conduct. Compl. (Doc No. 1) ¶ 117. *First*, the allegation that Suno's "product" allegedly "recognizes, retrieves, and deploys the identities of musicians by name" and uses those names to

generate outputs that appropriate Plaintiffs' so-called musical identities. *Id.* ¶ 117(a). We refer to this as the "violation by recognition" theory. *Second*, the allegation that Suno "appropriated Plaintiffs' identities [and] extracted their identifying attributes . . . to train" its AI models on Plaintiffs' songs. *Id.* ¶ 117(b). We refer to this as the "violation by training" theory. Neither category of activity is actionable.

### 1. *The "Violation by Recognition" Theory Is Not Actionable*

Suno does not advertise using any artist's name. It never suggests that any artist endorses Suno, or is affiliated with Suno in any way. The Suno user interface does not affirmatively display artist names, or provide options to generate songs using a menu of particular artist names, or even suggest the idea of artist names in prompts in general. It never generates a song that is a reproduction of an artist's existing song. Nor is there any allegation that it ever generates any song that has any attributes identifiable solely as a specific artist, such as an imitation of an artist's voice that might be confused for her. (In fact, Plaintiffs allege the opposite: that "the quality of Suno's outputs falls short of the true talent" of any artist. *Id.* ¶ 14.) There is no contrary contention anywhere in the Complaint.

Instead, Plaintiffs' principal substantive concern is that *users*, without invitation from Suno, can input an artist's name within a prompt. *See, e.g.*, *id.* ¶¶ 14, 16-18. Even then, Suno does not permit the use of the artist name to directly instruct the model what kind of music to create. When the user *sua sponte* includes an artist name in a prompt, they are told, "We don't reference artists directly, so we've replaced your prompt with similar styles you might like," using broad genre-level descriptions such as "Pop," "Country," "Country Pop," and "Synth-Pop." *Id.* ¶ 35. Suno proceeds to use those genre-level descriptions to generate output consistent with a style that might describe many artists—for example, "contemporary Americana singer-songwriter with fingerpicked acoustic guitar." *Id.* ¶ 16. There is no allegation that any such description ever

mentions an artist's name, let alone does so to convey the impression that the output was actually the work of an artist or that an artist endorses the output or the platform.

These facts do not comprise a violation of the right of publicity.

**a. The "violation by recognition" theory fails because there is no public use by Suno.** The right of publicity protects the use of a name "for purposes of trade." Restatement (Third) § 47. Paradigmatically, the tort encompasses the unauthorized use of a name in an advertisement or to suggest an individual's endorsement: "The theory of the right is that a celebrity's identity can be valuable in the promotion of products, and the celebrity has an interest that may be protected from the unauthorized commercial exploitation of that identity." *White v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395, 1399 (9th Cir. 1992) (recognizing Vanna White right of publicity claim based on alleged use of her likeness in advertisement of Samsung product); *see also* Tenn. Code § 47-25-1105(a)(1) (requiring proof a name was used "for purposes of advertising products, merchandise, goods, or services"); *Tyne v. Time Warner Ent. Co.*, 901 So.2d 802, 807-08 (Fla. 2005) (requiring proof of "use of a person's name or likeness to directly promote a product or service"). As noted, Plaintiffs do not allege that Suno used artist names in this manner. Instead, the principal alleged use of Plaintiffs' names occurs when (1) a user enters an artist's name as a prompt, (2) Suno recognizes that artist as belonging to a broad genre or musical style, and (3) Suno generates a new song in that genre or style. None of those three steps—taken together or independently—amounts to a violation of anyone's right of publicity by Suno.

**User prompts.** *First*, when a user supplies an artist name in a prompt, that is at most a use of the artist's name *by the user*—not by Suno. But "both the statutory and common law versions of a right of publicity claim require that *the defendant* actually use the plaintiff's likeness," not a third party. *Perfect 10, Inc. v. Google, Inc.*, 2010 WL 9479060, at *13 (C.D. Cal. July 30, 2010).

Applying that principle, courts have rejected right of publicity claims against platforms and service providers for alleged uses of the plaintiff's name or likeness by third party users of the platform or service. *See id.* (rejecting right of publicity claim against Google where third-party sites displayed models' names and likenesses); *Cross v. Facebook, Inc.*, 222 Cal. Rptr. 3d 250, 265-67 (Ct. App. 2017) (holding that Facebook could not be held liable for violating right of publicity when likeness was used by third parties); *Cornette v. Graver*, 2020 WL 1643370, at *10-11 (W.D. Pa. Apr. 2, 2020) (holding that plaintiff failed to allege Shopify "used" plaintiff's likeness when third party users were responsible for supplying the allegedly infringing products).

Any liability against Suno for a user's submission of an artist's name in a prompt would have to arise, if at all, under a theory of secondary liability—that is, Suno's being deemed responsible for someone else's conduct. But as numerous courts have noted, secondary liability for a right of publicity claim is not a recognized concept in the law. *See, e.g.*, *Perfect 10*, 2010 WL 9479060, at *13 (rejecting right of publicity claim based on third party users' conduct, reasoning "'[c]ontributing' to someone's violation of something is not the same as actually 'violating' it"). Plaintiffs' allegations about users' prompts, standing alone, thus do not establish any public use *by Suno*.

**Internal translation of name to genre.** *Second*, after Suno receives a prompt containing an artist name, Plaintiffs allege that the next steps to happen take place as part of a purely internal backend process that is not visible to the user, or to the public at all. While the Complaint's allegations on this score are undoubtedly colorful, in substance, they amount to nothing more than the contention that in response to a user prompt invoking a name, Suno identifies the broad characteristics of the genre and style of the artist, at a level of generality that might encompass any number of artists. *See* Compl. (Doc No. 1) ¶¶ 16-26. Suno then uses that information—and not

the artist's name—to instruct the model what kind of music to generate. There is no point in the process of translating artist names to the genre-level descriptions that comprise the actual instructions to the model where the artist's name is even allegedly used in a public-facing way.

That is fatal to Plaintiffs' claim. The right of publicity—as its name suggests—requires a *public* use by the defendant of the plaintiff's name, image, or likeness. *See, e.g.*, *Wallen v. Consumer Reports, Inc.*, 2022 WL 17555723, at *5 (S.D.N.Y. 2022) ("Public use is essential."); *J.R. v. Walgreens Boots All., Inc.*, 470 F. Supp. 3d 534, 551 (D.S.C. 2020) (explaining that "publicity" is "a fundamental requirement of the cause of action of wrongful appropriation of personality"), *aff'd*, 2021 WL 4859603 (4th Cir. 2021); *accord* Restatement (Second) of Torts § 652C cmt. d (1977) ("Restatement (Second)"). Internal, backend uses of a celebrity's name have never been the conduct regulated by the right of publicity tort. For that reason, Plaintiffs' allegations about Suno's use of artist names as part of the process of instructing the model are categorically non-actionable.

**Novel outputs in an established genre.** *Third*, the actual music that Suno outputs does not violate the right of publicity either. Plaintiffs concede those outputs are genuinely new works that, while recognizably partaking of established musical traditions, do not reproduce any artist's existing music. Compl. (Doc No. 1) ¶ 14. Their theory of liability is instead that those outputs unlawfully appropriate Plaintiffs' so-called "musical identities." But that is not a thing the law protects. The right of publicity requires that the likeness used be identifiable *as the plaintiff*. *See, e.g.*, Restatement (Third) § 46 cmt. d. To be sure, a plaintiff could allege that her likeness is "identifiable" through a sufficient combination of elements or features that, when "[v]iewed together," are characteristic "only" or uniquely of her. *White*, 971 F.2d at 1399 (concluding Vanna White's likeness was identifiable in advertisement that featured a "female-shaped robot [] wearing

a long gown, blond wig, and large jewelry," "in the process of turning a block letter on a game-board," and "standing on what looks to be the Wheel of Fortune game show set"). But that is a far cry from what is alleged here. Plaintiffs' descriptions of their so-called "musical identities" do not describe traits or characteristics associated uniquely with them.

Take, for example, Plaintiffs' allegations about the output produced from a prompt containing the name "Jason Isbell." Plaintiffs allege that prompt produced an original "Americana song" that Suno described as "contemporary Americana singer-songwriter with fingerpicked acoustic guitar," paired with an image of "a paper bell with a church and trees in the background evoking a country scene." Compl. (Doc No. 1) ¶ 16. That description of a broad genre and its characteristic iconography could describe countless Americana artists, not Isbell and Isbell alone. *See, e.g.*, Jay McDowell, *5 Contemporary Americana Artists You Have to Check Out*, Am. Songwriter (Oct. 24, 2023), https://americansongwriter.com/5-contemporary-americana-artists-you-have-to-check-out/. In truth, what Plaintiffs term their so-called "musical identities" are descriptions of musical styles that are not, and never could be, proprietary to any one artist: the characteristic instrumentation of a genre, its rhythmic feel, and the chord progressions and vocal conventions that have been used and reused for generations. As courts, scholars, and artists have long recognized, borrowing and building on these shared conventions is how music has always developed. *See, e.g.*, *Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1069 (9th Cir. 2020) (en banc); *Structured Asset Sales, LLC v. Sheeran*, 120 F.4th 1066, 1079 (2d Cir. 2024). "Musical identity," as Plaintiffs use the term, is not an intangible asset protected by right of publicity doctrine.

**b. The "violation by recognition" theory also fails because the right of publicity does not prohibit use of a person's identity for the purpose of communicating information or expressing an idea.** Even if Plaintiffs' allegations could establish a "public use" of the Plaintiffs'

names or likenesses "by Suno," their claims still fail. "The use of a person's identity primarily for the purpose of communicating information or expressing ideas is not generally actionable as a violation of the person's right of publicity." Restatement (Third) § 47 cmt. c; *Stayart v. Google Inc.*, 783 F. Supp. 2d 1055, 1057 (E.D. Wis. 2011), *aff'd*, 710 F.3d 719 (7th Cir. 2013) ("[I]t is not unlawful to use a person's name 'primarily for the purpose of communicating information.'" (citation omitted)); *see also* Restatement (Second) § 652C cmt. d ("The value of the plaintiff's name is not appropriated by mere mention of it, or by reference to it in connection with legitimate mention of his public activities[.]").

Applying that principle, courts have rejected right of publicity claims in circumstances closely analogous to those alleged here. For example, the district court in *Stayart* rejected the plaintiff's claim related to her name appearing in Google search results because her "allegations establish[ed] no more than that Google enables internet users to access public[]ly available materials connected to plaintiff's name," i.e., "that Google is merely reporting the results of its search of other websites." 783 F. Supp. 2d at 1057; *see also Obado v. Magedson*, 2014 WL 3778261, at *7 (D.N.J. July 31, 2014), *aff'd*, 612 F. App'x 90 (3d Cir. 2015) ("The mere appearance of Plaintiff's name or image as part of the search results displayed in response to a user-generated query does not mean that the relevant company used Plaintiff's name for advertising or trade purposes. . . . [T]he conduct that Plaintiff alleges infringed on his right to publicity is nothing more than the ordinary 'dissemination of news or information' that cannot give right to a right of publicity claim." (citation omitted)); *Vrdolyak v. Avvo, Inc.*, 206 F. Supp. 3d 1384, 1386-89 (N.D. Ill. 2016) (rejecting right of publicity claim related to inclusion of plaintiff's name and information in searchable database of lawyers). The facts of this case afford an even easier defense than in the search engine cases. There, the defendants actually did publicly

direct users to information about the plaintiffs, using their names publicly. Here, Suno has not even done that.

At bottom, under Plaintiffs' "violation by recognition" theory, when a user supplies Plaintiffs' names to Suno, it is illegal for Suno to identify information about Plaintiffs' general genre or style using their names. But factual references cannot be the target of a right of publicity claim—and the doctrine should not be stretched to prohibit such conduct. It is absolutely commonplace for a musician to use another artist's name as a shorthand to convey information about the genre that they want to create in, or even refer to another artist when describing their *own* style. For instance, during one interview, Isbell himself explained that as he was recording his track "St. Peter's Autograph," he "did some George Harrison-style parts" and "we even did the Automatic Double-Tracking effect, like the Beatles used." Jim Beaugez, *Jason Isbell on the Redemptive Power of Vintage Gear, Sweet Tones and Finding What Works for the Song,* Guitar Player (July 31, 2020), https://www.guitarplayer.com/players/jason-isbell-on-the-redemptive-power-of-vintage-gear-sweet-tones-and-finding-what-works-for-the-song. Isbell surely was not suggesting that he wanted to create a song that infringes "Lucy in the Sky with Diamonds," or that he intended to co-opt the commercial value of Harrison's (or any of the other Beatles') name or likeness. He was plainly using Harrison's name to communicate about sound and style in the process of creating something new.

Similarly, when promoting his debut album *Sirens of the Ditch*, Isbell acknowledged that "[i]n a lot of ways, some of the songs on this album remind me of a Tony Joe White record or even something like Aretha Franklin is in there somewhere." Andy Tennille, *Jason Isbell Answers the Siren's Call*, Jambands.com (July 24, 2007), https://jambands.com/features/2007/07/24/jason-isbell-answers-the-sirens-call/. In another interview, Isbell stated that "when it's done right, the

songs of mine that are the best hopefully remind people of John Prine or Guy Clark or Kris Kristofferson or something like that." Craig Manning, *Interview: Jason Isbell*, Chorus.fm (Apr. 3, 2016), https://chorus.fm/features/interviews/jason-isbell/. Nobody would suggest that Isbell violated these artists' right of publicity by publicly comparing his own work to their musical styles (much less *considering* those artists and their associated musical styles in the process of creation). But Plaintiffs' theory here—which in no way is cabined to the particular technologies at issue in this case—would make unlawful the very forms of communication that Plaintiffs themselves and countless other artists regularly engage in.[2]

The law does not prevent people from using names to find or describe information, nor does it prevent building a tool capable of recognizing those references and acting on the information they supply.

**c. The "violation by recognition" theory would be barred by the First Amendment.** Separate and apart from the preceding defects, Plaintiffs' first theory amounts to an unlawful content-based restriction on speech—it would hold Suno liable for understanding the information a name conveys about musical genre and style, and creating wholly new expression based on that style. *See, e.g.*, *Snyder v. Phelps*, 562 U.S. 443, 451 (2011) (noting "the First Amendment . . . can

---

[2] *See, e.g.*, Mike Levine, *For Producer and Mix Engineer Dave Isaac, Being a Great Listener Has Been the Key to Success*, Audio Fanzine (Sep. 25, 2017), https://en.audiofanzine.com/sound-technique/editorial/articles/the-ears-have-it.html ("Once I understood the vision of the song, . . . I had enough references to know, 'OK, he's trying to sound like Curtis Mayfield.' 'He's trying to play this kind of music.' . . . And then the next time, he listened to something else after we had finished the mix. He listened to another artist, The Roots, I think. Then he wanted to go in that direction."); Sound Field, *Where Is the Funk? How Prince Created the Minneapolis Sound (feat. Jellybean Johnson of The Time)* at 1:28-1:33, YouTube (Jan. 2, 2020), https://www.youtube.com/watch?v=TBr6H75DBsU ("Most people immediately think of Prince when they think of the Minneapolis sound."); The Tonight Show Starring Jimmy Fallon, *Fred Armisen Impersonates Each Decade of Punk Music*, YouTube (Nov. 3, 2021), https://www.youtube.com/watch?v=bB5KyoKtivI (using artists like Velvet Underground, Sonic Youth, and the Ramones to describe styles and eras of alternative music).

serve as a defense in state tort suits"). That would punish Suno and its users for speech that is a building block of communication, expression, and ideas. *See ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 933 (6th Cir. 2003) (explaining celebrity names "are an important element of the shared communicative resources of our cultural domain" (quoting *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 972 (10th Cir. 1996))).

Because Plaintiffs' claim would "restrict[] discussion of a subject matter or topic," i.e., their names, it amounts to a "content-based regulation [that] 'targets speech based on its communicative content.'" *Vidal v. Ester*, 602 U.S. 286, 292-93 (2024) (citation and alteration omitted). Accepting that view would "absolutely bar[] the use of an individual's name without consent for any purpose" and "would raise grave questions as to constitutionality." *Valentine v. C.B.S., Inc.*, 698 F.2d 430, 433 (11th Cir. 1983); *see also Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 21 P.3d 797, 807 (Cal. 2001) ("What the right of publicity holder possesses is not a right of censorship, but a right to prevent others from misappropriating the economic value generated by the celebrity's fame through the merchandising of the 'name, voice, signature, photograph, or likeness' of the celebrity." (citation omitted)).

As the Sixth Circuit explained in *ETW Corp. v. Jireh Publishing, Inc.*, "celebrities are an important part of our public vocabulary." 332 F.3d at 933. "[C]elebrities are 'common points of reference for millions of individuals who may never interact with one another, but who share, by virtue of their participation in a mediated culture, a common experience and a collective memory.'" *Id.* (quoting *Cardtoons*, 95 F.3d at 972). For that reason, their names "are an important element of the shared communicative resources of our cultural domain." *Id.* (quoting *Cardtoons*, 95 F.3d at 972).

That is, at most, what Plaintiffs allege Suno has done—recognized their names as part of a "public vocabulary" for communicating about musical style and genre. True, users could do that work themselves—research the artist's musical genre and style, and then compose, in a dozen or so words, a description of the various abstract features of that genre or style that they want to capture in the work they are creating with Suno. But there is nothing improper about Suno's judgment that a user might reasonably find it more convenient to refer to an artist whose work falls within that style or genre. It is certainly not unlawful for Suno *to recognize* the message that users are conveying—especially when Suno converts the artist's name into a description of unprotectable musical style and returns an output that does not replicate any individual artist's work and that is described using abstract elements of genre and style. *See* Compl. (Doc No. 1) ¶ 117(a) (alleging that Suno's "Name-Indexed" platform allows users to create outputs "*evoking* [a] named artist" or "*like one* the named musician might make" (emphasis added)); *see also, e.g.*, *id.* ¶ 17 (prompt "Camper Van Beethoven" described by Suno as "quirky late-1980s alternative rock with folk-rock" and produced song with "playful lyrics and sound"); *id.* ¶ 22 (prompt "Carly Simon" became description "1970s soft rock singer-songwriter").

Restricting the use of Plaintiffs' names would hinder and chill users' processes for creating new expression embodied in original sound recordings and musical works—speech protected by the First Amendment. *See Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989) ("Music, as a form of expression and communication, is protected under the First Amendment."). In short, this is precisely the "form[] of expressive activity protected by the First Amendment [that] fall[s] outside the boundaries of th[e] right [of publicity]." *Comedy III*, 21 P.3d at 811; *see also New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 306-07 (9th Cir. 1992) ("Much useful social and commercial discourse would be all but impossible if speakers were under threat of an

infringement lawsuit every time they made reference to a person, company or product by using its trademark."). The Court should not read the right of publicity to conflict with the First Amendment. *See, e.g.*, *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018) (describing the "canon of constitutional avoidance"). This, too, is an independent reason to reject Plaintiffs' theory here.

### 2. *The "Violation by Training" Theory Fails Because Using an Artist's Music to Train a Transformative AI Model Is Not Appropriation of a Protected "Identity"*

Plaintiffs' second theory—the "violation by training" theory—posits that Suno infringed Plaintiffs' right of publicity by training its model on recordings of Plaintiffs' performances, which allegedly embody Plaintiffs' "musical identity." *See* Compl. (Doc No. 1) ¶¶ 94-95. This theory fares no better than the last.

*First*, this theory is based on purely *internal* uses of Plaintiffs' names. *See id.* ¶ 14 (alleging storage of "Plaintiffs' and others' identifying attributes . . . *inside* Suno's model in functional, accessible, name-indexed form"). Plaintiffs do not allege that Suno publicly uses their names, likenesses, or works in connection with training its models. Those allegations, even accepted as true, involve only the purely *internal* use of Plaintiffs' names and a description of their style. Even if that were sufficient to allege a use of a protected identity, it does not infringe the right of publicity because "[p]ublic use is essential" as an element of that claim. *Wallen*, 2022 WL 17555723, at *5.

*Second*, Plaintiffs' allegations for this theory appear again to turn on the suggestion that what Suno did wrong was misappropriate a novel form of intellectual property they have sought to create from whole cloth, which they refer to as their "musical identities." *E.g.*, Compl. (Doc No. 1 ) ¶ 95. By this, they must mean something other than that, as part of the model-training process, Suno simply made copies of recordings these artists appear on—because any such theory would obviously be preempted by the federal Copyright Act. *See infra* Part I.B. But framed at a higher level of abstraction—perhaps one whereby the wrong Suno committed was to make copies

of recordings that embody an approach to music, or a gestalt, or a style—the theory fares no better. A "musical identity" defined in such terms is not an intangible asset protected by right of publicity doctrine. *See supra* at 10-11. Nor could it be, for the burden on speech it would impose. *See supra* Part I.A.1.c.

In short, the "violation by training" theory fails as a matter of law several times over.

**B. Plaintiffs' Right of Publicity Claims Are Preempted by the Copyright Act**

Plaintiffs' claims fail for a further, independent reason: they are preempted by the Copyright Act. Federal copyright law reflects a deliberate judgment about what elements of musical creativity may be owned and what must remain free for everyone to use. Copyright protects particular original expression—a melody, a lyric, a specific recording—but leaves the ideas, styles, and conventions underlying that expression in the public domain. *See* 17 U.S.C. § 102(b). That choice is not incidental or contingent; the guarantee that "every idea . . . in a copyrighted work becomes instantly available for public exploitation" is one of the "built-in First Amendment accommodations" of the Copyright Act. *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003). And Congress took the further step of protecting that essential federal policy from state-law encroachment. Section 301(a) "prevent[s] states from giving special protection" to subject matter that Congress "has decided should be in the public domain." *ProCD, Inc. v. Zeidenburg*, 86 F.3d 1447, 1453 (7th Cir. 1996). Plaintiffs themselves acknowledge the tension between their claims and the Copyright Act. *See* Compl. (Doc No. 1 ) ¶ 112(B) (listing preemption as a common class question). And with good reason: their Complaint attempts what § 301(a) forbids—removing from the public domain musical styles that federal law leaves free for all to use and reuse, under the banner of state publicity law, which would confer the very restrictions that Congress declined to extend.

### 1. *Plaintiffs' Claims Are Expressly Preempted*

The Copyright Act preempts state-law claims that "come within the subject matter of copyright as specified by sections 102 and 103" and assert "rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106." 17 U.S.C. § 301(a); *see Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1164 (1st Cir. 1994) (Act preempts "any state cause of action which is equivalent in substance to a federal copyright infringement claim"). Under the First Circuit's two-part test, a state claim is preempted "if 1) the work involved falls within the subject matter of copyright and 2) the state law claim incorporates no extra element that is qualitatively different from the copyright claim." *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 795 F. Supp. 501, 505 (D. Mass. 1992), *aff'd*, 36 F.3d 1147 (1st Cir. 1994). Both conditions are met here.

#### a. Plaintiffs' Claims Fall Within the Subject Matter of Copyright

The first prong is satisfied because what Plaintiffs seek to protect—their so-called "musical identities"—consist of musical styles, which fall squarely within copyright's subject matter for preemption purposes. Critically, the "subject matter of copyright" for this purpose encompasses musical styles even though they are themselves unprotected by federal rights under § 102(b). The first prong of the preemption test does not ask whether the material at issue is actually protected by copyright. It asks whether the material is the kind of thing the Copyright Act addresses—including the ideas, concepts, and methods Congress deliberately chose to leave *unprotected* under § 102(b). As courts have explained, the "shadow actually cast by the Act's preemption is notably broader than the wing of its protection." *United States ex rel. Berge v. Bd. of Trs. of the Univ. of Ala.*, 104 F.3d 1453, 1463 (4th Cir. 1997). That breadth is essential to the relationship between state and federal law in this area. *See ProCD*, 86 F.3d at 1453. Otherwise, states could undo Congress's choice to place ideas in the public domain simply by protecting them under another

name. *See Spear Mktg., Inc. v. BancorpSouth Bank*, 791 F.3d 586, 596 (5th Cir. 2015) ("Congress intended the Copyright Act to protect some expressions but not others, and it wrote § 301(a) to ensure that the states did not undo this decision.")

Musical genres, instrumentation, and conventions are textbook § 102(b) material. Courts consistently treat musical "style[s]" and "technique[s]" as unprotectable ideas: "copyright does not protect styles, but only particular original expressions of those styles." *McDonald v. West*, 138 F. Supp. 3d 448, 455 (S.D.N.Y. 2015). Copyright does not extend to "common" "musical elements" or elements "that are firmly rooted in [a] genre's tradition." *Skidmore*, 952 F.3d at 1069 (citation modified). "These building blocks belong in the public domain and cannot be exclusively appropriated by any particular author," because "giving exclusive rights to the first author who incorporated an idea, concept, or common element would frustrate the purpose of the copyright law and curtail the creation of new works." *Id.* Courts thus do not extend copyright protection to the basic elements of musical style and genre. *See, e.g.*, *Structured Asset Sales*, 120 F.4th at 1079 ("basic musical building blocks like notes, rhythms, and chords" are not protected by copyright); *Swirsky v. Carey*, 376 F.3d 841, 848 (9th Cir. 2004) ("chord progression, key, tempo, rhythm, and genre" are not individually protectable); *Cortes v. Universal Music Latino*, 477 F. Supp. 3d 1290, 1301 (S.D. Fla. 2020) ("the musical genre of 'Reggaeton'" is not protectable); Melvin Simensky et al., *Entertainment Law: Legal Concepts and Business Practices* § 16:10 (3d ed. 2024) ("Musical choices that are dictated by traditional music theory or the use of common place musical phrases, technique, tempo, or style are not protected by copyright.").

The Complaint confirms that Plaintiffs effectively seek to control and make proprietary unprotectable musical elements of style. They identify no melody, lyric, or recording that Suno allegedly took. *See* Compl. (Doc No. 1) ¶¶ 14, 161. Instead, their examples of individual

"identities" are descriptions of genres: "contemporary Americana singer-songwriter with fingerpicked acoustic guitar," *id.* ¶ 16; "latin jazz with a swinging mambo pulse," *id.* ¶ 19; and "[g]ospel soul with a mid-tempo handclap groove and a warm walking bass," *id.* ¶ 23.[3] Those are the general sonic hallmarks of the traditions in which Plaintiffs perform—the instrumentation, vocal characteristics, rhythms, and production conventions of Americana, blues, and Latin jazz. They were not created by any one musician. Each evolved over decades through the work of countless performers, songwriters, and session players who jointly contributed to the genre. Plaintiffs themselves are beneficiaries of those traditions. Jason Isbell has spoken openly of his debt to the slide guitar playing of Duane Allman and David Lindley, the southern rock of Lynyrd Skynyrd and the Allman Brothers, and the influence of Neil Young, Bob Dylan, and John Prine. *See, e.g.*, Rich Kienzle, *Jason Isbell: New Vistas, Old Gear*, Vintage Guitar Mag. (Mar. 2025), https://www.vintageguitar.com/87562/jason-isbell/. The eclectic music of Camper Van Beethoven continues in the vein of Kaleidoscope and the late Beatles, sampling a diverse range of styles including surf rock, progressive rock, and punk. *See, e.g.*, *Interview with David Lowery*, Marc Laidlaw, https://www.marclaidlaw.com/interview-david-lowery/ (last visited Nov. 3, 2026). Guy Forsyth admits he is heavily indebted to blues legends like Robert Johnson, Howlin' Wolf,

[3] *See also id.* ¶ 17 ("quirky late-1980s alternative rock with folk-rock with occasional accordion and fiddle flourishes" (quotation marks and alterations omitted)); *id.* ¶ 18 ("Blues-rock with swampy mid-tempo shuffle"); *id.* ¶ 20 ("Alt-country rock"; "punky gallop and cracked acoustic-electric blend"; "Alt-country punk with a driving mid-tempo stomp"); *id.* ¶ 21 ("Vintage electric Chicago blues, slow shuffle groove around 74 beats per minute, greasy overdriven guitar front and center with stabbing piano fills and fat walking bass, male vocals, conversational and raw with call-and-response phrasing between voice and lead guitar." (alterations omitted)); *id.* ¶ 22 ("1970s soft rock singer-songwriter"; "soft 70s confessional pop with brushed drums, warm acoustic guitar, and gentle bass" (alterations omitted)); *id.* ¶ 24 ("ska-punk with fast offbeat guitar chops, jumping bassline, and punchy two-step drums"); *id.* ¶ 25 ("Hawaiian folk reggae with laid-back midtempo sway, steady offbeat guitar chops, ukulele strums, brushed hand percussion, and a warm bass pulse"); *id.* ¶ 26 ("country-pop with brisk two-step groove, bright acoustic strums, fiddle snaps, and a stomping kick").

and John Lee Hooker, as well as the same southern rock as Isbell. *See, e.g.*, ATX Music Talent, *Guy Forsyth*, YouTube (June 21, 2025), https://www.youtube.com/watch?v=R60q6NIR--8. And Eduardo Calle has discussed the influence of saxophonists Tom Myrick and Phil Woods, as well as Latin jazz greats like Tito Puente. *See, e.g.*, The Sessions Panel, *Dr. ED CALLE*, YouTube (Apr. 1, 2020), https://www.youtube.com/watch?v=CoJ8hGngUPo&t=191s. Plaintiffs insist that they "claim no ownership of country music, of Americana music, or of any genre, style, or musical idea." *Id.* ¶ 42. But that is exactly what their legal theory would confer. It would prohibit a new artist from using Jason Isbell's name as a step in describing the style of Americana music that she hopes to build on—even if her track borrows no copyright-protected element of Isbell's music. *Cf.* 17 U.S.C. § 114(b) (providing that the exclusive rights in a sound recording under copyright law "do not extend to the making . . . of another sound recording that consists entirely of a fixation of other sounds, even though such sounds imitate or simulate those in the copyrighted sound recording").

**b. Plaintiffs' Claims Assert Rights Equivalent to Copyright's Exclusive Rights**

The second prong is satisfied as well. To avoid preemption, a state claim's supposed "extra element" must be more than "mere copying, preparation of derivative works, performance, distribution or display." *Data Gen. Corp.*, 36 F.3d at 1164; *see Laws v. Sony Music Ent., Inc.*, 448 F.3d 1134, 1143-44 (9th Cir. 2006) (extra element must "transform the nature of the action"). The inquiry is not a "mechanical" search for extra elements but a "holistic evaluation" of whether the claim "is qualitatively different from a copyright infringement claim." *In re Jackson*, 972 F.3d 25, 44 n.17 (2d Cir. 2020). Plaintiffs' claims contain no extra element.

Stripped of their labels, Plaintiffs' claims assert a reproduction or derivative-work right, *see* 17 U.S.C. § 106(1)-(2), over songs "like one the named musician might create." Compl. (Doc

No. 1) ¶¶ 14, 117(a); *see Laws*, 448 F.3d at 1143-44. The alleged wrong consists of two acts: (1) copying Plaintiffs' recordings into a training set and (2) using what was learned from those recordings, paired with Plaintiffs' names, to allow users to generate new songs that resemble Plaintiffs' music in genre and style by invoking their names. *See* Compl. (Doc No. 1) ¶ 58. The first is a reproduction theory; the second is a derivative-work theory—albeit one more sweeping than even the Copyright Act would sanction. *See Tremblay v. OpenAI, Inc.*, 742 F. Supp. 3d 1054, 1058-59 (N.D. Cal. 2024) (holding state law claim preempted when "[t]he basis of both claims is the unauthorized copying and use of the Infringed Works to train ChatGPT"). Claims that add nothing beyond "the essential claim that Plaintiff's ideas were misappropriated" are "clearly preempted." *Dielsi v. Falk*, 916 F. Supp. 985, 992 (C.D. Cal. 1996).

On Plaintiffs' own account, the alleged appropriation of their musical "identities" occurs through copying their recordings and generating new music in a similar style. *See* Compl. (Doc No. 1) ¶ 66 (alleging that "the data scraping delivers to Suno's pipeline . . . the raw material from which the identifying attributes of human beings are then extracted"); *id.* ¶ 71 (alleging that, from a spectrogram of a recording, Suno's system "can extract and compute the identifying features of the performer"); *id.* ¶ 73 (alleging that Suno's model "captures [the] content" of each song, "from the verse-bridge-chorus song structure down to the placement of the bass," and retains "all of the information necessary to reproduce a sound that most human listeners will perceive as identical to the original"); *id.* ¶ 74 (alleging that the embeddings "distill[] information from each song and recording fed into the model" and that musicians' "personhood signals" are "captured in these embeddings"); *id.* ¶ 94 (alleging that "[t]hrough the ingested data, the system learned each musician's identifying attributes"); *id.* ¶ 117(b) (alleging that the attributes at issue are those "distilled from music the class members created"). If Plaintiffs believe Suno's training practices

or the music it generates are unlawful, the Copyright Act provides the framework for deciding that question. Indeed, other plaintiffs have brought these very allegations against Suno as copyright infringement claims, which are being litigated in this Court. *See, e.g.*, Dkt. 277 ¶¶ 38-40, 84-99, *UMG Recordings, Inc. v. Suno, Inc.*, No. 24-cv-11611 (D. Mass. Aug. 25, 2026); Dkt. 27 ¶¶ 154-155, 442-475, *Justice v. Suno, Inc.*, No. 25-cv-11739 (D. Mass. Sep. 22, 2025).

It makes no legal difference that Plaintiffs characterize their claims as directed at the use of their names. Federal law bars Plaintiffs from claiming exclusive rights in their musical styles; Plaintiffs cannot obtain the same result—and the same remedy for the same alleged injury—by barring the public from referring to those styles by Plaintiffs' names. "[I]n determining whether a claim is preempted, the court must not focus 'upon the label affixed to the state cause of action, but rather upon what the plaintiff seeks to protect, the theories in which the matter is thought to be protected and the rights sought to be enforced.'" *Power v. Connectweb Techs., Inc.*, 2023 WL 4019042, at *15-17 (D. Mass. Feb. 13, 2023). Applying that principle, courts have repeatedly held name-based publicity claims preempted where the claim, examined as a whole, concerns copyright subject matter and asserts equivalent rights. *See, e.g.*, *Maloney v. T3Media, Inc.*, 853 F.3d 1004, 1007-08, 1020 (9th Cir. 2017) (holding preempted former student-athletes' publicity claims based in part on the use of their "names" in connection with "photographs chronicling . . . NCAA sports history," because the claims challenged the licensing of copyrighted photographs); *Ray v. ESPN, Inc.*, 783 F.3d 1140, 1141-45 (8th Cir. 2015) (holding preempted professional wrestler's claim based in part on the "misappropriation of [his] name" in connection with the rebroadcast of "films of his wrestling matches"); *Laws*, 448 F.3d at 1136, 1142-43, 1146 (holding preempted singer's claim based in part on the inclusion of her name "in the booklet accompanying the [defendants']

compact disk," because the claim challenged the licensed use of a copyrighted recording of her performance).

A plaintiff cannot "recast [its] claims to evade copyright preemption" by invoking her name when the "crux of [its] case" is the assertion of a right within § 301's preemptive scope. *Ray*, 783 F.3d at 1142-44. Here, on Plaintiffs' own allegations, each Plaintiffs' name functions as a description of the music to be generated: what it summons is a sound—genre, instrumentation, vocal timbre and phrasing—learned from Plaintiffs' recordings. *See* Compl. (Doc No. 1) ¶¶ 16, 21, 58, 94. Thus to the extent Plaintiffs' claims rest on the use of their names, they seek to control a sonic style, and invoking those names adds no qualitatively different element to Plaintiffs' claims.

### 2. *Plaintiffs' Claims Are Conflict Preempted*

Plaintiffs' name-based theory of liability is also barred by implied, or conflict, preemption. A state-law claim is impliedly preempted where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *In re Jackson*, 972 F.3d 25, 34 (2d Cir. 2020) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)). When a plaintiff "undertakes to exert control over a work within the subject matter of the Copyright Act" through a state-law claim, "implied preemption may bar the claim unless the state-created right vindicates a substantial state law interest, i.e. an 'interest[] outside the sphere of congressional concern in the [copyright] laws.'" *Id.* at 37 (applying *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141 (1989)). The Second Circuit found no such interest in *In Re Jackson*, where the defendant listed the plaintiff's stage name in the track list of a mixtape to identify him as the performer of a sampled song. 972 F.3d at 38-39, 54-55. The court held that a right of publicity claim based on that use to "accurately name [him] as the performer" would "impermissibly interfere[] with the federal copyright framework," and was therefore "barred by implied

preemption," because the claim "s[ought] to control the use of a copyrighted work by prohibiting accurate descriptions of that work." *Id.* at 54-55. The court further observed that such a rule would interfere with uses by others as well—"such as an art critic, teacher, news reporter or parodist"—who rely on an artist's name to describe a work. *Id.* at 55 n.37.

Plaintiffs' claims here fail for the same reason: they would make it unlawful to use Plaintiffs' names to accurately describe, and to generate, music in styles that Congress deemed free for anyone to use. Musical traditions flourish because each generation of artists is free to learn from, discuss, and build upon styles created by artists that came before them. A state-law claim that restricts how musical styles may be referenced and used cannot coexist with the Copyright Act's guarantee that such styles remain in the public domain, as open to the next generation of artists as they were to Plaintiffs. *See id.* at 40-41 (explaining that a state law that "would impose liability on a defendant for use of a public domain work" would "interfere with the federal policy . . . of allowing free access to copy whatever the federal . . . copyright laws leave in the public domain" (quoting *Compco Corp. v. Day-Brite Lighting, Inc*., 376 U.S. 234, 237 (1964))).

Plaintiffs' theory would also create a parallel scheme of exclusive rights, pursuant to which an artist who has assigned away every copyright interest in her catalog nonetheless retains a separate, state-law veto over the use of that same music—and over any reference to its style—simply by invoking her name. In *Jackson*, the Second Circuit warned of allowing "a thinly disguised effort by the creator and performer of a work within the subject matter of copyright—who owns no copyright interest in the work—to nonetheless exert control over its distribution, notwithstanding that the law of copyright confers the right to exercise such control exclusively on the rights holder." *Id.* at 41. Plaintiffs seek to do exactly what *Jackson* forbids.

Plaintiffs do not allege they own any of the exclusive rights in the sound recordings or musical compositions for their songs—rights that, in the standard practice of the industry, are likely owned by their record labels or music publishers. Yet they nonetheless seek to control the use of those very same recordings and compositions via the right of publicity. For example, multiple copyrighted works by Plaintiff Lowery's bands Camper Van Beethoven and Cracker—presumably the exact same recordings this lawsuit complains about—are asserted in the pending copyright litigation against Suno in this District, brought by the record label that claims to actually own those rights, over essentially the identical model-training conduct that this suit seeks to cast as unlawful. *See* Dkt. 1-1 at 208-09 & 213-14, *UMG Recordings, Inc. v. Suno, Inc.*, No. 1:26-cv-14275 (D. Mass. Sep. 18, 2026) (entries 8624-8651 and 8832-8891 identifying asserted works by Camper Van Beethoven and Cracker, respectively); *see* Compl. (Doc No. 1) ¶ 5 (noting Lowery is a member of both bands). Lowery evidently has no copyright over those works, but nonetheless seeks to control the use of those same content under a competing theory of intellectual property.

Plaintiffs, in fact, brazenly embrace the notion that they are seeking to establish a parallel IP regime under state law, where ownership may directly conflict with federal rights. They argue that even if Suno had licensed the sound recordings and compositions for Plaintiffs' songs, Suno still would need Plaintiffs' separate authorization to use their names in the process of generating works in the same (unprotectable) style as those songs. *See* Compl. (Doc No. 1) ¶ 83 (alleging Suno's conduct "would be just as much of a violation even if every song in the training corpus were in the public domain for copyright purposes or obtained via authorized copyright licensing"). That is no different than the claim rejected in *Jackson*, where the artist invoked the use of his name to control the reproduction of a recording that his label, not he, had the exclusive right to authorize.

Such a claim "conflicts with and acts in derogation of the exclusive right of the rights holder." 972 F.3d at 41.

Plaintiffs' theory would thus undermine both the rights of copyright owners and the public's right to use what Congress has left free. Courts have warned of similar efforts to use state tort law as Plaintiffs here seek to, cautioning that "left to creative legal arguments, the right of publicity could easily supplant the copyright scheme." *Id.* (alterations omitted) (quoting *Laws*, 448 F.3d at 1145). That beacon flashes bright red in this litigation.

### C. Plaintiffs' Individual Claims Fail for Multiple Independent Reasons

Each named Plaintiff's claim also fails for other independent reasons. Without a viable individual claim, a Plaintiff lacks standing to serve as a named plaintiff on behalf of any putative class. *See, e.g.*, *Phillips v. Equity Residential Mgmt. LLC*, 2016 WL 10706403, at *1 (D. Mass. Feb. 9, 2016) ("[A] class action cannot be maintained 'absent a plaintiff with a live individual case.'" (alterations modified) (quoting *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 161 (2016))). No individual's claim survives, purely on the following bespoke bases:

**Isbell.** Plaintiff Jason Isbell's Tennessee-law claim fails because he has not alleged (nor could he) that Suno used his voice. Tennessee law requires allegations the defendant used the plaintiff's voice in public. Tenn. Code § 47-25-1105(a)(1)-(3). The statute defines a "voice" as "a sound in a medium that is readily identifiable and attributable to a particular individual." *Id.* § 47-25-1102(6). But Plaintiffs do not allege that Suno ever created an output that contained a voice that was "readily identifiable" as and solely "attributable to" Isbell. To the contrary, the Complaint explicitly alleges that Suno's outputs are *not* identifiable as the "true" voice of Jason Isbell. Compl. (Doc No. 1) ¶ 14 (alleging "the quality of Suno's outputs falls short of the true talent" of Jason Isbell). Dismissal is required.

**Lowery.** Plaintiff David Lowery's Georgia-law claim fails because he has failed to allege Suno used his name, image, or likeness at all, as opposed to the name of a band to which Lowery belongs. *See* Compl. (Doc No. 1) ¶ 17 (alleging use of Lowery's band's name—Camper Van Beethoven). Under Georgia law, Lowery's allegations are insufficient to state a claim that *his* right of publicity was infringed. *See, e.g.*, *Isaac Hayes Enters., LLC v. Trump*, 2025 WL 1211113, at *7 (N.D. Ga. Apr. 25, 2025) (dismissing right of publicity claim under Georgia law where "there is no allegation that the Defendants ever used the Songwriter's name or likeness"). Lowery's claim should be dismissed.

**Forsyth.** Plaintiff Guy Forsyth's Texas-law claim fails because he fails to make any plausible, nonconclusory allegations that Suno "misappropriated [his] name or likeness *for the value associated with it* and not in an *incidental manner*." *Canidae, LLC v. Cooper*, 2022 WL 3588936, at *9-10 (N.D. Tex. Aug. 4, 2022) (emphasis added), *adopted*, 2022 WL 3588046 (N.D. Tex. Aug. 22, 2022). Plaintiffs allege no facts showing that Suno used his name to appropriate its value, or that such value exists. *See, e.g.*, *Watkins v. Cornell Cos.*, 2013 WL 1914713, at *7 (N.D. Tex. Mar. 15, 2013), *adopted*, 2013 WL 1926375 (N.D. Tex. May 8, 2013) (dismissing claim where plaintiff did not show "that Defendant appropriated Plaintiffs' likenesses for the value associated therewith or that there was some advantage or benefit to Defendant"). The Court should dismiss Forsyth's claim.

**Calle.** Plaintiff Eduardo Calle's Florida-law claim fails because he fails to allege that Suno used his name, image or likeness to directly promote a product or service. Florida law requires allegations that the defendant "us[ed] a person's name or likeness to directly promote a product or service.'" *Davis v. Yelp, Inc.*, 2026 WL 1138502, at *2 (M.D. Fla. Mar. 27, 2026), *adopted*, 2026 WL 1137848 (M.D. Fla. Apr. 27, 2026) (quoting *Lane v. MRA Holdings, LLC*, 242 F. Supp. 2d

1205, 1212 (M.D. Fla. 2002)). Use in an "expressive work" does not qualify. *See Lane,* 242 F. Supp. 2d at 1212-15 (dismissing claim). Because Calle only alleges that his name was used in the name of a song—an expressive work—and not to promote a product or service, his claim fails as a matter of law. *See* Compl. (Doc No. 1) ¶ 19. It should be dismissed.

## II. PLAINTIFFS LACK STANDING TO ASSERT CLAIMS THAT BELONG SOLELY TO ABSENT CLASS MEMBERS

"Persons who wish to represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Yan v. ReWalk Robotics Ltd.*, 973 F.3d 22, 35-36 (1st Cir. 2020). Here, however, Plaintiffs seek to bring numerous state-law claims solely on behalf of absent putative class members, even though they lack standing to bring such claims themselves. That flouts black letter law, and Counts I-V, IX-XIV, and XVI-XVII should be dismissed on that basis.

### A. Plaintiffs Cannot Assert an Illinois BIPA Claim

Plaintiffs lack standing to litigate the Illinois Biometric Information Privacy Act ("BIPA") class claim. They allege no facts as to themselves that would establish the elements of a BIPA claim. Instead, Plaintiffs attempt to rely on the possibility that absent class members might have standing to assert these claims. *See* Compl. (Doc No. 1) ¶¶ 98-99 (referring only to the "Illinois and BIPA subclass members"). That attempt is directly contrary to binding precedent, and these claims should be dismissed. *See Yan*, 973 F.3d at 35; *see also* 1 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 2:3 (6th ed., June 2026 rev.) ("The class representative's standing may not be premised solely upon the standing of other class members: the representative herself must have standing.").

Plaintiffs' claims do not fit any established exception to that rule. As the First Circuit has held, for a named plaintiff "to bring claims on behalf of class members whose claims arise under the laws of . . . states" for which "no named plaintiff can successfully bring a claim" directly, the named plaintiff must show that the state "laws are materially the same.'" *In re Asacol Antitrust Litig.*, 907 F.3d 42, 48-49 (1st Cir. 2018) (citation omitted) (alterations modified). Plaintiffs' right of publicity claims do not even remotely resemble a BIPA claim, let alone resemble it in all "material[]" respects. *Id.* That statute was created in response to the growing "use of biometrics . . . in the business and security screening sectors," 740 ILCS 14/5(a), and requires companies that collect biometric data to engage in the proper handling, storage, and retention of that data. The elements and purposes of that statute are far afield from elements required to prove a right of publicity claim (under any state's law), and the incentives that statute creates for plaintiffs bears no resemblance to BIPA. *See* 740 ILCS 14/20. The BIPA claim should be dismissed.

The BIPA claim should also be dismissed or, at a minimum, stayed, under the first-to-file rule. Over a year ago, David Woulard, an actual Illinois resident, filed suit asserting a BIPA claim against Suno on behalf of a putative class of Illinois residents. *See* Dkt. 1 ¶¶ 14, 124, 250-265, *Woulard v. Suno, Inc.*, No. 25-cv-12684 (N.D. Ill. Oct. 16, 2025). The *Woulard* action involves an identical BIPA claim, brought on behalf of the same purported BIPA subclass, based on the same allegations against Suno. *Compare id.* ¶¶ 14, 124, 250-265, *with* Compl. (Doc No. 1) ¶¶ 100, 122-135; *see also Jimenez v. Kohl's Dep't Stores, Inc.*, 480 F. Supp. 3d 305, 306 (D. Mass. 2020) (articulating elements in favor of first-to-file rule). The BIPA claim here should not proceed, in light of the first-filed BIPA claim in *Woulard*.

### B. Plaintiffs Cannot Assert Absent Class Members' Right of Publicity Claims from Other States or Post-Mortem Claims

The numerous other right of publicity claims that Plaintiffs seek to assert under twelve state laws—including post-mortem causes of action—solely on behalf of absent class members should also be dismissed. *See* Compl. (Doc No. 1) ¶¶ 113-121, 136-166, 171-176, 179-181. While Plaintiffs could theoretically try to establish that each of these twelve state laws is "materially the same" as theirs, the Complaint does not even *try* to do so. *Asacol*, 907 F.3d at 49. Because it is Plaintiffs' burden to establish standing, *see Lewis v. Casey*, 518 U.S. 343, 357 (1996), they fail by alleging nothing.

Plaintiffs do not address this requirement in the Complaint at all. Instead, they merely list the elements of the various causes of action, without making any effort to connect those elements to their own states' laws. That is not a formality or a foregone conclusion. Even the named Plaintiffs' own state-law claims do not share identical elements. For example, Tennessee law permits right of publicity claims premised on the appropriation of a plaintiff's "voice," while other states do not. *Compare* Tenn. Code § § 47-25-1105(a), *with, e.g.*, *Bullard v. MRA Holding, LLC*, 740 S.E.2d 622, 626 (Ga. 2013). And Florida law requires that any misappropriation be in connection with advertising or promotion of commercial products, while other states are not so limited. *Compare Davis*, 2026 WL 1138502, at *2 , *with, e.g.*, *Canidae*, 2022 WL 3588936, at *9-10. These differences show that merely listing additional states' causes of action does not establish that any Plaintiff has the personal stake necessary to litigate those claims under Article III. *See Asacol*, 907 F.3d at 50 (concluding that plaintiffs failed to carry their burden to demonstrate they had an adequate stake in litigating New York law claim with materially different elements).

Finally, Plaintiffs lack standing to bring post-mortem right of publicity claims under any state's laws. Every state's post-mortem right of publicity statute limits the right to bring claims to designated successors, heirs, or rightsholders—not to unrelated living plaintiffs. *See, e.g.*, N.Y. Civ. Rights Law § 50-f(7) (successor in interest who must register with Secretary of State); 765 ILCS 1075/15 (individuals who received right "by written transfer" or "by intestate succession only to an individual's spouse, parents, children, and grandchildren"). But all four Plaintiffs are living individuals, and none claims to represent an estate, heir, beneficiary, or personal representative, or otherwise to hold any right to a post-mortem claim. Asserting *live* claims on Plaintiffs' own behalf is not sufficient to convey standing either, because those claims are not materially identical to post-mortem claims. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 263 F. Supp. 2d 172, 193 (D. Mass. 2003) ("[A] named plaintiff cannot acquire standing to sue by bringing his action on behalf of others who suffered injury which would have afforded them standing had they been named plaintiffs. . . . Standing cannot be acquired through the backdoor of a class action." (quoting *Allee v. Medrano*, 416 U.S. 802, 828-29 (1974)). The post-mortem claims should be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should grant Suno's motion and dismiss Plaintiffs' claims.

Dated: November 3, 2026

Respectfully submitted,

*/s/ Andrew M. Gass*

Andrew M. Gass (*pro hac vice*)
Brittany N. Lovejoy (*pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
andrew.gass@lw.com
britt.lovejoy@lw.com

Sarang V. Damle (*pro hac vice* pending)
Brent T.F. Murphy (*pro hac vice* pending)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
sy.damle@lw.com
brent.murphy@lw.com

Shlomo Fellig (BBO# 699643)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116-5009
Telephone: (617) 948-6000
Facsimile: (617) 948-6001
shlomo.fellig@lw.com

*Attorneys for Defendant Suno, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that this document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing.

*/s/ Andrew M. Gass*
Andrew M. Gass